UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBINHOOD DERIVATIVES, LLC,

          Plaintiff,

     v.

TINA GRIFFIN, in her official capacity as Executive Director of the Washington State Gambling Commission; ALICIA LEVY, in her official capacity as Chair of the Washington State Gambling Commission; SARAH LAWSON, in her official capacity as Vice Chair of the Washington State Gambling Commission; NOAH SKARTVEDT, in his official capacity as Commissioner of the Washington State Gambling Commission; MICHAEL CHARLES, in his official capacity as Commissioner of the Washington State Gambling Commission; and NICHOLAS W. BROWN, in his official capacity as Attorney General for the State of Washington,

          Defendants.

No. 3:26-cv-5311

COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF

Plaintiff Robinhood Derivatives, LLC ("Robinhood"), by its undersigned counsel, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## **NATURE OF THE ACTION**

1.    Plaintiff Robinhood Derivatives, LLC ("Robinhood") is a financial-services company that offers its approved customers the opportunity to trade, among other things, event

COMPLAINT (3:26-cv-5311) - 1

contracts through the Robinhood platform. Event contracts, including sports-, election-, and entertainment-related event contracts, trade on Commodity Futures Trading Commission ("CFTC")-designated contract markets, known as "DCMs." Robinhood is registered with the CFTC as a futures commission merchant ("FCM"). As an FCM, Robinhood facilitates the placement and liquidation of event contracts for its customers, though the contracts themselves trade on registered DCMs, including the DCM of KalshiEx, LLC ("Kalshi") and ForecastEx, LLC ("ForecastEx").

2. Currently, Robinhood only offers event contracts via Kalshi and ForecastEx, including event contracts relating to sports, politics, entertainment, weather, and other events. Robinhood is actively working to offer event contracts on contract markets beyond Kalshi's and ForecastEx's. As soon as June of this year, Robinhood intends to begin offering event contract trading via a DCM—Rothera Exchange and Clearing LLC ("Rothera")—controlled by a joint venture between Robinhood Markets, Inc. ("Robinhood Markets"), the parent company of Robinhood, and another entity.

3. On December 9, 2025, Washington's gaming regulator, the Washington State Gambling Commission ("WSGC"), issued guidance on event contract markets—also known as prediction markets—which warned that "prediction markets are an unauthorized activity in Washington State" and that "[o]ffering events-based contracts or participating in these markets is not authorized in Washington State." Press Release, Wash. State Gambling Comm'n, *Prediction Markets* (Dec. 9, 2025), https://wsgc.wa.gov/news/2025/prediction-markets (Ex. A).

4. This was not an empty threat. On March 27, 2026, the Washington Attorney General's Office ("Washington" or the "State") filed a civil enforcement action against Kalshi on the theory that all federally regulated event-contract trading violates Washington's prohibitions against betting and wagering pursuant to RCW §§ 19.86.080, 19.86.140, 43.10.030, 9.46.010, 4.24.070, among others. *See generally State v. KalshiEx LLC*, No. 26-2-10264-3 (King Cnty. Super. Ct. Mar. 27, 2026) (the "Kalshi Complaint") (Ex. B). Washington alleges that Kalshi's federally regulated event contracts violate Washington's Consumer Protection Act, Gambling Act,

COMPLAINT (3:26-cv-5311) - 2

and Recovery of Money Lost at Gambling Act, and alleges that Kalshi is "offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and Illegal Gambling Activities to Washington consumers." *Id.* at ¶¶ 2.1, 3.4.  Washington also alleges that "[u]nder longstanding, well-established, and unambiguous Washington state law, Kalshi's gambling operation is illegal," and that "every core feature of Kalshi's Illegal Gambling Activities—its wagers, fees, and online transmission of gambling information—constitutes illegal online gambling." *Id.* ¶¶ 1.1, 4.18. This action demonstrates Washington's willingness to use state law to attempt to shut down federally authorized markets.

5.   At a press conference announcing the commencement of the Kalshi Action, Washington Attorney General Brown said that "Kalshi really is just a bookie with a fancy name, and a huge amount of venture capital behind them."  David Gutman, *Kalshi 'Prediction Market' Violates WA Antigambling Laws, AG Says*, Seattle Times (Mar. 27, 2026), https://www.seattletimes.com/seattle-news/politics/kalshi-prediction-market-violates-wa-anti-gambling-laws-ag-says (Ex. C).  The Attorney General's press release announcing the action similarly claimed that "Kalshi attempts to skirt state law by branding its betting platform as a 'prediction market,' but whatever Kalshi chooses to call it, Kalshi's operations clearly fall under the definition of illegal gambling in Washington."  Press Release, Wash. State Off. of the Att'y Gen., *Washington Sues Online Betting Platform Kalshi for Illegal Gambling* (Mar. 27, 2026), https://www.atg.wa.gov/news/news-releases/washington-sues-online-betting-platform-kalshi-illegal-gambling (Ex. D).

6.   Within the last several months, Washington has also jointly filed amicus briefs with other states in the Third, Fourth and Ninth Circuits taking the position that states have the authority to prohibit federally authorized event contracts as contrary to state gambling laws.  *See* Brief of *Amici Curiae* of Nevada, Ohio, 32 Other States, District of Columbia, and Northern Mariana Islands Supporting Appellants, Dkt. 29, *KalshiEx LLC v. Flaherty*, No. 25-1922 (3d Cir. Jun. 17, 2025) (Ex. E); Brief of *Amici Curiae* of Nevada, Ohio, 36 Other States, and the District of Columbia Supporting Appellees, Dkt. 41-1, *KalshiEx LLC v. Martin*, No. 25-1892 (4th Cir. Dec.

COMPLAINT (3:26-cv-5311) - 3

22, 2025) (Ex. F); Brief of *Amici Curiae* of New Jersey, Ohio, 37 Other States, and the District of Columbia Supporting Appellees, Dkt. 48.1, *KalshiEX LLC v. Assad, et al.*, No. 25-7516 (9th Cir. Jan. 30, 2026) (Ex. G); Brief of *Amici Curiae* of Ohio, New Jersey, 37 Other States, and the District of Columbia Supporting Appellees, Dkt. 76.1, *N. Am. Derivatives Exch., Inc. v. Nevada*, Nos. 25-7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026) (Ex. H)  Indeed, two of these amicus briefs were filed in this circuit, asserting that "federal law does not preempt States from regulating … events contracts," Ex. G at 13, and that the CFTC's assertion of its own exclusive jurisdiction is wrong, *see* Ex. H at 10-12.

7.    In light of the civil enforcement action Washington commenced against Kalshi, WSGC's formal guidance declaring prediction markets "unauthorized" in Washington, and Washington's multijurisdictional advocacy in support of state regulators in event contract litigation—including as *amicus curiae* in a Ninth Circuit appeal in which Robinhood is an opposing party—there is a concrete and imminent threat that Washington will file an enforcement action against Robinhood as it did against Kalshi.  Robinhood is offering and facilitating event-contract trading to Washington residents in its capacity as a CFTC-regulated FCM, and the enforcement risk against it is particularly acute because Robinhood intermediates many of its users' event contract trades on Kalshi's platform.

8.    However, as applied to event contracts on DCMs, Washington law is preempted by the Commodity Exchange Act's ("CEA") comprehensive federal framework for regulating commodity futures, swaps, and options trading.

9.    In light of the State's enforcement action against a federally regulated DCM, there is a real and imminent threat that Washington will initiate an enforcement action against Robinhood.  As a result, Robinhood now faces an immediate threat of civil prosecution by the State, along with the attendant reputational harm that any enforcement proceeding by the State would cause.  Robinhood's Washington customers would also face abruptly losing access to event contract trading through their Robinhood account and the liquidation of any open positions.

COMPLAINT (3:26-cv-5311) - 4

10.    The resulting harm would be irreparable.  Even a meritless state enforcement action would immediately disrupt Robinhood's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, harm Washington residents, and force Robinhood to choose between exercising its federal right to operate nationwide or submitting to unlawful state coercion.  Such disruption to a nationally uniform market cannot be remedied through damages.

11.    Robinhood therefore had no choice but to file this lawsuit to protect its customers and its business.  Robinhood respectfully requests that this Court enjoin Defendants from enforcing preempted Washington law against Robinhood for its facilitation of transactions involving event contracts on federally regulated DCMs.

## **PARTIES**

12.    Plaintiff Robinhood is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  Robinhood is one of the family of companies within the broader Robinhood organization.  The Robinhood companies' mission is to democratize finance for all by removing barriers to access to financial markets.  Robinhood is registered with the CFTC as an FCM.

13.    Defendant Tina Griffin is sued in her official capacity as Executive Director of the WSGC.

14.    Defendant Alicia Levy is sued in her official capacity as Chair of the WSGC.

15.    Defendant Sarah Lawson is sued in her official capacity as Vice Chair of the WSGC.

16.    Noah Skartvedt is sued in his official capacity as Commissioner of the WSGC.

17.    Michael Charles is sued in his official capacity as Commissioner of the WSGC.

18.    Defendant Nicholas W. Brown is sued in his official capacity as Attorney General for the State of Washington.

COMPLAINT (3:26-cv-5311) - 5

19.    Defendants Griffin, Levy, Lawson, Skartvedt, Charles and Brown have the power and duty to enforce Washington gaming laws, including the laws preempted by federal law.  RCW §§ 19.86.080, 19.86.140, 43.10.030, 9.46.010, 4.24.070.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over Robinhood's claim pursuant to 28 U.S.C. § 1331.  This action presents a federal question under the Supremacy Clause of the United States Constitution because it concerns whether Washington laws are preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, to the extent they purport to regulate trading on a CFTC DCM.

21.    The Eleventh Amendment does not preclude this Court from exercising its jurisdiction because the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), is an exception to Eleventh Amendment immunity which "allows citizens to sue state officers in their official capacities 'for prospective declaratory or injunctive relief ... for their alleged violations of federal law.'" *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (quoting *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012)).

22.    This Court has personal jurisdiction over the Defendants.  The Defendants are domiciled in Washington and perform their official duties in Washington.

23.    Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (b)(2).  All Defendants are residents of the State of Washington, and a substantial part of the events giving rise to Robinhood's claim occurred in this District.  Designation to the Tacoma Division is appropriate because all of Defendants' principal places of business are in Thurston County.

## RELEVANT FACTS

### A.    Event Contracts

24.    An event contract is a type of derivative that allows customers to trade on their predictions about the occurrence of future events.  Event contracts are typically structured as binary options posing a particular yes-or-no question.  A buyer takes the "yes" side and a seller takes the

COMPLAINT (3:26-cv-5311) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

"no" side, and upon the expiration of the contract—typically, when the outcome of the future event in question becomes known—the value of the contract goes to the party who was right.

25.     Until that time, buyers and sellers can trade the contract, and the price of the contract fluctuates based on the market's assessment of the probability that the event will occur. For example, for an event contract worth $1, if the "yes" position is trading at 17 cents and the "no" position is trading at 83 cents, that implies that the market believes there is a 17% chance the event will occur.  If new information becomes available that indicates that the event is more likely to occur, market participants' trading will change in ways that reflect that new information (for example, more market participants might purchase the "yes" position), which will cause the price of the "yes" position to go up.  Thus, the price of an event contract can reveal valuable information about market sentiment concerning the underlying event and can therefore be an important information-gathering tool.

26.     Traders may use event contracts to mitigate risk (*e.g.*, an orange grower may buy a contract predicting an early frost to offset the risk of loss of income from frost damage) or simply to seek a financial return.

**B.     Robinhood Makes Available Certain Event Contracts**

27.     Companies within the Robinhood organization are financial-services companies that are democratizing finance by removing barriers to access to financial markets, including by offering zero-commission stock trading and easy-to-use mobile and web applications.  With their commitment to offering low fees, an intuitive mobile experience and powerful tools, the Robinhood companies empower everyday investors to navigate financial markets safely and efficiently.  Robinhood is registered with the CFTC as an FCM, which is an entity that solicits or accepts orders to buy or sell futures and swaps, and accepts payment from customers to support such orders.  *See* National Futures Association, Futures Commission Merchant Members, *available at* https://www.nfa.futures.org/members/fcm/index.html.

28.     Kalshi is a CFTC-registered DCM.  Kalshi offers many types of event contracts relating to a variety of areas including climate, technology, health, cryptocurrencies, popular

COMPLAINT (3:26-cv-5311) - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

culture, economics and sporting events. Kalshi self-certified that its sports-related event contracts, for example, comply with the CEA's requirements and began listing them on January 24, 2025. Because the CFTC declined to review or prohibit Kalshi's sports-related contracts, they were deemed approved by the CFTC, became effective and are legal under federal law. *See infra* ¶¶ 39-41.

29.    On March 17, 2025, Robinhood launched its prediction markets hub, through which its customers can place event contract trade orders. Robinhood currently intermediates its customers' sports-related event contract trades only on Kalshi's exchange, and other event contract trades through both Kalshi's and ForecastEx's exchanges. Robinhood has entered into agreements with Kalshi and ForecastEx that allow Robinhood to access their contract market facilities for this purpose. Those agreements obligate Robinhood to ensure such access is secure and in compliance with all applicable laws, including the CEA and CFTC regulations; they also require Robinhood to comply with Kalshi's and ForecastEx's rules.

30.    This means that while Robinhood customers are placing orders for event contract trades in their Robinhood accounts, the *trades* themselves are taking place on Kalshi's and ForecastEx's CFTC-designated exchanges. This is no different from when a Kalshi customer places an order for an event contract trade through her Kalshi account, which is then executed on Kalshi's exchange. Here, the user interface is Robinhood's, which is convenient for Robinhood customers but does not affect the way in which trades are executed on the exchanges or regulated by the CFTC; it merely adds additional CFTC regulation of Robinhood's activities as an FCM.

31.    Robinhood is actively working to be able to offer event contracts on one or more additional DCMs.

32.    In November 2025, Robinhood Markets formed a joint venture to operate a futures and derivatives exchange and clearinghouse. On January 20, 2026, the joint venture (in which Robinhood Markets owns 50%) closed on a transaction to acquire 90% of the equity in Rothera, a DCM.

COMPLAINT (3:26-cv-5311) - 8

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

33.     Robinhood plans to offer event contracts through Rothera's DCM and anticipates that once its partnership with Rothera is launched, a significant portion of its event contract volume will be redirected to Rothera.

34.     Robinhood is targeting launching event contracts trading on Rothera by June 2026.

**C.     The Commodity Exchange Act and the Commodity Futures Trading Commission**

35.     Since the 1930s, futures contracts have been regulated by the federal government. In 1936, Congress passed the CEA, which provided for federal regulation of all commodity futures trading activities and required that all futures and commodity options be traded on organized, regulated exchanges.

36.     In 1974, Congress passed a series of amendments to update the CEA's regulatory framework and established the CFTC which is empowered to oversee and regulate commodity futures and (since 2010) swaps trading under the CEA.  Congress intended to centralize regulatory authority with the CFTC to avoid the "total chaos" that could ensue if states attempted to regulate the futures markets, thereby subjecting exchanges to different regulations.  Hearings Before the Committee on Agriculture and Forestry, United States Senate, on S. 2485, S. 2587, S. 2837 and H.R. 13113, 93d Cong., 2d Sess. 685 (1974) ("Senate Hearings") (statement of Sen. Clark); *see also Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992) (setting forth legislative history of the CFTC Act of 1974), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995).  Accordingly, Congress put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).  Indeed, Congress considered adding but ultimately removed from the bill's final language a provision of the CEA that would have preserved parallel state authority over futures trading.  *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge).  As described below, the CEA was further amended by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, which brought swaps within

COMPLAINT (3:26-cv-5311) - 9

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

the coverage of the CEA and added a special rule about event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

37. The CEA provides that the CFTC has "exclusive jurisdiction" over transactions involving event contracts—which, as described below, are swaps, options, and contracts of sale of a commodity for future delivery—traded on registered exchanges (known as DCMs): "The Commission shall have exclusive jurisdiction ... with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option'….), and *transactions involving swaps or contracts of sale of a commodity for future delivery* (including significant price discovery contracts), *traded or executed on a contract market designated pursuant to section 7 of this title ....*" 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA expressly preserves state authority to regulate transactions "not conducted on or subject to the rules" of a CFTC-regulated exchange. *Id.* § 16(e)(1)(B)(i).

38. To receive the CFTC's designation as a contract market, an exchange must apply and set forth its ability to comply with CFTC rules and regulations. *Id.* §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The CFTC's comprehensive regulatory framework for contract markets, including a set of 23 "Core Principles," 17 C.F.R. pt. 38, is designed to ensure and protect the integrity of those markets. Status as a CFTC-designated contract market "imposes upon [an exchange] a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement, Inc.*, 977 F.2d at 1150–51. The CFTC is authorized to suspend or revoke an exchange's designation if it fails to comply with any of the provisions of the CEA or the CFTC's regulations. 7 U.S.C. § 8(b).

39. An exchange may submit new contracts to the CFTC for approval prior to listing; alternatively, it may self-certify the contracts as complying with CFTC requirements. *Id.* § 7a-2(c)(1), (c)(4)(A); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). Generally, the CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B).

COMPLAINT (3:26-cv-5311) - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

40.     The CEA contains a special rule relating to CFTC review and approval of event contracts, which was added by the Dodd-Frank Act of 2010.  Pub. L. No. 111-203, § 745(b), 124 Stat. 1376, 1735-36.  With respect to event contracts specifically, the CFTC may prohibit event contracts in specific categories if it determines them to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)-(2).

41.     If an exchange self-certifies a new contract, the CFTC may initiate a review of that contract within 10 business days of receiving notice of it.  *See* 7 U.S.C. § 7a-2(c)(2); *see also* 17 C.F.R. § 40.11(c) (permitting the CFTC to select a 90-day review period for event contracts).  If the CFTC does not act within that window, the new contract is deemed approved and becomes effective.  *See* 7 U.S.C. § 7a-2(c)(2).

42.     Fundamental differences in how contract markets and sportsbooks operate mean they are susceptible to different forms of risk to participants.  Contract markets leverage the power and rigor of financial markets to provide traders with liquidity and transparency, and prices are set by market participants.  Customers can manage risk by adjusting or exiting their positions up until the contract expires, and prices respond accordingly.  These markets may be at risk of market manipulation and other market distortions and inefficiencies.  For sports bets, by comparison, casinos set a line, typically ahead of time and, once a bet is placed, the line does not change for that bet.  Gamblers bet directly against the house, and once a position is entered, gamblers typically do not have the option to exit their position.  Sportsbooks risk exploitation of gamblers due to the power imbalance between the house and the gambler.  Based on these different risks, it makes sense that contract markets and sportsbooks are subject to two different modes of regulation.  The federal regulations that govern commodity futures and swaps trading have as a major focus creating and maintaining fair and efficient markets for trading, *see* 17 C.F.R. §§ 38.250, 38.151, whereas sportsbooks are regulated by state law and subject to the police powers of the state to halt and remedy any exploitation of gamblers.

43.     Robinhood is registered with the CFTC as an FCM.  As relevant here, an FCM is "an individual, association, partnership, corporation, or trust that is engaged in soliciting or in

COMPLAINT (3:26-cv-5311) - 11

accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; a swap" or certain other transactions and "in or in connection with [those activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28) (cleaned up). FCMs must register with the CFTC unless they fall within certain exemptions. *Id.* § 6f; 17 C.F.R. § 3.10(c).

44. Similar to a DCM, registered FCMs such as Robinhood must comply with a host of federal requirements. FCMs are subject to reporting requirements to the CFTC, 17 C.F.R. §§ 1.10(b), 1.10(d), 17.00, disclosure requirements to the public, *id.* § 1.55, and minimum financial requirements, *id.* §§ 1.12, 1.17. FCMs must "establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of the" FCM, *id.* § 1.11(c)(1), and the CFTC's regulations set forth elements that such a risk management program must include, *id.* § 1.11(e), as well as reporting requirements related to risk management, *see id.* § 1.15. The CFTC requires FCMs to "establish and enforce internal rules, procedures and controls to" ensure compliance with certain trading standards. *Id.* § 155.3. FCMs must also "adopt and implement written policies and procedures" to ensure that they and their employees comply with CFTC regulations concerning conflicts of interest. *Id.* § 1.71. Finally, the CFTC imposes recordkeeping requirements on FCMs. *Id.* §§ 1.14, 1.18. Failure to comply with these requirements could require the FCM to "transfer all customer accounts and immediately cease doing business as a futures commission merchant." *Id.* § 1.17(a)(4).

**D.     The Washington Case Against Kalshi**

45. On December 9, 2025, the WSGC issued guidance on prediction markets which warned that "prediction markets are an unauthorized activity in Washington State" and that "[o]ffering events-based contracts or participating in these markets is not authorized in Washington State." Ex. A.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

46.     On March 27, 2026, the State of Washington, by and through its Attorney General, filed a civil enforcement action in King County Superior Court against KalshiEx alleging that Kalshi operates an illegal online betting platform in violation of Washington's Gambling Act, Consumer Protection Act, and Recovery of Money Lost at Gambling Act. *See generally* Ex. B. Washington alleges that all of Kalshi's federally regulated event contracts violate Washington's Consumer Protection Act, Gambling Act, and Recovery of Money Lost at Gambling Act, and that Kalshi is "offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and Illegal Gambling Activities to Washington consumers." *Id.* at ¶¶ 2.1, 3.4. Washington further alleges that alleges that "[u]nder longstanding, well-established, and unambiguous Washington state law, Kalshi's gambling operation is illegal," and that "every core feature of Kalshi's Illegal Gambling Activities—its wagers, fees, and online transmission of gambling information—constitutes illegal online gambling." *Id.* ¶¶ 1.1, 4.18. The State seeks injunctive relief, restitution, disgorgement, civil penalties, an accounting, and other remedies. *Id.* ¶¶ 7.1–7.12.

47.     At the press conference announcing the suit, Washington Attorney General Brown called Kalshi "just a bookie with a fancy name, and a huge amount of venture capital behind them," adding that Kalshi "publicly pat[s] themselves on the back for being sneaky and getting around Washington's gambling laws," but "it's a lie and it's illegal." Ex. C. The Attorney General's press release further claimed that "Kalshi attempts to skirt state law by branding its betting platform as a 'prediction market,' but whatever Kalshi chooses to call it, Kalshi's operations clearly fall under the definition of illegal gambling in Washington." Ex. D.

48.     Within the last several months, Washington has also jointly filed amicus briefs with other states in the Third, Fourth and Ninth Circuits taking the position that states have the authority to prohibit federally authorized event contracts as contrary to state gambling laws. Exs. E-H. Indeed, two of these amicus briefs were filed in this circuit, asserting that "federal law does not preempt States from regulating … events contracts," Ex. G at 13, and that the CFTC's assertion of its own exclusive jurisdiction is wrong, *see* Ex. H at 10-12.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

49.     In contrast to the lawsuits in which Washington filed amicus briefs, Washington took a more radical position in the Kalshi Action.  While the other cases concerned state efforts to regulate sports-related event contracts specifically, Washington alleges that *all* event contracts, regardless of subject matter, are unlawful under Washington law.  Kalshi Complaint ¶¶ 4.3–4.4, 4.9–4.10.

50.     In light of the Kalshi Complaint, the WSGC's formal guidance declaring prediction markets "unauthorized" in Washington, and Washington's coordinated advocacy in support of state regulators in other cases, there is a real and imminent threat that Washington will file an enforcement action against Robinhood.  Were it to do so, Robinhood would face an immediate threat of civil penalties, along with the attendant reputational harm that such proceedings would cause.  Robinhood's Washington customers would also face abruptly losing access to event contract trading through their Robinhood accounts.

**E.     The CEA Preempts Application of State Gaming Laws to Event Contract Trading on CFTC-Designated Contract Markets**

51.     Transactions involving event contracts traded on a CFTC-designated contract market are subject to the CFTC's exclusive jurisdiction, and Washington law is preempted to the extent it purports to regulate those transactions.

52.     The Constitution and laws of the United States "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and accordingly, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Federal law can preempt state law expressly, through a statement to that effect in the statute itself, or impliedly, through either field preemption or conflict preemption.  Field preemption exists where Congress manifests an intent to occupy exclusively an entire field of regulation.  *See Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982).  Conflict preemption exists where compliance with federal and state law is "a physical impossibility" or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (internal quotation omitted).

COMPLAINT (3:26-cv-5311) - 14

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

53.    The statutory language of the CEA, its legislative history and the comprehensive regulatory framework it sets out demonstrate that Congress deliberately preempted state law. Whether analyzed as express or implied preemption, the scope of preemption is the field of commodity futures and swaps trading, including event contract trading, on CFTC-designated exchanges.

54.    The CEA provides expressly that the CFTC "shall have exclusive jurisdiction" over commodity futures, swaps, and options trading on CFTC-designated exchanges.    7 U.S.C. § 2(a)(1)(A).  Express provisions of this type are regularly held to preempt state law. *See, e.g.*, *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 765-66 (9th Cir. 2018) (describing statute's grant of "exclusive" jurisdiction as a "broad and general" preemption provision); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001) (holding that statute's "exclusive jurisdiction" provision preempts state law claims).

55.    This express preemption provision includes event contracts, which are both "transactions involving swaps or contracts of sale of a commodity for future delivery," and "option[s]" over which the CFTC has "exclusive jurisdiction" when "traded or executed on a [designated] contract market."  7 U.S.C. § 2(a)(1)(A).  The term "swap" includes "any agreement, contract, or transaction" that, among other things, "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  *Id.* § 1a(47)(A)(ii).  The term "swap" was added to the CEA in 2010 by the Dodd-Frank Act.  *See* Pub. L. No. 111-203, §§ 721(a)(21) (adding the definition of "swap" in 7 U.S.C. § 1a(47)), 722(a)(1)(D) (adding "swaps" to the exclusive jurisdiction provision in 7 U.S.C. § 2(a)(1)), 124 Stat. 1376, 1666, 1672.

56.    Event contracts are also transactions in a type of intangible commodity that the CEA calls an "excluded commodity."  *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (reviewing "excluded commodities" under the CEA).  An "excluded commodity" includes "an occurrence, extent of an occurrence, or contingency (other than [certain exceptions]) that is

COMPLAINT (3:26-cv-5311) - 15

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

57.    Event contracts are also "options." In a consolidated appeal in the Ninth Circuit which addresses these exact issues of whether and how the CEA preempts state gambling laws, the CFTC has filed an amicus brief in support of Robinhood's position. *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187, Dkt. 38-2 (Ex. H). There, the CFTC cited its own glossary to explain that "[a]n event contract is also a binary option." *Id.* at 16. A binary option can be structured to pay $100 if a hurricane hits Florida by a certain date or $0 if one does not. That is no different from a event contract that pays $100 if the Seahawks win a game but $0 if they lose, or one that pays $100 if Gavin Newsom wins the 2028 presidential election but $0 if he does not. *See Kalshiex LLC v. Orgel* ("*Orgel*"), 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026) (analogizing event contracts to one-touch barrier options).

58.    These are precisely what the event contracts traded on the registered exchanges that Robinhood has partnered with are. To take one example, event contracts are within these statutory definitions of swaps, options, and transactions in excluded commodities because: (i) they are binary contracts that pay out depending on the occurrence or non-occurrence of a future event that is beyond the control of the parties to the contract; and (ii) the underlying events they concern have economic consequence. *See KalshiEx LLC v. Flaherty* ("*Flaherty*"), 2025 WL 1218313, at *2, *6 (D.N.J. Apr. 28, 2025); *Orgel*, 2026 WL 474869, at *7–8.

59.    With respect to the latter requirement, wins and losses in sporting events have obvious, significant financial consequences for the players, the teams, the owners or schools they represent, their communities, the television networks that cover the matches, and other stakeholders. These economic consequences include, among many other things, increased revenue from ticket sales, sponsorships and TV viewership for winning teams, and boosts in economic activity for cities where playoff games occur.

COMPLAINT (3:26-cv-5311) - 16

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

60.     Similarly, whether a particular candidate wins a race for political office has profound economic consequences.  An elected official may support raising or lowering taxes, increasing or decreasing business regulations, or broadening or shrinking the social safety net.

61.     As another example, the outcome of the Academy Awards carries substantial financial consequences for the actors, filmmakers, studios, and distributors involved. A Best Picture win can dramatically extend a film's theatrical run and drive a surge in streaming subscriptions and home video sales, while a Best Actor or Best Actress win can dictate future negotiations between actors and studios.  Whether a certain actor or film wins can shape broader commercial ecosystems by boosting the foreign box office performance of American films, driving up the value of advertising inventory surrounding the telecast, and influencing which kinds of projects get greenlit in the years that follow.

62.     And finally, whether a corporation is listed on the S&P 500 has tremendous financial consequences for the corporation, its stockholders, and the market at large.  Robinhood permits its customers to trade event contracts concerning whether particular corporations will be listed on that index.  Washington's theory that all event contracts are unlawful fails to explain why these contracts, which clearly concern financial matters, do not meet the CEA's definitions of swaps, options, or transactions in excluded commodities.

63.     The CEA expressly grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  The CEA also includes a separate provision entitled "Special rule for review and approval of event contracts and swaps contracts," which confirms that the CFTC has authority over "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than [certain exemptions]), by a designated contract market or swap execution facility."  *Id.* § 7a-2(c)(5)(C)(i).  The "special rule," added by the Dodd-Frank Act of 2010, Pub. L. No. 111-203, § 745(b), 124 Stat. at 1735–36, makes clear that the CEA's grant of exclusive jurisdiction to the CFTC extends to event contracts.

COMPLAINT (3:26-cv-5311) - 17

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

64.    To the extent the text of the statute leaves any doubt about preemption, the legislative history of the 1974 amendment to the CEA that established the CFTC confirms that this grant of exclusive jurisdiction was intended to preempt state law.  As the Conference Committee explained, "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned.  Therefore, if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern.  In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the States."  H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; *see also Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).  As the D.C. Circuit has recognized, "the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'"  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590–91 (D.C. Cir. 2001) (quoting S. Rep. No. 93-1131, at 23 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863) (emphasis in original).  "The passage of 7 U.S.C. § 2 is intended to clarify 'the preemption of all other would-be regulators at every level of government.'"  *Witzel v. Chartered Sys. Corp. of N.Y.*, 490 F. Supp. 343, 347 (D. Minn. 1989) (quoting *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 219 (D. Kan. 1979)).  Likewise, the history surrounding the adoption of the "special rule" concerning event contracts in 2010 makes it clear that Congress intended the CFTC's exclusive jurisdiction to embrace event contracts.  *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).

65.    Congressional statements about the creation of the CFTC confirm the intent for broad express or implied field preemption.  The 1974 amendments to the CEA were motivated by "concerns that states might regulate futures markets" themselves and create "conflicting regulatory requirements."  *Flaherty*, 2025 WL 1218313, at *1; *see also Mallen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 605 F. Supp. 1105, 1112 (N.D. Ga. 1985) ("The congressional hearings

COMPLAINT (3:26-cv-5311) - 18

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

focused on the need for sole regulatory power of commodities to be placed in one federal agency, unlike the regulation of securities which is shared by a federal agency and state agencies."). Establishing the CFTC and endowing it with exclusive jurisdiction was meant to "avoid unnecessary, overlapping and duplicative regulation." *Ken Roberts Co.*, 276 F.3d at 588 (quoting 120 Cong. Rec. 34,736 (1974) (remarks of House Agriculture Committee Chairman Poage)); *see also* 120 Cong. Rec. 34,997 (1974) (remarks of Sen. Curtis on behalf of Sen. Talmadge); Senate Hearings at 685 (statement of Sen. Clark) ("[D]ifferent State laws would just lead to total chaos."). Accordingly, the CFTC was empowered to set forth uniform rules and regulations for "all exchanges and all persons in the industry." H.R. Rep. No. 93-975, at 79 (1974). Congressional statements concerning the event contract "special rule," including by the drafters of the Dodd-Frank Act of 2010, are consistent with these earlier statements and reveal clear Congressional intent to vest exclusive jurisdiction over event contracts with the CFTC. *See* Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Lincoln conveying her intent and that of Sen. Dodd).

66.    As further indication of Congressional intent that the CEA preempt broadly, during the amendment process for the 1974 amendments, the Senate considered adding but ultimately did not include a provision that retained the states' jurisdiction over futures trading. *See* Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 687-88 (1982); *see also* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge). Congress therefore could not have intended States to regulate futures trading in parallel with the CFTC.

67.    The regulatory scheme set out in the CEA, over which the CFTC has exclusive jurisdiction, is comprehensive as it relates to designated and registered entities, and the existence of this comprehensive scheme further evinces Congressional intent to preempt the field and foreclose parallel state regulation. *See Arizona v. United States*, 567 U.S. 387, 401 (2012) (comprehensive statutory framework led to the conclusion that "the Federal Government has occupied the field" in the relevant area); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69 (1986) ("Pre-emption occurs ... where Congress has legislated comprehensively, thus occupying

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

an entire field of regulation and leaving no room for the States to supplement federal law ....”). Indeed, the Supreme Court has recognized that the CEA establishes “a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.” *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).

68.     Accordingly, the CEA, as amended in 1974 to give the CFTC exclusive jurisdiction and in 2010 to add swaps and the special rule regarding event contracts, expressly and impliedly preempts the field of commodity futures and swaps trading, including event contracts trading, on designated contract markets.

69.     In addition to express or implied field preemption, conflict preemption exists here with respect to the determination of *which* event contracts are permitted on CFTC-designated exchanges.  As noted above, the special rule relating to CFTC review of event contracts vests the CFTC with the power to approve or prohibit certain event contracts.  7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a)(1)–(2).  If Washington or the WSGC were allowed *also* to make a determination about whether event contracts on a CFTC-regulated exchange were permitted (which it already purported to do by claiming that the offering of all event contracts in Washington state is “illegal” and “unauthorized”), there would be a direct conflict between federal and state regulation because the CFTC has already impliedly approved those same event contracts.  *See Crosby*, 530 U.S. at 380 (conflict preemption exists where state law “undermines the congressional calibration of force” and is “at odds with achievement of the federal decision about the right degree of pressure to employ”); *De la Cuesta*, 458 U.S. at 153 (conflict preemption exists where “state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (internal quotation marks omitted)).  Here, the CFTC has determined to allow Kalshi’s event contracts by taking no action in response to Kalshi’s self-certification of those contracts, making them legal under federal law, but Washington, in its recently filed civil enforcement action against Kalshi, is attempting to preclude trading of those same event contracts by enforcing Washington gambling laws.  The conflict is clear.  *See Orgel*, 2026 WL 474869, at

COMPLAINT (3:26-cv-5311) - 20

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*9-10 (finding that Kalshi would likely prevail in its argument that simultaneous compliance with federal and Tennessee law was impossible, and that Tennessee law stands as an obstacle to uniform federal regulation).

70.     In its amicus brief supporting Robinhood's position, the CFTC reaffirmed its longstanding view that event contracts, including sports-related event contracts, are swaps and options over which it has exclusive jurisdiction. *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187, Dkt. 38-2 (Ex. H). The CFTC is aware event contracts trade on DCMs, is aware they were self-certified as swaps, and has concluded that they are swaps and therefore fall within its exclusive jurisdiction. *Id.* at 1–3. As the CFTC recognizes, state enforcement actions against FCMs and DCMs "upend[] decades of well-settled and Congressionally-mandated exclusive jurisdiction across the full spectrum of event contracts." *Id.* at 2–3. Washington's laws, as applied to event contract trading on DCMs, are expressly preempted, field preempted, and conflict preempted. *Id.* at 25–36.

**F.      The CEA's Preemption of State Gaming Laws as Applied to Event Contracts Includes Those Opened and Traded Through Robinhood's Platform.**

71.     Robinhood facilitates transactions involving "swaps or contracts of sale of a commodity for future delivery" traded on a DCM, and these transactions therefore fall squarely within the statutory grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC "exclusive jurisdiction" over all "accounts, agreements ... , and transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC). Because it is the *transaction* on a regulated exchange over which the CFTC has exclusive jurisdiction, *see id.*, the CFTC must have jurisdiction over the *entire* transaction and all participants. This includes entities like Robinhood that accept orders or otherwise facilitate transactions, as well as the DCMs that execute transactions.

72.     If states could regulate some but not all entities relevant to these transactions, such regulation would infringe on the CFTC's exclusive jurisdiction and fracture what Congress

COMPLAINT (3:26-cv-5311) - 21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

intended to be a uniform set of regulations for commodity futures and swaps trading. A state cannot circumvent the exclusive jurisdiction of the CFTC by enforcing state law against an entity involved in *facilitating* a transaction when the state would be prohibited from enforcing state law against the entity involved in executing that same transaction. Indeed, as the CFTC itself explained to the D.C. Circuit, "due to federal preemption, event contracts *never violate state law when they are traded on a [designated contract market].*" CFTC Brief, *KalshiEx LLC v. U.S. Commodity Futures Trading Comm'n*, 2024 WL 4512583, at \*27 (D.C. Cir. Oct. 16, 2024) (emphasis added).

73. The conclusion that preemption applies equally to Robinhood's facilitation of these transactions as an FCM is further supported by the fact that Congress explicitly included FCMs such as Robinhood within the extensive set of federal regulatory requirements and CFTC oversight established to manage commodity derivatives trading. The "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Curran*, 456 U.S. at 356 (internal quotation marks omitted), established by Congress includes FCMs that facilitate purchases and sales of commodities for future delivery and swaps; indeed, this is in part what defines an FCM, 7 U.S.C. § 1a(28)(A)(i)(I)(aa)(AA), (CC). As noted above, FCMs such as Robinhood that are registered with the CFTC must comply with a multitude of requirements, including minimum financial requirements, 17 C.F.R. §§ 1.12, 1.17, reporting requirements, *id.* §§ 1.10(b), 1.10(d), 17.00, and disclosure requirements, *id.* § 1.55. They must also establish and enforce policies relating to trading standards, risk management, and conflicts of interest. *Id.* §§ 1.15, 1.71, 155.3. State regulation of orders on an FCM (when those orders will be executed on a DCM) would conflict with federal authorization of transactions through FCMs subject to CFTC jurisdiction. *See id.* § 1a(28)(A) (CEA expressly envisions FCMs facilitating transactions in swaps and commodities for future delivery).

74. In short, the "oversight of futures commission merchants" is an "important aspect" of the CFTC's oversight responsibility for futures trading. *Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 650 (7th Cir. 2013). FCMs like Robinhood are therefore

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

an integral part of the fabric of the CEA's comprehensive regulatory scheme, and their activities in facilitating trading on DCMs are equally subject to federal preemption as those of DCMs.

### G.      Robinhood Will Suffer Irreparable Harm Without Injunctive Relief.

75.     In light of Washington's civil enforcement action against Kalshi, Robinhood faces the imminent threat of an enforcement action by Washington and/or the WSGC and the potential for severe civil penalties.  The civil sanctions for violation of the relevant Washington statutes include $7,500 in civil penalties for each Consumer Protection Act violation and repayment to Washington traders of all revenue Robinhood has earned by facilitating event contract trading.  *See* Ex. B at 17–19 (alleging that Kalshi's event contract activities violate RCW §§ 9.46.0241(3)–(4), 9.46.0253, 9.46.0269(d), 9.46.0368, 9.46.180, 9.46.215, 9.46.217, 9.46.220-.222, 9.46.228, 9.46.240, 19.86.010, 19.86.020); *see also* RCW § 19.86.140 ("Every person who violates RCW 19.86.020 shall forfeit and pay a civil penalty of not more than $7,500 for each violation."); *id.* § 4.24.070 ("All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover ... such money or things of value won, the amount of money, or the value of the thing so lost.").

76.     The threat of prosecution, evidenced by Washington's enforcement action against Kalshi, is actual and imminent.  A credible threat of prosecution under a preempted state statute causes irreparable harm.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

77.     Further, the harm to Robinhood's reputation caused by the potential or actual enforcement proceedings by Washington and/or the WSGC is also irreparable, because it cannot be easily or quickly repaired.  *Flaherty*, 2025 WL 1218313, at *7; *Orgel*, 2026 WL 474869, at *10-11; *see also Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474 (9th Cir. 2015).  Robinhood also stands to lose the goodwill of its customers, including its customers in Washington.  This goodwill, once lost, cannot easily or quickly be regained, even if Robinhood ultimately prevails in litigation, and the risk to goodwill therefore also constitutes irreparable harm.  *Flaherty*, 2025 WL 1218313, at *7; *Orgel*, 2026 WL 474869, at *10–11; *see also Life Alert*, 601 F. App'x at 474 (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

COMPLAINT (3:26-cv-5311) - 23

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

F.3d 832, 841 (9th Cir. 2001) (holding that company was entitled to preliminary injunction due to "the threat to [its] reputation and goodwill," which "is not readily compensable")).

78.    If Robinhood were to cease offering event contract trading in Washington, Robinhood would forgo significant business in Washington, resulting in loss of revenue.  These economic losses would be unrecoverable because sovereign immunity bars Robinhood from obtaining monetary damages for this impact on Robinhood's business.  *See Alden v. Maine*, 527 U.S. 706, 712–13 (1999).  Damages that are unrecoverable due to sovereign immunity constitute irreparable harm.  *See, e.g.*, *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (plaintiff state would suffer irreparable harm without a preliminary injunction because "the [defendant] Tribe's sovereign immunity likely would bar the State from recovering monetary damages"); *Grondal v. United States*, 2020 WL 13388646, at *5 (E.D. Wash. Aug. 20, 2020) ("[F]inancial harm can constitute irreparable injury in the context of preliminary injunctions when the money lost cannot be recovered later due to sovereign immunity.").

79.    Abruptly discontinuing its Washington customers' ability to open new event contract positions would also undermine customers' confidence in Robinhood and their reliance on its financial services, causing irreparable harm.  *Flaherty*, 2025 WL 1218313, at *7; *Orgel*, 2026 WL 474869, at *10; *see also Life Alert*, 601 F. App'x at 474.

80.    Further, taking a wait-and-see approach and defending any enforcement action Washington decides to file would leave Robinhood with uncertainty about the future of its event contracts business in Washington and would inflict upon Robinhood the reputational harms noted above that would be associated with an enforcement action.

81.    Given the imminent threat that Washington will attempt to enforce preempted state law against Robinhood as it has done against Kalshi, Robinhood has no way to avoid irreparable harm absent injunctive relief.

82.    There is an imminent likelihood that Defendants will violate the Supremacy Clause. To prevent irreparable harm, Robinhood seeks declaratory and injunctive relief restraining

COMPLAINT (3:26-cv-5311) - 24

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Defendants from enforcing Washington law to the extent it purports to regulate Robinhood's offering of event contracts traded on a DCM.

## **COUNT I**

### **(Supremacy Clause – Preemption by Commodity Exchange Act)**

83. Robinhood restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

84. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

85. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government and to the extent state law conflicts with federal law.

86. Congress preempted the regulation of commodity futures, swaps, and options trading on CFTC-designated markets, leaving no room for parallel state regulation. Through the CEA, Congress granted the CFTC "exclusive jurisdiction" to regulate "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" "traded or executed on a contract market" designated by the CFTC. 7 U.S.C. § 2(a)(1)(A). That broad grant of jurisdiction includes "option[s]." *Id.* This exclusive grant of jurisdiction therefore includes transactions involving event contracts.

87. Because federal law occupies the entire field of commodity futures, swaps, and options trading on CFTC-designated markets and/or conflicts with state law, Defendants' threatened enforcement of Washington gambling laws is preempted by the CEA and the CFTC's regulations pursuant to the Supremacy Clause. By enforcing Washington gambling laws, including RCW §§ 4.24.070, 9.46.0241(3)-(4), 9.46.0253, 9.46.0269(d), 9.46.0368, 9.46.180, 9.46.215, 9.46.217, 9.46.220-.222, 9.46.228, 9.46.240, 19.86.010, 19.86.020, 19.86.080,

COMPLAINT (3:26-cv-5311) - 25

19.86.140, against Robinhood for offering transactions involving event contracts via DCMs, such as Kalshi, ForecastEx, and Rothera, Defendants would intrude on the CFTC's exclusive jurisdiction to regulate those transactions.

88.    Robinhood has suffered and continues to suffer irreparable harm as a result of Defendants' actions and has no remedy at law to address the conduct complained of herein.  The equities and public interest tilt strongly in Robinhood's favor because without relief, the harm to Robinhood will be significant, and by contrast, the State and the public would suffer little to no harm if the requested relief is granted.

89.    To prevent further harm to Robinhood, the Court should enjoin Defendants from enforcing preempted Washington law against Robinhood in contravention of the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Robinhood respectfully requests that the Court enter judgment in favor of Robinhood and against Defendants:

i.    Issuing an injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Plaintiff RCW §§ 4.24.070, 9.46.0241(3)–(4), 9.46.0253, 9.46.0269(d), 9.46.0368, 9.46.180, 9.46.215, 9.46.217, 9.46.220-.222, 9.46.228, 9.46.240, 19.86.010, 19.86.020, 19.86.080, 19.86.140, and any other Washington law that attempts effectively to regulate Plaintiff's involvement in transactions involving event contracts traded on a DCM;

ii.    Awarding a declaration that using RCW §§ 4.24.070, 9.46.0241(3)–(4), 9.46.0253, 9.46.0269(d), 9.46.0368, 9.46.180, 9.46.215, 9.46.217, 9.46.220–.222, 9.46.228, 9.46.240, 19.86.010, 19.86.020, 19.86.080, 19.86.140, and any other Washington law in a manner effectively to regulate Plaintiff's involvement in

COMPLAINT (3:26-cv-5311) - 26

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

transactions involving event contracts traded on a DCM violates the Supremacy Clause of the United States Constitution as applied to Plaintiff; and

iii.    Granting such other and further relief as the Court deems just and proper.

DATED this 30th day of March, 2026.

DAVIS WRIGHT TREMAINE LLP

By *s/ Kenneth E. Payson*
　　Kenneth E. Payson, WSBA #26369
　　920 Fifth Avenue, Suite 3300
　　Seattle, WA 98104
　　Telephone: (206) 622-1610
　　Fax: (206) 757-7700
　　Email: kenpayson@dwt.com

CRAVATH, SWAINE & MOORE LLP

　　Kevin J. Orsini*
　　Antony L. Ryan*
　　Brittany L. Sukiennik*
　　375 Ninth Avenue
　　New York, New York 10001
　　Telephone: (212) 474-1000
　　Fax: (212) 474-3700
　　Email: korsini@cravath.com
　　　　　aryan@cravath.com
　　　　　bsukiennik@cravath.com

*pro hac vice forthcoming*

*Attorneys for Plaintiff Robinhood Derivatives, LLC*

COMPLAINT (3:26-cv-5311) - 27