# Exhibit A

Home > News > Prediction Markets

# Prediction Markets

December 9, 2025 - 12:00pm

Due to the increased interest in prediction markets (online operators that offer event-based contracts for purchase), the Washington State Gambling Commission is issuing the following guidance:

Offering events-based contracts or participating in these markets is not authorized in Washington State.

While prediction markets are an unauthorized activity in Washington State, we acknowledge that the future of prediction markets, including those for sports, political events, etc., remains a subject of ongoing litigation both federally and in other states. We will continue to monitor the ongoing cases as they progress through the court system and will provide updates once the courts provide further guidance.

Washington consumers interested in gambling on sports are able to do so legally at Tribal casinos authorized to conduct sports wagering pursuant to tribal-state gaming compacts. Click here to see which Tribal casinos conduct sports wagering.

For more information on sports wagering in Washington, click here.

## Share on social media

   

# Exhibit B

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. |
| Plaintiff, | COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF |
| v. | |
| KALSHIEX, LLC, | |
| Defendant. | |

## I.    INTRODUCTION

1.1    KalshiEx, LLC ("Kalshi") claims to have "cracked the code on legal betting in all 50 states" through its online betting platform. Kalshi offers and advertises a continuous and captivating stream of opportunities to bet money online on thousands of topics ranging from sports and elections to the total number of "measles cases this year," "what will the witnesses say during the Child Trafficking hearing," and whether Ali Khamenei will be "out as Supreme Leader" of Iran, all while Kalshi takes a cut of the action. Under longstanding, well-established, and unambiguous Washington state law, Kalshi's gambling operation is illegal.

1.2    Washington has some of the most restrictive gambling laws in the United States. The Washington Constitution of 1889 explicitly prohibited all gambling activities on state lands, and Washington continues to tightly regulate gambling to this day. In 2006, the Washington State Legislature expressly banned online gambling, finding that "with the advent of the internet and other technologies . . . it is appropriate for this legislature to reaffirm the policy prohibiting gambling that exploits such new technologies." Laws of 2006, ch. 290, § 1. That prohibition

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 1

remains in effect, with the sole exception of sports wagers placed and accepted on tribal lands. RCW 9.46.240.

1.3    In direct violation of this prohibition and public policy, Kalshi operates its online betting market nationwide, including in Washington and other states that prohibit online gambling. In its advertising and marketing, Kalshi specifically promotes illegal online sports gambling in Washington state.



1.4    Kalshi's platform extends well beyond sports gambling, however, to include betting on politics, news, entertainment and cultural topics, so-called 'mention markets' that urge bettors to wager on what will be said during public broadcasts, and thousands upon thousands of niche issues—all available online 24/7. Indeed, Kalshi boasts that it has made it possible to "bet on anything" by restructuring and rebranding traditional gambling models as "predictive markets." In so doing, Kalshi is driving an explosion of online gambling activity, while openly violating Washington law, and turning a profit in the process.

1.5    Kalshi's gambling operations violate numerous provisions of Washington's Gambling Act, as well as the Consumer Protection Act and the Recovery of Money Lost at

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 2

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Gambling Act. The Attorney General accordingly brings this enforcement action in the name of the State and as *parens patriae* on behalf of persons residing in Washington to prevent and remedy Kalshi's unlawful, unfair, and deceptive business practices and to vindicate the public interest.

## II.   JURISDICTION AND VENUE

2.1   The Attorney General files this Complaint to enforce Washington's Consumer Protection Act, RCW 19.86 (CPA), Gambling Act, RCW 9.46, and Recovery of Money Lost at Gambling Act, RCW 4.24.070 (RMLGA). This Court has jurisdiction under these statutes, as well as RCW 2.08.010 and RCW 7.24.010.

2.2   Kalshi has engaged in the conduct set forth in this Complaint in King County and elsewhere in the State of Washington.

2.3   Venue is proper in King County pursuant to RCW 4.12.020 and RCW 4.12.025, and Civil Rule 82 because Kalshi transacts business in King County by offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and illegal gambling activities, including, without limitation, illegal gambling games, bookmaking, sports wagering, professional gambling and/or gambling devices (hereinafter, collectively, "Illegal Gambling Activities"), to consumers in King County.

## III.   PARTIES

3.1   The Plaintiff is the Washington State Attorney General's Office, Consumer Protection Division.

3.2   The Attorney General is authorized to commence this action pursuant to RCW 19.86.080, RCW 19.86.140, and RCW 43.10.030 to address practices that violate the CPA, the Gambling Act, and the RMLGA, and to vindicate the rights of the public because Illegal Gambling Activities are matters of public concern. RCW 9.46.010, .0213, .0269, .038, .0368, .903.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 3

3.3    Defendant Kalshi is a Delaware limited liability company with its principal place of business located at 594 Broadway, Suite 407, New York, New York 10012. Kalshi is a wholly owned subsidiary of Kalshi, Inc. Kalshi is not licensed by the Washington State Gambling Commission to conduct online gambling.

3.4    Kalshi conducts business throughout King County and throughout Washington State by offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and Illegal Gambling Activities to Washington consumers. Kalshi offers, operates, and advertises in Washington State, and it collects fees from bets made within Washington State.

## IV.    FACTS

### A.    The Evolution of Kalshi's Unlawful Gambling Activity

4.1    Tarek Mansour and Luana Lopes Lara founded Kalshi in 2018. "Kalshi" means "everything" in Arabic, reflecting the founders' vision of allowing people to "bet on everything."[1] Indeed, Kalshi advertises that it has "cracked the code on legal betting in all 50 states" for "sports markets" and "everything else."

Kalshi - Trade the Headlines
Sponsored · Paid for by KALSHI INC.
Library ID: 1233804148260706

Kalshi cracked the code on legal betting in all 50 states.

Using a financial exchange license, we're opening up sports markets—and everything else - for all Americans.

Business

**Two MIT Math Nerds Crack Open Legalized Gambling on Wall Street**

Armed with a federal license and allies in Trumpworld, the tech start-up is pushing prediction markets across America into a legal gray zone: sports betting.

---

[1] Oliver Roeder, *This 29-year-old is worth $15b and wants you to bet on everything*, Australian Financial Review (Feb. 10. 2026), https://www.afr.com/companies/games-and-wagering/this-29-year-old-is-worth-15b-and-wants-you-to-bet-on-everything-20260210-p5o0x0 (last accessed March 26, 2026).

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 4

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.2    Kalshi's platform became publicly available in 2021, initially offering a limited selection of topics. Over time, Kalshi rapidly expanded both the scope of its offerings and the reach of its platforms. By 2024, Kalshi began allowing bets on politics, advertising that "[y]ou can't bet on sports," but "[f]or the first time in 100 years, you can now bet on the election!"



4.3    Kalshi's political betting offerings include primary and general election outcomes, voter turnout, party control of Congress, and results in swing states. For example, bettors could wager on the outcome of the 2025 King County Executive race and can currently wager on the various 2026 House primaries in Washington congressional districts, the 2028 Washington gubernatorial race, which party will control the Washington State Senate in 2028, and the outcome of the 2028 U.S. presidential election. Kalshi also offers Washingtonians opportunities to bet on numerous political issues and elections outside the United States including, as one of many examples, who will become the next mayor of Lyon, France.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 5

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.4     In 2025, Kalshi launched "mention markets," which encourage betting on whether specific words or phrases will be used by public speakers—including politicians, sports announcers, and actors—during speeches, television shows, or broadcasts. For example, Kalshi permitted bettors to wager on whether Survivor host Jeff Probst would say the words "alliance," "immunity idol," or "tribe has spoken."



4.5     In early 2025, Kalshi announced its entry into the sports betting market just ahead of the Super Bowl and today sports betting constitutes a substantial percentage of Kalshi's platform.

4.6     In August and September 2025, Kalshi expanded its sports betting options by offering spread bets (a bet on the difference in score between two competing sports teams), over/under wagers (a bet on how many total points will be scored in a sports game), and proposition bets (bets on specific things that may occur within a sports game, such as the number of touchdowns a football player might score during the game).

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 6

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.7    For example, Kalshi offered bets on whether the Gonzaga University Bulldogs would beat the Seattle University Redhawks by more than 11.5 points, or whether the teams would combine to score more than 149.5 points total, during a midseason college basketball game.





4.8    In recent months, Kalshi began offering "combo" bets, known to sports bettors as a "parlay." These bets link the outcomes of multiple wagers, where each wager must win to get a payout. To place a "combo" bet, a Kalshi user links together multiple wagers and submits a Request for Quote (RFQ). RFQs are reviewed by designated entities who have access to Kalshi's Application Programming Interface (API) and act like a traditional casino "house," calculating odds and prices for each combo bet.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 7

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.9    Over time, the scope of Kalshi's offerings has expanded to a nearly limitless array of political, popular culture, and other issues to bet on, including, for example, the total number of "measles cases this year" and "what will witnesses say" during a child trafficking hearing.

 

4.10    Kalshi also allowed bets on when Ali Khamenei would be "out as Supreme Leader" of Iran.



4.11    Kalshi's bet-on-anything model is designed to provide a constant stream of wagering opportunities, generating ever-greater volumes of betting activity, and driving up Kalshi's profits.

**B.    Kalshi's Betting Platform**

4.12    Kalshi operates its online betting platform on its website at https://kalshi.com and through its mobile applications for Android and Apple iOS devices. The platform is readily accessible to Washington residents and does not restrict access based on location. Any

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 8

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Washingtonian over 18 years old can create an account, deposit funds, and place bets from anywhere in the state.

4.13    Kalshi collects transaction fees, which vary depending on the expected earnings, of each bet. Kalshi also charges bettors fees for certain types of deposits and withdrawals from their accounts.

4.14    The price of an individual bet on Kalshi fluctuates between $0.01 and $0.99 per bet, exclusive of any transaction fees. The individual bet price is determined by the volume of "yes" and "no" bets on an underlying question. As more "yes" bets get placed compared to "no" bets for a question, the price of a "yes" bet goes up and the price of a "no" bet goes down.

4.15    If the price of a bet changes before the underlying question resolves, bettors can "sell" their bets at the updated price. Once the question is resolved, winning bettors receive $1 and losing bettors receive $0.

4.16    Kalshi's platform matches bettors on opposite sides of a particular wager. For example, if Kalshi offers a bet asking, "Will the Seattle Mariners win their game on Friday?" a user might want to bet "yes" at 0.65 cents, expecting the Mariners to win. To complete the wager, another Kalshi user must take the opposite side of this bet. If the Mariners win, the first user receives the full $1.00 payout, and the second user receives nothing. Regardless of the outcome, Kalshi takes its transaction fees from both users.

4.17    In order to ensure a sufficient volume of betting activity on both sides of a bet, Kalshi uses so-called "market makers," including its own affiliated entity, Kalshi Trading LLC ("Kalshi Trading"), to place bets. Individual Kalshi users never know whether they are betting against other bettors or against a market maker like Kalshi Trading. In this way, Kalshi plays a role similar to that of the house in a traditional gambling model.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 9

**C.** **Kalshi's Illegal Gambling Activity Violates Washington's Strict Gambling Laws and Public Policy**

4.18   Under Washington law, every core feature of Kalshi's Illegal Gambling Activities—its wagers, fees, and online transmission of gambling information—constitutes illegal online gambling.

4.19   Since Washington's founding in 1889, gambling has been tightly regulated in the state. This long-standing public policy protects the health, welfare, and safety of Washingtonians.

4.20   Over time, the Legislature has reaffirmed the need to regulate gambling in light of advancing technologies. In 2006, the Washington Legislature passed Substitute Senate Bill 6613 (SSB 6613), reaffirming that all forms of internet and electronic gambling remain prohibited, unless explicitly authorized.[2] Section 1 of SSB 6613 states:

> It is the policy of this state to prohibit all forms and means of gambling, except where carefully and specifically authorized and regulated. With the advent of the internet and other technologies . . . it is appropriate for this legislature to reaffirm the policy prohibiting gambling that exploits such new technologies.[3]

4.21   SSB 6613, codified at RCW 9.46.240, effectively banned all online gambling in Washington. *See Rousso v. State*, 170 Wn.2d 70, 74-75, 239 P.3d 1084 (2010) (RCW 9.46.240 "criminalizes the knowing transmission and reception of gambling information by various means, including use of the Internet. Since sending and receiving gambling information is illegal, Internet gambling in the state of Washington is effectively banned.").

4.22   Kalshi's Illegal Gambling Activities meet every element of the definition of gambling under state law. Washington's Gambling Act defines "gambling" broadly to include "staking or risking something of value upon the outcome of a contest of chance or a future

---

[2] SSB 6613, 59th Leg., Reg. Sess., Laws of 2006, ch. 290 ("reaffirming and clarifying the prohibition against internet and certain other interactive electronic or mechanical devices to engage in gambling[.]").

[3] *Id*., § 1.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 10

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." RCW 9.46.0237.

4.23    A "contest of chance" means "any contest, game, gaming scheme, or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." RCW 9.46.0225.

4.24    A "thing of value" means "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge." RCW 9.46.0285.

4.25    On Kalshi, bettors wager on issues ranging from sports scores, political elections, popular culture to you-name-it. Each bet risks money, relies in part on chance, and promises a payout to winners. Kalshi's Illegal Gambling Activities therefore constitute gambling under Washington law.

4.26    Kalshi's Illegal Gambling Activities also constitute "professional gambling," which is illegal in Washington. RCW 9.46.220-.222. "Professional gambling" occurs when an entity "knowingly accepts or receives money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of gambling activity." RCW 9.46.0269. Kalshi charges fees for every bet and ensures liquidity through its affiliated entity, Kalshi Trading. By facilitating wagers, absorbing unmatched bets, and collecting fees, Kalshi profits from professional gambling at every stage.

4.27    Kalshi also engages in illegal "bookmaking" under state law by accepting bets as a business and charging a fee to place bets on its platform. Washington considers "bookmaking"—accepting bets for a fee—to constitute illegal "professional gambling." RCW 9.46.0213; RCW 9.46.0269(d); RCW 9.46.220-.222; *see Internet Cmty. & Ent. Corp. v.*

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 11

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*Washington State Gambling Comm'n*, 169 Wn.2d 687, 694-95, 238 P.3d 1163 (2010) (finding "bookmaking" includes "either accepting bets as a business or charging a fee for the opportunity to place a bet" and is "therefore professional gambling under RCW 9.46.0269").

4.28    Kalshi also transmits gambling information on the internet and maintains equipment to do so, in violation of Washington law. RCW 9.46.240. "Gambling information" means "any wager made in the course of and any information intended to be used for professional gambling. . . . [I]nformation as to *wagers, betting odds and changes in betting odds shall be presumed to be intended for use in professional gambling*." RCW 9.46.0245 (emphasis added); *see Internet Cmty.*, 169 Wn.2d at 695-96 (finding that "information on wagers and odds [online betting platform] received from its users must be presumed, under the plain terms of the statutes, as intended for use in professional gambling"). Kalshi's website and mobile applications, which provide real-time odds and match users for wagers, clearly fall within this prohibition.

4.29    Kalshi likewise violates Washington's prohibition of internet gambling, which "introduces new ways to exacerbate the[] same threats to health, welfare, safety, and morals" as traditional gambling, including "gambling addiction" and "other societal ills." *See Rousso*, 170 Wn.2d at 82. Online sports wagers are illegal in Washington unless "placed and accepted at a tribe's gaming facility [and] only while the customer placing the wager is physically present on the premises of that tribe's gaming facility." RCW 9.46.0368. Kalshi violates Washington law by allowing Washingtonians to place online bets from anywhere in the state.

4.30    Finally, Kalshi also violates Washington's prohibition on gambling records and unlicensed gambling devices. "Gambling records" include "any record, receipt, ticket, certificate, token, slip or notation given, made, used or intended to be used in connection with professional gambling." RCW 9.46.0253; RCW 9.46.217; *see Internet Cmty.*, 169 Wn.2d at 696 ("Because we hold that [online betting platform] was engaged in professional gambling, it necessarily follows that it used 'gambling records' as part of its business."). "Gambling devices" include "any device . . . or installation designed primarily for use in connection with professional

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 12

gambling" such as "electronic games of chance." RCW 9.46.0241. Kalshi's website and mobile apps constitute "gambling devices" and all of Kalshi's records in connection with its professional gambling platform constitute illegal "gambling records" under Washington law.

4.31    Every aspect of Kalshi's Illegal Gambling Activities, from engaging in unlicensed gambling in violation of RCW 9.46.160 to illegal bookmaking and transmitting gambling information through online gambling devices, constitutes illegal gambling in Washington. Kalshi profits from each of these unlawful activities, in direct violation of the explicit prohibitions in state law and Washington's longstanding public policy of tightly regulating gambling to protect the health, welfare, and safety of its residents.

**D.    Kashi Provides and Promotes Addictive Gambling Activities**

4.32    Gambling addiction is a public health crisis throughout the country, including in Washington. Approximately 2.5 million adults in the U.S. engage in compulsive gambling and suffer from gambling disorder, a clinically recognized behavioral addiction. An additional five to eight million adults experience problems due to their gambling behavior, with often devastating consequences to the individuals involved, their families, and communities.[4]

4.33    According to the 2021 Washington State Adult Problem Gambling Prevalence Study, among Washington adults who gambled, 3.5% would likely be diagnosed with gambling disorder (1.5% of all adults), and 17% were at an increased risk for problem gambling (7.5% of all adults).[5]

4.34    The Washington State Adult Problem Gambling Prevalence Study further found that the prevalence of moderate-to-severe problem gambling was substantially higher among "online gamblers" (10.3%) compared to all gamblers (3.5%). Additionally, "online gamblers"

---

[4] Nat'l Council on Problem Gambling, Problem Gambling Fact Sheet, www.ncpgambling.org/wp-content/uploads/2025/01/PGAM-2025-Problem-Gambling-Fact-Sheet.pdf (last accessed March 26, 2026).

[5] Washington State Health Care Authority, 2021 Washington State Adult Problem Gambling Prevalence Study Results: Report to the Legislature (June 30, 2022), at iv, www.evergreencpg.org/wp-content/uploads/2022/12/wa-state-adult-problem-gambling-prevalence-study-final-2021.pdf (last accessed March 26, 2026).

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 13

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

were almost four times as likely to experience problem gambling compared to gamblers who only gambled at brick-and-mortar venues such as Washington's tribal casinos where sports gambling is legal in Washington (10.3% as compared to 2.6%).[6]

4.35    The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) categorizes gambling disorder as an "addictive disorder," making it the only defined behavioral addiction recognized in the DSM-5. The symptoms of gambling disorder include an increased tolerance for gambling (i.e. wagering more money over time), repeated unsuccessful efforts to control, reduce, or stop gambling behavior, and lying or concealing the extent of gambling involvement from others.[7]

4.36    Gambling stimulates the brain's dopamine center and reward system and leads gamblers to participate in risky behavior and risk their money in the hopes of gaining the "high" of a winning wager. Over time, this continuing chase for the "gambler's high" often leads to addiction.

4.37    Gambling addiction can destroy the lives of the gamblers, but the destructive effects of compulsive gambling are not limited to the gamblers themselves. Gambling disorders also negatively affect spouses, partners, children, and others. Studies show for example that gambling disorders are associated with higher rates of domestic and intimate partner violence.[8]

4.38    Kalshi's advertising targets young adults, particularly young men, to place bets on its platform. Young men are at a disproportionally higher risk of developing problem

---

[6] *Id*. at vii.

[7] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

[8] Nerilee Hing et al., *An integrative review of research on gambling and domestic and family violence: Fresh perspectives to guide future research*, 13 Frontiers Psych., Oct. 2022 [https://doi.org/10.3389/fpsyg.2022.987379]; *see also*, American Gaming Association, "Engaging in Responsible Play," https://www.americangaming.org/responsibility/ (last accessed March 26, 2026).

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 14

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

gambling behaviors.[9] Yet, Kalshi is expanding its reach among college students by leveraging social media campaigns and student influencers, amplifying exposure to this high-risk group.[10]

4.39    The risks and harms associated with online gambling are also greater than with in-person gambling (such as that permitted at Washington's tribal casinos) because mobile devices are a necessity of life and people carry them everywhere. From their mobile phones and other devices, users can gamble on Kalshi anywhere and at any time—at home, at work, at lunch, at their children's soccer games, on vacation, or anywhere else that receives a signal.

4.40    Kalshi's online betting platform is addictive and can lead to gambling disorder in the same way as any other form of gambling. Kalshi has admitted as much itself by advertising on Instagram that Kalshi, in its own words, is "kind of addicting."[11]

4.41    Kalshi encourages gambling and potential addiction by including features on its apps that are designed to encourage continued engagement, attention, and betting. These include behavioral design mechanisms meant to encourage impulsive engagement, push notifications to users' phones, and advertisements through sponsored influencers.

4.42    Kalshi encourages high-risk gambling behavior by emphasizing reward while minimizing risk. When placing a bet, Kalshi highlights potential payouts in bright green font, a color synonymous with safety. In contrast to the bright green payout information, information associated with risk and negative consequences, like betting costs and odds, is left in standard black text.

---

[9] Vincent O. Mancini et al., *Predicting Problem Gambling in Young Men: The Impact of Sports Gambling Frequency and Internalizing Symptoms*, 41 J. Gambling Stud. 1119 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12361320/ [https://doi.org/10.1007/s10899-025-10403-0].

[10] Katherine Long et al., *'Is This Insider Information?' The Prediction Market Bets Driving a Campus Frenzy*, Wall St. J. (Mar. 5, 2026), https://www.wsj.com/business/media/prediction-markets-campus-e57cd19f?reflink=desktopwebshare_permalink.

[11] Dustin Gouker, "Kalshi Says It's 'Kind of Addicting' in Instagram Post," Event Horizon (Oct. 21, 2025), https://nexteventhorizon.substack.com/p/kalshi-says-its-kind-of-addicting (last accessed March 26, 2026).

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 15

4.43    Kalshi promotes competition between bettors on its platform to increase impulsive gambling and transaction volume. For instance, Kalshi encourages bettors to create "Ideas" profiles that include nicknames and profile photos so they can interact with other bettors on the platform. These social profiles can publicly display detailed betting histories, including potential payouts and total number of bets. Bettors use their "Ideas" profiles to like, bookmark, and reply to others' posts.

4.44    Kalshi also encourages bettors to join its "leaderboard," where they can "track" their performance and become part of Kalshi's "competitive environment." Bettors navigate to the "leaderboard" page by clicking a gold trophy symbol, which then ranks bettors by daily, weekly, monthly, and all-time profits, and by trading volumes.

4.45    Kalshi further encourages continued engagement and more bets on its platform by showing users what "people are also buying" and displays what "people also bought" after a user makes a bet.

4.46    Kalshi markets to individuals who already engage in gambling. For example, Covers.com, a gambling publication and Kalshi sponsor, offers a $10 bonus for joining the Kalshi platform. Covers.com describes itself as a sports betting information outlet "[w]here people who love the risk and rush of competition come together," and as being part of a "world-class team in sports betting and gaming" that reaches "millions of players each year."

4.47    Kalshi also attempts to hook and take advantage of bettors by intentionally conflating its gambling scheme with traditional investments, representing that Kalshi's "events contracts" are financial products, rather than simply an opportunity to wager money.

4.48    For example, Kalshi's marketing slogans, such as "everyone is an expert at something" and "trade what you know" create the deceptive impression that placing online wagers on Kalshi is not gambling, but making use of a skill-based financial tool.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 16

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

4.49   Kalshi's design features exploit psychological triggers, enticing frequent and continuing transactions, and driving disordered consumption and addictive behavior, while Kalshi reaps ever increasing profits.

4.50   Kalshi is now fueling a public health crisis in Washington by promoting and providing illegal online betting in the state under the guise of "events trading" in a financial "prediction market."

## V.   FIRST CAUSE OF ACTION
### (Unfair and/or Deceptive Conduct in Violation of the Consumer Protection Act, RCW 19.86)

5.1   Plaintiff incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

5.2   The Attorney General may obtain injunctive relief, as well as monetary relief, including restitution, disgorgement, civil penalties, and recovery of costs and fees for violations of the Consumer Protection Act. RCW 19.86.080, .140.

5.3   The Consumer Protection Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

5.4   Kalshi's provision, marketing, and advertising of Illegal Gambling Activities constitute unfair and/or deceptive acts or practices in trade or commerce under RCW 19.86.020.

5.5   Kalshi's provision, marketing, and advertising of Illegal Gambling Activities occurred and are occurring in trade or commerce under RCW 19.86.010, as constituting the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington.

5.6   Kalshi's provision, marketing, and advertising of Illegal Gambling Activities demonstrate a pattern of conduct committed in the course of its business and of which there is a real and substantial potential for repetition, impacting the public interest.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 17

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

## VI.    SECOND CAUSE OF ACTION
### (Recovery of Money Lost at Gambling Act, RCW 4.24.070)

6.1    Plaintiff incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

6.2    The Recovery of Money Lost at Gambling Act provides that "[a]ll persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost." RCW 4.24.070.

6.3    Pursuant to RCW 43.10.030(1), the Attorney General has discretionary authority to act in any court in matters of public concern provided there is a cognizable common law or statutory cause of action, such as RCW 4.24.070. *State v. City of Sunnyside*, 3 Wn.3d 279, 304, 550 P.3d 31 (2024); *see, e.g.*, *State v. Gattavara*, 182 Wn. 325, 329, 47 P.2d 18 (1935) (the Attorney General may "in the absence of express legislative restriction to the contrary, exercise all such power and authority as the public interest may, from time to time, require."); *City of Seattle v. McKenna*, 172 Wn.2d 551, 562, 259 P.3d 1087 (2011); *State v. Taylor*, 58 Wn.2d 252, 257, 362 P.2d 247 (1961); *Reiter v. Wallgren*, 28 Wn.2d 872, 880, 184 P.2d 571 (1947) ("It has always been a paramount duty of the attorney general to protect the interests of the people of the state.").

6.4    Illegal gambling and the recovery of money lost at gambling is a matter of public concern. RCW 9.46.010; *Rousso*, 170 Wn.2d at 82; *see also O'Neil v. Crampton*, 18 Wn.2d 579, 583-84, 140 P.2d 308 (1943) (holding basis for RMLGA is not only protection of the individual but "also a protection to the public, which is even more important").

6.5    Defendant Kalshi operates, develops, manages, finances, and/or profits from Illegal Gambling Activities in Washington, and continues to engage in these activities, including, among other things, unlicensed online sports wagering.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 18

6.6    Kalshi engaged and continues to engage in professional gambling, including by engaging in bookmaking, in violation of Washington law. RCW 9.46.220-.222; RCW 9.46.0269(d).

6.7    Kalshi has engaged and continues to engage in online gambling activity in violation of Washington law. RCW 9.46.240.

6.8    Kalshi has engaged and continues to engage in unlicensed online sports wagering in violation of Washington law. RCW 9.46.240; RCW 9.46.0368.

6.9    Kalshi has used and continues to use gambling records as part of its business in violation of Washington law. RCW 9.46.217; RCW 9.46.0253.

6.10    Kalshi owns, develops, and operates a website and apps that are unlicensed gambling devices in violation of Washington law, and continues to do so. RCW 9.46.215; RCW 9.46.0241(3), (4).

6.11    Kalshi has conducted, managed, directed, and/or profited from unlicensed gambling activities in violation of Washington law, and continues to do so. RCW 9.46.180; RCW 9.46.228.

6.12    Defendant Kalshi has offered and continues to offer gambling on its platform in violation of Washington's gambling laws and/or regulations.

6.13    The Attorney General is entitled to recover all money Washingtonians have lost through Defendant Kalshi's illegal gambling operation.

## VII.    REQUEST FOR RELIEF

Wherefore, the Plaintiff requests the following relief:

7.1    That the Court adjudge and decree that the Defendant has engaged in the conduct complained of herein.

7.2    That the Court adjudge and decree that Defendant's operation of gambling activities, as described above, violates Washington's Gambling Act, RCW 9.46.

7.3    That the Court adjudge and decree that Defendant's conduct complained of herein constitutes unfair or deceptive acts or practices and is unlawful in violation of the Consumer Protection Act (CPA), RCW 19.86.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 19

7.4     That the Court issue a permanent injunction pursuant to the CPA, RCW 19.86.080, enjoining and restraining Defendant and its representatives, successors, assigns, offices, agents, servants, employees, and all other persons acting or claiming to act for, on behalf of, or in concert or participation with Defendant, from continuing or resuming the unlawful conduct complained of herein.

7.5     That the Court make such other orders pursuant to RCW 19.86.080 as it deems appropriate to provide for restitution to consumers of money or property unlawfully acquired by Defendant as a result of the conduct complained of herein.

7.6     That the Court, as an equitable remedy, disgorge Defendant of money or property acquired by Defendant as a result of the conduct and violations complained of herein.

7.7     That the Court assess civil penalties, pursuant to RCW 19.86.140, against Defendant for each and every violation of the CPA.

7.8     That the Court order Defendant to provide an accounting of the names and contact information of each Washington consumer from whom Defendant collected monies, and to whom Defendant remitted monies, and the amount of monies received from and remitted to each such consumer.

7.9     That the Court make such orders as necessary to recover all money Washingtonians have lost at illegal gambling and/or activities through Defendant pursuant to Washington's Recovery of Money Lost at Gambling Act, RCW 4.24.070.

7.10    That the Court make such orders pursuant to RCW 19.86.080 to provide that the Plaintiff, State of Washington, have and recover from Defendant the costs of this action, including reasonable attorneys' fees.

7.11    That the Court award pre- and post-judgment interest, at the maximum allowable rate provided by law.

7.12    For such other relief as the Court may deem just and proper.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 20

DATED this 27th day of March, 2026.

NICHOLAS W. BROWN
Attorney General


*s/Andrea Alegrett*
ANDREA ALEGRETT, WSBA No. 50236
JULIA K. DOYLE, WSBA No. 43993
BEN J. BRYSACZ, WSBA No. 54683
MATTHEW GEYMAN, WSBA No. 17544
SEANN COLGAN, WSBA No. 38769
Assistant Attorneys General
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
andrea.alegrett@atg.wa.gov
julie.doyle@atg.wa.gov
ben.brysacz@atg.wa.gov
matt.geyman@atg.wa.gov
seann.colgan@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF - 21

# Exhibit C

# Kalshi 'prediction market' violates WA antigambling laws, AG says

ST  seattletimes.com/seattle-news/politics/kalshi-prediction-market-violates-wa-anti-gambling-laws-ag-says

By David Gutman                                                                 March 27, 2026



Washington Attorney General Nick Brown sued Kalshi on Friday, calling the company's claims to be a "prediction market" little more than a front for an illegal gambling operation.

The lawsuit, filed in King County Superior Court, accuses Kalshi of violating Washington's relatively strict antigambling laws and using the company's own boasts to prove the point.

Kalshi has claimed to be the first site where people can "bet on the NFL in all 50 states" and more broadly, "bet on everything."

Online gambling remains illegal in Washington state, except in-person at tribal casinos. Kalshi calls itself a "prediction market" that allows customers to buy a share in the likelihood of something happening.

Kalshi allows wagers on every March Madness game, Brown noted. But it also allows wagers on much, much more. You can "trade" — to use Kalshi's term – or "bet" – to use Brown's term, on sporting events, elections, the weather, when Kanye will release an album, when Taylor Swift will get married and almost anything else you can think of.

You can wager on what words Supreme Court justices will say, on the length of presidential press conferences and, most recently, on the outcome of America's war in Iran.

"Kalshi really is just a bookie with a fancy name, and a huge amount of venture capital behind them," Brown said at a news conference Friday in downtown Seattle. "They publicly pat themselves on the back for being sneaky and getting around Washington's gambling laws, but it's worse than being sneaky. It's a lie and it's illegal."

Brown's lawsuit is technically about consumer protection — he is seeking to stop Kalshi from operating in Washington and to collect damages to compensate those who have lost money.

But he framed it Friday in more sweeping terms, as part of an effort to determine "what kind of a society we want to live in."

"Do we want everything to be gambling?" Brown asked. "Do we want to be an America that goes from worrying about the human cost of war to betting on the over/unders of that war? What else would we lose about ourselves if the whole world became a craps table?"

Brown also recently filed suit against more than a dozen online gambling apps that he alleged were operating illegally in Washington.

Arizona this month filed criminal charges against Kalshi, accusing it of running an illegal gambling operation. Nevada has also sued the company, calling it an unlicensed sports betting operation.

Before the launch of the war with Iran, Kalshi offered wagers on when Ayatollah Ali Khamenei would be out as supreme leader of Iran. It has offered wagers on how many measles cases the country will see and what witnesses would say at a hearing on child trafficking.

Founded in 2018, Kalshi calls itself "an exchange dedicated to trading on the outcome of future events." The site has grown exponentially since gaining attention during the 2024 election and now handles about $10 billion a month in wagers. The company's chief "prediction market" competitor, Polymarket, does not currently operate in the U.S.

Kalshi did not immediately respond to a request for comment Friday.

The company is regulated by the federal Commodity Futures Trading Commission as a prediction market, which has to date allowed it to operate even in states where online gambling is illegal.

The Trump administration has backed Kalshi and other services like it, threatening to sue states that try to regulate "prediction markets." Mike Selig, the chair of the CFTC, last month warned state governments against trying to ban "these exciting products."

"To those who seek to challenge our authority in this space, let me be clear, we will see you in court," Selig said in a video posted to social media.

The Trump family stands to benefit from the rise of prediction markets. Donald Trump Jr. is a strategic adviser to both Kalshi and Polymarket and his venture capital fund has invested in Polymarket ahead of a planned launch in the U.S.

Brown's lawsuit takes pains to note the similarities between the services Kalshi offers and those of a traditional casino or bookie. For instance, Kalshi takes wagers not only on the winner of a game, but on a point spread and an over/under, that is how many points two teams will score, combined. You can make a parlay, linking two wagers together.

Kalshi functions by linking up two customers on opposite sides of a wager. For instance one person who thinks the Mariners will win and one who thinks the Mariners will lose. The company takes a transaction fee from both users. But to ensure there is enough action, Brown writes, the company also uses its own affiliate, Kalshi Trading LLC, to make wagers. Customers never know if they are pitted against another customer or against Kalshi Trading, Brown writes.

"In this way, Kalshi plays a role similar to that of the house in a traditional gambling model," the lawsuit says.

*This is a developing story. Check back for updates.*

David Gutman: 206-464-2926 or dgutman@seattletimes.com. David Gutman covers local politics and King County government at The Seattle Times, reporting on how leaders and institutions impact the lives of everyday people.

# Exhibit D

# Washington sues online betting platform Kalshi for illegal gambling

 **atg.wa.gov**/news/news-releases/washington-sues-online-betting-platform-kalshi-illegal-gambling

March 27, 2026

FOR IMMEDIATE RELEASE:

Attorney General Nick Brown filed a lawsuit today against Kalshi, a company that violates state law by operating and advertising an online platform where users can bet on sports, elections, and other events. Kalshi even allows consumers to bet on the total number of "measles cases this year," "what will witnesses say" during a child trafficking hearing, or potential outcomes in the Iran war.

Kalshi attempts to skirt state law by branding its betting platform as a "prediction market," but whatever Kalshi chooses to call it, Kalshi's operations clearly fall under the definition of illegal gambling in Washington. The lawsuit argues Kalshi violates the Washington state Gambling Act and Consumer Protection Act, and seeks to halt these unlawful activities, recover money lost by Washingtonians, and assess civil penalties.

"Kalshi wants people betting on almost everything possible in life—the outcome of elections, Supreme Court cases, even wars. For Kalshi, every event, every tragedy is nothing more than a potential way for Americans to risk their fortunes and for Kalshi to get rich," said Brown. "As they advance this bleak vision of the future, they line their pockets and pat themselves on the back for sneaking around Washington's gambling laws. No more."

The definition of gambling under Washington law is "staking or risking something of value upon the outcome of a contest of chance or a future contingent event," and Kalshi's activities fall squarely within that definition. Each Kalshi bet risks money, relies in part on chance, and promises a payout to winners.



Kalshi's website and app show consumers a range of events that they can bet on and the odds for those various events, which dictate how much the bettor will be paid out if the event occurs. This is exactly how sportsbooks and other gambling operations function. Kalshi advertises that they allow consumers to "bet on anything" by simply calling their service a "prediction market" rather than "gambling." In one Kalshi advertisement, one person texts another that they "found a way to bet on the NFL even though we live in Washington," which seems to acknowledge that Kalshi knows that they are attempting to skirt state law. In fact, Kalshi *did* find a way to bet on the NFL in Washington; all they had to do was break the law.

Kalshi entered the betting market in 2025, first allowing Washington consumers to bet on both college and pro sports. Kalshi offers spread bets (a bet on the difference in score between two competing sports teams), over/under bets (a bet on how many total points will be scored in a sports game), and proposition bets (bets on specific events that may occur within a sports game, such as the number of touchdowns a football player might score during the game). All of these types of bets are commonly offered by sportsbooks and casinos, and unlawful in Washington state. Its activities spread quickly, encompassing all ranges of betting.

From the beginning, when Washington became a state in 1889, its constitution prohibited gambling on state lands, and the state continues to carefully regulate gambling activities to protect and safeguard the public since then. In 2006, the Legislature amended the 1973 Gambling Act to make it clear that internet gambling is prohibited under Washington law. But online platforms like Kalshi put consumers at particular risk for problem gambling.

Kalshi has marketed itself to young people between the ages of 18 and 21. They have coaxed college students to their platform, advertising that "College campuses…will play a key role in bringing the next 100M users" to their product. They routinely pay college student influencers to

promote their gambling app to their peers, and at one point event briefly tried to recruit a 15-year-old influencer to promote their brand.

Read the complaint here.

* * * * *

If you or someone you know is suffering from gambling addiction or gaming disorder, please contact the Washington State Problem Gambling Helpline at 1-800-547-6133. Other resources can also be accessed here.

Consumers wanting to file a complaint with the Consumer Protection Division should call 1-800-551-4636 or 1-800-833-6384 for the hearing impaired or visit the AG web site at https://www.atg.wa.gov/file-complaint.

-30-

*Washington's Attorney General serves the people and the state of Washington. As the state's largest law firm, the Attorney General's Office provides legal representation to every state agency, board, and commission in Washington. Additionally, the Office serves the people directly by enforcing consumer protection, civil rights, and environmental protection laws. The Office also prosecutes elder abuse, Medicaid fraud, and handles sexually violent predator cases in 38 of Washington's 39 counties. Visit www.atg.wa.gov to learn more.*

Media Contact:

Email: press@atg.wa.gov

Phone: (360) 753-2727

General contacts: Click here

1125 Washington St SE • PO Box 40100 • Olympia, WA 98504 • 360-753-6200
OFFICE HOURS: 8:00 AM - 5:00 PM Monday - Friday  Closed Weekends & State Holidays

# Exhibit E

No. 25-1922

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

KALSHIEX LLC,
*Plaintiff-Appellee,*

v.

MARY JO FLAHERTY, ET AL.,
*Defendants-Appellants.*

On Appeal from the Judgment of the United States
District Court for the District of New Jersey
(Dist. Ct. No. 24-cv-4037)

BRIEF OF *AMICI CURIAE* OF NEVADA, OHIO, 32 OTHER STATES,
DISTRICT OF COLUMBIA, AND NORTHERN MARIANA ISLANDS
SUPPORTING APPELLANTS

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
JESSICA E. WHELAN
Chief Deputy Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
jwhelan@ag.nv.gov

*Counsel for Amicus Curiae
  State of Nevada*

DAVE YOST
Ohio Attorney General

T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Amicus Curiae
  State of Ohio*

*Additional counsel listed after signature block*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................ii

INTRODUCTION AND STATEMENT OF *AMICI* INTEREST ..............1

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT ...........................................................................................5

    I.    When Congress preempts the States from exercising their traditional authority, it does so clearly, not obscurely. ..............6

    II.    The States have traditionally regulated gambling.....................8

    III.    Kalshi's contrary position would leave sports betting largely unregulated and endanger the States' citizens........................14

        A.    Recognizing an events-contract loophole to state gaming laws would have far-reaching consequences. .......................16

        B.    Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.................................22

CONCLUSION .....................................................................................25

ADDITIONAL COUNSEL ...................................................................27

CERTIFICATE OF COMPLIANCE......................................................29

CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF ..............30

CERTIFICATE OF VIRUS SCAN .......................................................31

CERTIFICATE OF COUNSEL.............................................................32

CERTIFICATE OF SERVICE...............................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*Ah Sin v. Wittman,*
  198 U.S. 500 (1905).................................................................... 4, 9, 13

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
  576 U.S. 787 (2015)......................................................................25

*Bond v. United States,*
  572 U.S. 844 (2014)................................................................ *passim*

*Booth v. Illinois,*
  184 U.S. 425 (1902).......................................................................13

*CSX Transp. v. Easterwood,*
  507 U.S. 658 (1993)..................................................................... 4, 8

*EEOC v. Arabian Am. Oil Co.,*
  499 U.S. 244 (1991)........................................................................5

*Fin. Oversight & Mgmt. Bd. v. Centro de Periodismo
  Investigativo, Inc.,*
  598 U.S. 339 (2023)........................................................................7

*Helton v. Hunt,*
  330 F.3d 242 (4th Cir. 2003)............................................................9

*Kansas v. Garcia,*
  589 U.S. 191 (2020)........................................................................5

*Mills-Jennings of Ohio, Inc. v. Department of Liquor Control,*
  70 Ohio St. 2d 95 (1982) ............................................................ 10, 11

*Murphy v. NCAA,*
  584 U.S. 453 (2018)................................................................ 1, 10, 12

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.,*
  595 U.S. 109 (2022)........................................................................6

*Rousso v. State,*
   170 Wn. 2d 70 (2010) ........................................................................... 9

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ............................................................................. 7

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ......................................................................... 4, 6

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. X ............................................................................. 7

U.S. Const. art. VI, cl. 2 ....................................................................... 5

Ohio Const. art. XV, §6 ...................................................................... 12

17 C.F.R. §38.100–.1200 .................................................................... 22

17 C.F.R. §38.700 ............................................................................... 22

17 C.F.R. §38.750 ............................................................................... 22

17 C.F.R. §38.850 ............................................................................... 22

17 C.F.R. §38.1150 ............................................................................. 22

7 U.S.C. §2 ....................................................................................... 2, 3

7 U.S.C. §7 ..................................................................................... 2, 24

Nev. Gaming Comm'n Reg. 22.010 .................................................. 19

Nev. Gaming Comm'n Reg. 22.080 .................................................. 19

Nev. Gaming Comm'n Reg. 22.1205 ................................................ 20

Nev. Gaming Comm'n Reg. 22.121 .................................................. 20

Nev. Gaming Comm'n Reg. 5.170 .................................................... 19

Nev. Gaming Comm'n Regs. 22.060-.063 ......................................... 19

Nev. Rev. Stat. ch. 462 ..................................................................... 13

Nev. Rev. Stat. ch. 463 ...................................................................... 13

Nev. Rev. Stat. ch. 463B...................................................................... 13

Nev. Rev. Stat. ch. 465 ...................................................................... 13

Nev. Rev. Stat. §129.010 .................................................................... 21

Nev. Rev. Stat. §463.0129 .................................................................. 19

Nev. Rev. Stat. §463.170 ........................................................ 19, 23, 24

Nev. Rev. Stat. §463.220 .................................................................... 24

Nev. Rev. Stat. §463.318 .................................................................... 24

Nev. Rev. Stat. §463.350 .................................................................... 21

Nev. Rev. Stat. §§463.362–.3668......................................................... 19

Nev. Rev. Stat. §463.530 .................................................................... 19

Nev. Rev. Stat. §463.5735 .................................................................. 19

Nev. Rev. Stat. §§465.092–.094........................................................... 19

Ohio Rev. Code §3109.01.................................................................... 21

Ohio Rev. Code §§3769.01–.28 ........................................................... 13

Ohio Rev. Code §§3772.01-.99............................................................ 13

Ohio Rev. Code §§3775.01-.99............................................................ 13

Ohio Rev. Code §3775.02.................................................................... 20

Ohio Rev. Code §3775.03.................................................................... 20

Ohio Rev. Code §3775.09.................................................................... 20

Ohio Rev. Code §3775.13.................................................................... 21

Ohio Rev. Code §3775.99.................................................................... 21

## Other Authorities

Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024) .......................................................... 17

Dusting Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon ...................................................... 1, 15, 16

Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024) .................................................. 17

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527 (1947) ................................................. 6

George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch & Rev. J. 65 (1996) ........................... 9, 10

*History of Gaming in Nevada*, Nevada Resort Association .............. 10, 11

Jennifer Carleton et al., Nevada *in* The Gambling Law Review (Carl Rohsler ed. 2016) ........................................ 12

Kalshi Member Agreement (Dec. 13, 2024) ........................................... 21

Kalshi Website, Help Center: Trading; Fees ......................................... 15

Kalshi Website, Sports: Baseball ......................................................... 14

Kalshi Website, Sports: Football ......................................................... 14

Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024) .................................. 18, 20

Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024) .................................... 17

Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies (2023) .................................................. 18

Matt Stone, *Risk of Gambling Addiction Up 30%* (Feb. 16, 2025) ............................................................................. 17

Nat'l Gambling Impact Study Comm'n, Final Report (1999) ..... 13, 17, 18

*Ohio Gambling Survey 2022*, Ohio Casino Control Commission ..................................................................... 18

Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024) ................................................. 12, 17

Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, University of Nevada: The Center for Gaming Research (2011) ............................. 11

## INTRODUCTION AND STATEMENT OF *AMICI* INTEREST

"Americans have never been of one mind about gambling." *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). But this country's system of government is well equipped for such disagreement. Under our federalist approach, States act as laboratories of democracy for solving complex problems and serving the needs of a diverse citizenry. As a result, the States have long experimented with different approaches to gambling, as their citizens' "attitudes have swung back and forth" on the topic. *Id.*

Stripping away the semantics, this case most directly concerns gambling on sports. In 2018, the Supreme Court held that Congress could not bar the States from authorizing sports betting. *Id.* at 458, 480. Most States have since legalized the practice. In these States—and even in other States that have not legalized sports betting, like California and Texas—companies such as Kalshi now offer online sports betting through events contracts on the futures marketplace. Kalshi itself has called what it does "sports betting." Dusting Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon, https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could (last accessed June 16, 2025); *see below* 16 (advertisement). Even so, Kalshi makes a

1

bold legal claim: it says that the States have no power to regulate its conduct, regardless of whether these so-called events contracts qualify as sports betting under state law. According to Kalshi, Congress—through obscure language within a special rule in the Commodity Exchange Act—subtly preempted the States from exercising authority over sports betting when that betting is offered through a so-called events contract.

If that sounds farfetched, that is because it is. When Congress removes the States' historic police powers, it does not whisper in the dark of night. Rather, courts expect Congress to speak clear as day when it intends a dramatic shift in our country's traditional balance of power. *See Bond v. United States*, 572 U.S. 844, 857–59 (2014). This federalism canon proves quite significant here. Nothing in the Commodity Exchange Act's language clearly signals that Congress was trying to strip the States of their traditional power to regulate sports gambling. Indeed, several parts of the statutory scheme overtly recognize the continued application of state law. *See, e.g.*, 7 U.S.C. §§2(a)(1)(A), 7a-2(c)(5)(C)(i)(I). It follows that the Commodity Exchange Act does not accomplish the broad preemptive coup that Kalshi envisions.

2

For these and other reasons, the *amici* States are interested in this case. Accepting Kalshi's position would wrongly upset our country's traditional division of power. Beyond that, eliminating the States' ability to regulate online sports betting would pose very serious risks to the States' citizens. Online sports betting, while convenient and entertaining for many, comes with life-altering consequences for some. Thus, depriving the States of the power to regulate naturally increases the dangers to a vulnerable population of citizens. Because no federal law requires that potentially devastating result, the *amici* States urge reversal.

## SUMMARY OF ARGUMENT

The *amici* States agree with New Jersey that the Commodity Exchange Act does not preempt States from regulating sports betting via events contracts. The preemption analysis in this case implicates several underlying issues—including whether sports-events contracts even qualify as "swaps" under federal law. *See* 7 U.S.C. §2(a)(1)(A). The *amici* States leave those finer details to the parties. The *amici* States also assume that absent preemption Kalshi's events contracts would otherwise qualify as regulated (or illegal) sports betting under many if not most States' laws. With those assumptions in place, this brief focuses on how

this country's federalist structure should inform the Court's preemption analysis here.

**I.** When lawmakers intend major changes to the existing state of the law, they do not obscure that intent. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That holds true when Congress intends to make major changes to this nation's traditional division of power. Courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond*, 572 U.S. at 857–59. It follows that, absent clear language from Congress, courts should hesitate to read federal law as preempting an area of traditional state power. *See CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993).

**II.** That principle matters a great deal to the preemption analysis in this case. As the Supreme Court has long recognized, the regulation of gambling forms a part of the States' traditional police powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Thus, for centuries, the States have been regulating gambling, including sports betting. This Court should not upset that traditional balance absent a clear directive from Congress. And—as the New Jersey defendants explain in this case—the Commodity Exchange Act offers no such clear directive.

4

**III.** The negative ramifications of Kalshi's aggressive position are just another sign that the company is wrong. Millions of Americans struggle with gambling problems. Those struggles have only increased as modern technology has made gambling more convenient. Against those realities, state-gambling regulations play an important role in protecting vulnerable individuals across this country. And federal regulations, geared toward the futures marketplace, provide cold comfort in the absence of state protections.

## ARGUMENT

Under the Supremacy Clause, federal law constitutes "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. It follows that, when Congress acts within the boundaries of its enumerated powers, it may choose to preempt state law through federal statutes. Such preemption can take different forms: federal statutes sometimes preempt state law expressly; other times they preempt by implication. *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). But no matter the form, preemption turns on the text of federal law. *Id.* at 202. And to give statutory text a "fair reading," courts must remain aware that "'Congress legislates against the backdrop'" of certain presumptions. *Bond*, 572 U.S. at 857 (quoting *EEOC v. Arabian*

*Am. Oil Co.*, 499 U.S. 244, 248 (1991)); *see* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

Keeping that last notion in mind, this brief unfolds in three parts. *First*, the *amici* States stress a backdrop canon—arising from this country's federalist structure—that should inform the Court's analysis. *Second*, the *amici* States explain why that canon applies with full force to the States' regulation of gambling. *Third*, and finally, the *amici* States highlight the considerable downsides of removing the States' ability to regulate online sports betting.

## I. When Congress preempts the States from exercising their traditional authority, it does so clearly, not obscurely.

Congress, as the saying goes, does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468. Thus, when Congress seeks to change the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.* Textual arguments that suggest otherwise "ultimately founder." *See id.*

This no-elephants-in-mouseholes principle has several context-specific applications. For example, the "major questions doctrine" teaches that if Congress "wishes to assign to an executive agency decisions of vast economic and political significance," it must "speak clearly." *Nat'l Fed'n of*

*Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring) (quotation omitted). Likewise, to abrogate a government body's sovereign immunity, "Congress must use unmistakable language." *Fin. Oversight & Mgmt. Bd. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023). And "absent a clear statement from Congress," courts stick with the default assumption that federal statutes are inapplicable outside the United States. *Bond*, 572 U.S. at 857; *see also West Virginia v. EPA*, 597 U.S. 697, 736 (2022) (Gorsuch, J., concurring) (discussing these and other "clear-statement rules" that "help courts act as faithful agents of the Constitution" (quotation omitted)).

The federalism canon offers another example of this principle at work. This canon stems from "basic principles of federalism embodied in the Constitution." *Bond*, 572 U.S. at 859. As every schoolchild learns, the Constitution gives the federal government "only limited powers; the States and the people retain the remainder." *Id.* at 854; *see* U.S. Const. amend. X. That setup leaves the States with considerable police powers that they exercise for the public good. *Bond*, 572 U.S. at 854. Congress, for its part, legislates against this default ordering of sovereign authority. *Id.* at 857–58. Against that "backdrop," any statute that displaces or

7

limits a significant amount of state power constitutes a major change. *See id.* (quotation omitted). And one expects Congress to speak clearly when effecting a major change to the existing order. Adding all this up, the following rule emerges: absent a "clear statement," courts should not assume that Congress intends "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *Id.* at 858–59 (quotation omitted).

This federalism canon applies with particular force to preemption. Preemption, by its nature, triggers the "sensitive relation between federal and state" authority. *Id.* (quotation omitted). Courts thus need "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 858 (quotation omitted). And courts should be especially "reluctant to find" preemption when "interpreting a federal statute pertaining to a subject traditionally governed by state law." *Easterwood*, 507 U.S. at 664.

## II.   The States have traditionally regulated gambling.

The question remains whether the regulation of sports gambling triggers the federalism canon. It certainly does. As mentioned already, the States' reserved powers include police powers, which refer to the States'

"broad authority to enact legislation for the public good." *Bond*, 572 U.S. at 854. Given the dangers of gambling (more on that to come, *below* 16–18), the regulation of gambling fits neatly "within the police powers of a State." *Ah Sin*, 198 U.S. at 505–06; *see also Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) ("[B]ecause the regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens the regulation of gambling lies at the heart of the state's police power." (quotation omitted)); *Rousso v. State*, 170 Wn. 2d 70, 82 (2010) (noting various "societal ills" associated with gambling, including "gambling addiction" and "underage gambling"). Unsurprisingly, therefore, the States have a lengthy history of gambling regulation.

Gambling has a long track record in this country, and its regulation dates back to well before the founding. On their way to the Americas, sailors on Columbus's ships played games of chance to help pass the time. *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch & Rev. J. 65, 66 (1996). But, at least as early as the seventeenth century, settling communities began to outlaw such behavior. In 1633, for instance, the Puritans of Massachusetts enacted idleness laws that barred people from possessing cards, dice, or other gambling

devices. *Id.* About fifty years later, the Quakers of Pennsylvania enacted a similar prohibition. *Id.* During the next century, colonies like New Hampshire and New Jersey took comparable steps. *Id.* Authorities in the Northwest Territories did, too. *Mills-Jennings of Ohio, Inc. v. Department of Liquor Control*, 70 Ohio St. 2d 95, 99 (1982).

After the founding, opposition to gambling continued to build. For example, shortly after Ohio entered the Union, its General Assembly made various forms of gambling illegal. *Id.* And the Ohio Constitution of 1851 expressly added prohibitions on lotteries. *Id.* Even in Nevada, perhaps the most gambling-friendly State in the Union, games of chance were prohibited by the territorial and early State legislatures of the 1860s. *See History of Gaming in Nevada*, Nevada Resort Association, https://perma.cc/9VX4-F8NG (last accessed June 16, 2025). Eventually, by the late 1800s, "gambling was largely banned throughout the country." *Murphy*, 584 U.S. at 458; *but see* Fenich, *A Chronology of (Legal) Gaming in the U.S.*, at 67–69 (listing some early examples of gambling).

The pendulum began to swing back in the twentieth century, with many States loosening gambling prohibitions to raise state revenue or fund non-profits. *Murphy*, 584 U.S. at 458–59. Return to Nevada. It was

10

an early adopter of legalized gambling, first decriminalizing certain forms of gambling in 1869. *History of Gaming in Nevada*, Nevada Resort Association. After a brief ban on gambling during the Progressive Movement, Nevada eventually legalized "wide-open" gambling in 1931, a move that soon gave rise to Nevada's booming casino industry. *Id.*; Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, University of Nevada: The Center for Gaming Research, at 1 (2011), http://digitalscholarship.unlv.edu/occ_papers/11 (last accessed June 16, 2025). A decade later, the Nevada Legislature shifted licensing authority from local to state government through passage of the Gaming Control Act of 1949. *See* Faiss, *Nevada Gaming Statutes: The Evolution and History*, at 3. The State's current regulatory structure, which involves the Nevada Gaming Control Board and Nevada Gaming Commission, evolved from there. *Id.* at 4–6.

Although Nevada was on the forefront, other States' views have also softened on gambling over time. For example, in the 1970s, Ohio legalized bingo for charitable purposes and state-conducted lotteries. *Mills-Jennings of Ohio*, 70 Ohio St. 2d at 101. And, about fifteen years ago, a

11

slim majority of Ohio voters approved a constitutional amendment allowing for casino gaming. *See* Ohio Const. art. XV, §6(C).

Recently, the country's attention has turned to sports gambling. *Murphy*, 548 U.S. at 460–61. Nevada set the pace in this area, too: the Silver State has permitted sports betting since the passage of the Gaming Control Act of 1949. *See* Jennifer Carleton et al., Nevada *in* The Gambling Law Review 147 (Carl Rohsler ed. 2016), https://perma.cc/3BSY-UYMZ. By the 1990s, a few other States had also legalized certain forms of sports betting. *Murphy*, 548 U.S. at 462.

To prevent sports gambling's continued growth, Congress enacted the Professional and Amateur Sports Protection Act, which purported to bar the States from authorizing sports betting. *Id.* at 461. A few years ago, however, the Supreme Court held in *Murphy* that Congress could not lawfully impose such a barrier on state lawmakers. *Id.* at 458, 480. That clarification has led most States to embrace sports betting. At present, nearly forty States have legalized at least some forms of sports betting. Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024), https://perma.cc/XL7W-QS2L.

12

Importantly, the increased legalization of gambling across the States does not mean that such gambling is unregulated. Quite the opposite. The States' "authorization of legalized gambling" over the years "has almost always been accompanied by the establishment of a corresponding regulatory regime and structure." Nat'l Gambling Impact Study Comm'n, Final Report, 3-1 (1999). For example, Ohio has comprehensive statutory schemes regulating the forms of gambling it authorizes. *See, e.g.*, Ohio Rev. Code §§3769.01–.28 (horse racing), 3772.01–.99 (casino gaming), 3775.01–.99 (sports gaming). As does Nevada. *See, e.g.*, Nev. Rev. Stat. chs. 462 (lotteries and games), 463 (licensing and control of gaming), 463B (supervision of certain gaming establishments), 464 (pari-mutuel wagering), 465 (crimes and liabilities concerning gaming), 466 (horse racing).

The takeaway from this history is simple. Gambling undeniably qualifies as an area of "traditional state responsibility." *See Bond*, 572 U.S. at 858; *see also Booth v. Illinois*, 184 U.S. 425, 429–32 (1902). Thus, under the federalism canon, this Court should not interfere with the State's police power over gambling absent "'clear, unmistakable'" legislation from Congress. *See Ah Sin*, 198 U.S. at 505–06 (quoting *Booth*, 184 U.S.

13

at 429). And, as the New Jersey defendants aptly explain, the language within the Commodity Exchange Act does not clearly signal Congress's intent to override the States' traditional authority over sports betting.

## III. Kalshi's contrary position would leave sports betting largely unregulated and endanger the States' citizens.

Kalshi takes a much different view of the world. Initially, it claims that its events contracts do not count as sports gambling. As a legal matter, that depends on definitions within state law. But, as a real-world matter, the activity Kalshi facilitates is obviously sports betting.

To confirm as much, one must only peruse Kalshi's website. The website has an entire category dedicated to "sports" where—through a few easy clicks—people can bet on things like the Steelers winning more than eight games this season or the Ravens winning the Super Bowl. *See* Kalshi Website, Sports: Football, https://perma.cc/M9ZA-V7DP (last accessed June 9, 2025). Baseball fans can similarly play the odds on whether the Phillies or the Mets will win the National League East. *See* Kalshi Website, Sports: Baseball, https://perma.cc/GP7X-ZLEW (last accessed June 9, 2025).

Kalshi's counter position strains credulity. The company has argued to States that its events contracts are not sports gambling because it is

14

not acting as the "House," like a traditional sportsbook operator does. Since Kalshi merely operates the "exchange" on which "contracts" are entered between two willing participants on either side of an uncertain outcome, the argument goes, Kalshi falls outside state gaming law in the first instance. This amounts to a distinction without a difference. Kalshi's position is indistinguishable from that of a Las Vegas poker room that simply operates as the venue in which willing participants play a card game. Like the poker room operator that takes a "rake" from each hand of poker played in its poker room, Kalshi takes a transaction fee from each contract entered on its exchange. *See* Kalshi Website, Help Center: Trading; Fees, https://perma.cc/49FW-FM8K (last accessed June 10, 2025).

Perhaps most importantly, from the consumer's perspective, it is immaterial whether Kalshi is acting as the "House" that sets the line and takes a vig, or as an exchange, which facilitates the contract and takes a transaction fee. Kalshi has even told the public that they can "bet" using its platform. Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon. Take the following advertisement from last year's March Madness tournament:

15



*Id.* Thus, Kalshi's own words betray its this-is-not-gambling position.

Regardless, Kalshi's broader argument is that, because of federal preemption, it does not matter if it facilitates sports gambling within the meaning of state laws. Said another way, Kalshi claims that by structuring sports betting as events contracts, it effectively makes state-law requirements disappear. And Kalshi relatedly argues that federal regulation—administered through the Commodity Futures Trading Commission—is both comprehensive and sufficient to protect consumers. Kalshi's views, in addition to being legally wrong, come with considerable societal consequences.

**A.    Recognizing an events-contract loophole to state gaming laws would have far-reaching consequences.**

**1.** While gambling is entertaining for many, it is dangerous for some. Millions of Americans across the country qualify as problematic or

16

pathological gamblers. Nat'l Gambling Impact Study Comm'n, *Final Report*, 4-1; Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024), https://perma.cc/BQY6-YBC3. Research, moreover, has linked gambling to many other problems—substance abuse and psychological distress, to name a few. *See* Richardson, *Online gambling has fueled an industry boom*, NBC News. Some gamble to the point of financial ruin. *See* Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024), https://perma.cc/JG9G-P7QT. Others place gambling over the health of loved ones. *See* Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024), https://perma.cc/E4ZU-U3MN. And still others gamble to the point of suicide. *See* Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025), https://perma.cc/76KG-5ZGS (noting that one in five problematic gamblers contemplates suicide due to hopelessness).

With the growing ease of gambling, these problems are on the rise. *See id.* For example, a 2022 survey performed by the Ohio Casino Control

17

Commission signaled that the prevalence of at risk/problem gamblers in the Buckeye State had nearly doubled in five years. *See Ohio Gambling Survey 2022*, Ohio Casino Control Commission, https://perma.cc/4GG3-SGQE (slide five of PowerPoint). As another datapoint, calls to Ohio's gambling hotline were up 55% in 2023. Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024), https://tinyurl.com/mtjnna33.

Online sports betting attracts a younger crowd. A recent New Jersey-based survey reflected that one in every five people surveyed between the ages of 18 and 24 was at a high risk of a gambling problem. *See* Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies, at 33 (2023), https://perma.cc/V3KH-BPHC. And research reflects that those who start gambling at a young age run a higher risk of problematic gambling. *See* Nat'l Gambling Impact Study Comm'n, Final Report, 4-12.

**2.** State regulations offer a powerful tool for combatting these dangers. Think, for example, of Nevada's regulatory scheme. Given the importance of gambling to Nevada's overall economy, the State strictly

18

regulates all gambling activities to ensure the public's continued "confidence and trust." Nev. Rev. Stat. §463.0129(1) (outlining Nevada's public policy on gambling). A central part of Nevada's mission is ensuring that gaming proprietors are "controlled and assisted" so as to "protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." *Id.*

Consistent with that goal, Nevada's regulatory scheme offers gamblers in the State many levels of protection. As a general matter, Nevada employs a rigorous licensing process that ensures any gambling entity undergoes an in-depth investigation before receiving a license. *See* Nev. Rev. Stat. §§463.170, 463.530, 463.5735; *see also below* 23–24.

Nevada's regulatory scheme also offers a variety of more specific protections. For instance, Nevada requires those that conduct gaming operations to conspicuously post information about resources for problem gamblers. Nev. Gaming Comm'n Reg. 5.170. Nevada law also includes various safeguards to protect against improper betting practices, including improper wagers on sports. *See, e.g.*, Nev. Rev. Stat. §§465.092–.094; Nev. Gaming Comm'n Regs. 22.010(14), 22.060–.063, 22.080(1); *cf. also* Nev. Rev. Stat. §§463.362–.3668 (detailing Nevada's dispute resolution

process).  Of particular note here, Nevada prohibits sports wagers by game officials, owners, coaches, players, or other team staff.  *See* Nev. Gaming Comm'n Reg. 22.1205; *cf. also* Mogg, *Gambling addiction hotlines say volume is up*, NBC News (reporting that gamblers recently threatened the coach of the Cleveland Cavaliers).  Further, Nevada requires that those facilitating sports betting report suspicious activity. Nev. Gaming Comm'n Reg. 22.121.

Under Kalshi's reading of the law, these types of state-law safeguards fall away so long as companies package sports betting as events contracts.  That, in turn, creates a sizeable hole in the States' ability to protect their citizens from predatory practices or other problematic behavior.

For additional support, consider Ohio's recently adopted approach to sports gambling.  Similar to Nevada, Ohio prohibits companies from offering sports betting without a license.  Ohio Rev. Code §3775.03(A). That requires a company to establish that it can responsibly facilitate such gambling.  *See* Ohio Rev. Code §3775.09(A)–(B).  Along related lines, Ohio facilitates an exclusion program whereby people worried about their sports gambling habits may place themselves on a voluntary exclusion list.  *See* Ohio Rev. Code §3775.02(B)(11).  To enforce that list, sports

20

gaming proprietors are required to "employ commercially reasonable methods to prevent any person who is participating in the sports gaming voluntary exclusion program from engaging in sports gaming." Ohio Rev. Code §3775.13(C)(1). But, adopting Kalshi's view, the company has no such state-law obligation.

Another problem also warrants mention. If left unregulated, Kalshi's business model would effectively lower the gambling age in many States. According to Kalshi's membership agreement, the company's services are open to anyone of the age of majority in their State. Kalshi Member Agreement (Dec. 13, 2024), https://perma.cc/7G3F-W7B5. In many—if not most—States, the age of majority is eighteen years old. *See, e.g.*, Nev. Rev. Stat. §129.010; Ohio Rev. Code §3109.01. But many States have decided to specifically limit gambling (or at least certain types of gambling) to those twenty-one or older. *See, e.g.*, Nev. Rev. Stat. §463.350; Ohio Rev. Code §3775.99(A). That discrepancy is no small matter. As discussed above, those who begin gambling at a younger age face a higher risk of long-term problems. That might be good for Kalshi's bottom line, but it is bad for the States' citizens.

21

**B.** **Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.**

Contrary to Kalshi's suggestions, federal regulation of the futures marketplace is not a cure-all when it comes to nationwide sports betting. More precisely, Kalshi seeks to alleviate any concern about the far-reaching consequences of its position by pointing to the Commodity Exchange Act's "detailed requirements for exchanges to maintain good standing as designated contract markets." ECF No. 2, at 5. These requirements, termed the "Core Principles," are twenty-three points, codified in the Code of Federal Regulations, by which designated contract markets, such as Kalshi, must abide. *See* 17 C.F.R. §38.100–.1200. These Core Principles govern topics from diversity of directors on the board of trade, 17 C.F.R. §38.1150, to dispute resolution, 17 C.F.R. §38.750, to conflicts of interest, 17 C.F.R. §38.850, to disciplinary procedures, 17 C.F.R. §38.700.

Although Kalshi is regulated in this sense, these Core Principles are naturally designed for participants in the financial markets. They do not replace the States' regulatory schemes, which are specifically designed to combat problems associated with gambling. *See above* 18–21. What is more, relying on federal regulation alone forces a one-size-fits-all regime, eliminating the States' ability to experiment with other approaches.

22

Giving the States flexibility to create their own regulatory schemes that are responsive to localized concerns is a core feature of federalism.

To better illustrate these points, return one last time to Nevada. The State, after all, has nearly one hundred years' experience in regulating legalized gambling and responding to challenges unique to both the gambling industry and local Nevadan concern.

With Nevada's considerable experience in mind, consider a key gap that would be left by a federal-only regime. Nevada has developed robust procedures for determining the suitability of any person involved in the gaming industry in Nevada. This suitability determination is a front-loaded process in which the person seeking a gaming approval bears the burden of showing the person is qualified to hold a license. Nev. Rev. Stat. §463.170(1). This burden entails satisfying the Nevada Gaming Commission that the person is a "person of good character, honesty and integrity"; that the person's "prior activities, criminal record . . ., reputation, habits and associations do not pose a threat to the public interest of [Nevada] or to the effective regulation and control of gaming"; and that the person is "[i]n all other respects qualified to be licensed or found suitable consistently with the declared policy of [Nevada]." Nev. Rev. Stat.

23

§463.170(2). This burden extends to the person showing "adequate business probity, competence and experience, in gaming" and that the financing for the operation is both adequate and from a suitable source. Nev. Rev. Stat. §463.170(3).

Further, the Nevada Gaming Commission "has full and absolute power and authority to deny any application for any cause it deems reasonable." Nev. Rev. Stat. §463.220(7). The decision of the Nevada Gaming Commission concerning a person's suitability is final; a person may not seek judicial review. Nev. Rev. Stat. §463.318(2).

For its part, the Commodity Exchange Act has no corollary to the Nevada suitability procedures. Worse still, designated contract markets may list new types of events contracts on their exchange without pre-approval, simply by self-certifying to the Commodity Futures Trading Commission that the new contract complies with federal law. *See* 7 U.S.C. §7a-2(c)(1). The result of such loose processes will be to have individuals who would be unable to clear state-law hurdles running de facto sports books throughout the country, immune from the States' regulation. And this is but one example where federal regulations for the futures marketplace fall short of safeguarding important public policy

24

considerations of the States and protecting consumers in the milieu of gambling.

*

All told, Kalshi's desire to be free from state regulation should give the Court considerable pause. As alluded to above, one of the benefits of our constitutional structure is that the States act "as laboratories" of democracy, "devising solutions" to new and difficult problems. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quotation omitted). The problems associated with modern-day online sports betting fit that description, no matter how proprietors label such betting. And the States are in the best position to implement innovative regulatory schemes responsive to particularized concerns that arise within their borders, thereby protecting the public and promoting confidence in the gaming industry.

## CONCLUSION

The Court should reverse.

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
JESSICA E. WHELAN
Chief Deputy Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
jwhelan@ag.nv.gov

*Counsel for Amicus Curiae*
  *State of Nevada*

DAVE YOST
Ohio Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Amicus Curiae*
  *State of Ohio*

**ADDITIONAL COUNSEL**

STEVE MARSHALL
Alabama Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia
Attorney General

ANNE E. LOPEZ
Hawaii Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANTHONY G. BROWN
Maryland Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

AUSTIN KNUDSEN
Montana Attorney General

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

DREW H. WRIGLEY
North Dakota Attorney General

EDWARD E. MANIBUSAN
Northern Mariana Islands
Attorney General

27

DAN RAYFIELD
Oregon Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

PETER F. NERONHA
Rhode Island Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

DEREK E. BROWN
Utah Attorney General

CHARITY R. CLARK
Vermont Attorney General

NICHOLAS W. BROWN
Washington Attorney General

JOSH KAUL
Wisconsin Attorney General

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume for an *amicus* brief supporting an appellant and contains 4,770 words.  *See* Fed. R. App. P. 32(a)(7)(B)(i), 29(a)(5).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

**CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF**

I hereby certify that the electronic version of this brief is identical to the text version in the paper copies that are being dispatched by overnight delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

/s/ T. Elliot Gaiser
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF VIRUS SCAN

I hereby certify that this document was scanned using CrowdStrike

Falcon Sensor, version 7.24.19607, and Microsoft Defender 365 and no

viruses were detected.

*/s/  T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF COUNSEL

I hereby certify that I am a member of the bar of this Court.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2025, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

# Exhibit F

No. 25-1892

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

KALSHIEX LLC,
*Plaintiff-Appellant*,

v.

JOHN A. MARTIN, ET AL.,
*Defendants-Appellees.*

On Appeal from the Judgment of the United States
District Court for the District of Maryland
(Dist. Ct. No. 1:25-cv-01283-ABA)

### BRIEF OF *AMICI CURIAE* OF NEVADA, OHIO, 36 OTHER STATES, AND THE DISTRICT OF COLUMBIA SUPPORTING APPELLEES

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
JESSICA E. WHELAN
Chief Deputy Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
jwhelan@ag.nv.gov

*Counsel for Amicus Curiae*
  *State of Nevada*

DAVE YOST
Ohio Attorney General

MATHURA J. SRIDHARAN*
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae*
  *State of Ohio*

*Additional counsel listed after signature block*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

STATEMENT OF AMICI INTEREST ...................................................... 1

INTRODUCTION .................................................................................... 1

BACKGROUND ...................................................................................... 3

    I.    The States traditionally have regulated gambling, including sports betting. ................................................................................. 3

    II.   In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis. ......................................... 7

    III.  Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide. .............. 11

SUMMARY OF ARGUMENT ................................................................ 14

ARGUMENT .......................................................................................... 15

    I.    When Congress makes major changes to the existing state of law, it does so clearly, not obscurely. ..................................... 16

        A.    Kalshi's position violates the federalism canon. ................. 17

        B.    Kalshi's position violates the major-questions doctrine. ...... 21

    II.   Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens. ........................................... 25

        A.    States are experienced in regulating sports betting and its many potential harms. ....................................................... 25

        B.    Existing federal regulation is an insufficient substitute for the States' robust gaming regulations. ............................... 31

CONCLUSION ...................................................................................... 34

ADDITIONAL COUNSEL ..................................................................... 36

CERTIFICATE OF COMPLIANCE ....................................................... 38

CERTIFICATE OF SERVICE ................................................................ 39

i

## TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Ah Sin v. Wittman,*
198 U.S. 500 (1905) ........................................................ 3, 14, 18, 19

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ................................................................ 33

*Bond v. United States,*
572 U.S. 844 (2014) .............................................................. *passim*

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) ................................................................ 21

*CSX Transp., Inc. v. Easterwood,*
507 U.S. 658 (1993) ................................................................ 18

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ................................................................ 20

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de
Periodismo Investigativo, Inc.,*
598 U.S. 339 (2023) ................................................................ 16

*Greater New Orleans Broadcasting Ass'n, Inc. v. United
States,*
527 U.S. 173 (1999) ................................................................ 19

*Helton v. Hunt,*
330 F.3d 242 (4th Cir. 2003) ..................................................... 19

*Inv. Co. Inst. v. CFTC,*
720 F.3d 370 (D.C. Cir. 2013) .................................................. 7, 8

*Kalshiex, LLC v. Hendrick,*
No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24,
2025) ................................................................................... 13

*Kansas v. Garcia,*
589 U.S. 191 (2020) ................................................................ 16

*King v. Burwell,*
  576 U.S. 473 (2015) ............................................................... 15, 22, 25

*Merrill Lynch, Pierce, Fenner & Smith v. Curran,*
  456 U.S. 353 (1982) ......................................................................... 9

*Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control,*
  70 Ohio St. 2d 95 (1982) ............................................................ 4, 5

*Murphy v. NCAA,*
  584 U.S. 453 (2018) ................................................................ *passim*

*United States v. Phillips,*
  155 F.4th 102 (2d Cir. 2025) ...................................................... 9, 10

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ................................................................ *passim*

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .............................................................. 1, 14, 16

**Statutes, Regulations, and Constitutional Provisions**

U.S. Const. amend. X ................................................................... 17

U.S. Const. art. VI ....................................................................... 15

Ohio Const. art. XV, §6 ................................................................. 5

17 C.F.R. §§38.100–.1200 ............................................................ 31

17 C.F.R. §38.700 ........................................................................ 31

17 C.F.R. §38.750 ........................................................................ 31

17 C.F.R. §38.850 ........................................................................ 31

54 Fed. Reg. 30694 (July 21, 1989) ............................................ 10

7 U.S.C. §1a ......................................................................... 11, 23

7 U.S.C. §2 .......................................................................... *passim*

iii

7 U.S.C. §7a-2 ....................................................................... 33

7 U.S.C. §16 ................................................................... 20, 21

Nev. Gaming Comm'n Reg. 22.010 ...................................................... 26

Nev. Gaming Comm'n Reg. 22.060–.063 ............................................... 26

Nev. Gaming Comm'n Reg. 22.080 ...................................................... 26

Nev. Gaming Comm'n Reg. 22.1205 ..................................................... 27

Nev. Gaming Comm'n Reg. 22.121 ...................................................... 27

Nev. Gaming Comm'n Reg. 5.170 ....................................................... 26

Nev. Rev. Stat. ch. 462 ............................................................... 7

Nev. Rev. Stat. ch. 463 ............................................................... 7

Nev. Rev. Stat. ch. 463B ............................................................. 7

Nev. Rev. Stat. ch. 464 ............................................................... 7

Nev. Rev. Stat. ch. 465 ............................................................... 7

Nev. Rev. Stat. ch. 466 ............................................................... 7

Nev. Rev. Stat. §129.010 ............................................................. 30

Nev. Rev. Stat. §463.0129 ........................................................ 25, 26

Nev. Rev. Stat. §463.170 ......................................................... 26, 32

Nev. Rev. Stat. §463.350 ............................................................. 30

Nev. Rev. Stat. §§463.362–.3668 ..................................................... 26

Nev. Rev. Stat. §463.530 ............................................................. 26

Nev. Rev. Stat. §463.5735 ........................................................... 26

Nev. Rev. Stat. §§465.092–.094 ...................................................... 26

iv

Ohio Rev. Code ch. 3769 ................................................................. 7

Ohio Rev. Code ch. 3770 ................................................................. 7

Ohio Rev. Code ch. 3772 ................................................................. 7

Ohio Rev. Code ch. 3774 ................................................................. 7

Ohio Rev. Code ch. 3775 ................................................................. 7

Ohio Rev. Code §3109.01 .............................................................. 30

Ohio Rev. Code §3775.02 .............................................................. 27

Ohio Rev. Code §3775.03 .............................................................. 27

Ohio Rev. Code §3775.09 .............................................................. 27

Ohio Rev. Code §3775.13 .............................................................. 27

Ohio Rev. Code §3775.99 .............................................................. 30

Pub. L. 111-203, 124 Stat. 1376 (2010) ....................................... 10

## Other Authorities

Am. Gaming Ass'n, *State of the States 2025* (May 13, 2025) .................. 6

Brandon Gustafson, *2024: A year of growth for sports betting
    revenue*, CBS Sports (Mar. 28, 2025) .............................................. 22

Charita M. Goshay, *Ohio offers Voluntary Exclusion List for
    problem gamblers as calls to helpline rise*, Canton
    Repository (Sept. 2, 2024) .............................................................. 28

Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For
    Monday Night Football Games*, Event Horizon (Sept. 30,
    2025) ............................................................................................. 12

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On
    Things*, Event Horizon (April 3, 2025) ..................................... 11, 12

Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024) .............................................................. 28

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011) ................................................................................. 10

George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65 (1996) ........................... 3, 4

*History of Gaming in Nevada*, Nevada Resort Association ................. 4, 5

Jennifer Carleton et al., The Gambling Law Review (Carl Rohsler ed. 2016) ........................................................................... 5

John C. Hull, *Options, Futures, and Other Derivatives* (8th ed. 2012) ...................................................................... 7, 8, 9

John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025) ........................................................ 22

Kalshi Member Agreement (November 4, 2025) .................................... 29

Kalshi Website, Sports: Pro Football; Exact wins ............................... 12

Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024) ........................................ 29

Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024) ................................... 28

Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025) ........................................ 22

Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies (2023) ..............................................................29

Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025)................................................................................28

Nat'l Gambling Impact Study Comm'n, Final Report (1999)....... 7, 27, 29

Norman Menachem Feder, *Deconstructing Over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. 677 (2002) ..............................8

*Ohio Gambling Survey 2022*, Ohio Casino Control Commission..................................................................................28

Rena S. Miller, *Derivatives Regulation and Legislation Through the 111th Congress*, Congressional Research Services (Jan. 30, 2012) ......................................................................8

Randi Richardson, *Online gambling has fueled an industry boom*, NBC News (Oct. 24, 2024) ......................................................28

Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, UNLV: The Center for Gaming Research Occasional Paper Series (2011)..........................5

Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025)................................................................30

Tom Withers, *Cavs coach Bickerstaff says he received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024)................................................................................30

*U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025)................................30

## STATEMENT OF AMICI INTEREST

*Amici* consist of Nevada, Ohio, 36 other States, and the District of Columbia (collectively, "the *amici* States").  They are interested in this case because Kalshi's aggressive theory of preemption threatens the States' longstanding ability to protect their citizens.  The *amici* States submit this brief under Federal Rule of Appellate Procedure 29(a)(2).

## INTRODUCTION

As the saying goes, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  Courts do not expect Congress to make dramatic changes through obscure language.  They instead expect Congress to speak clearly if it intends a sea change.

This basic point dooms Kalshi's case.  By way of background, in January 2025, Kalshi began offering online sports betting on its platform. This activity, unsurprisingly, caught the States' attention.  The States have long regulated gambling, including sports betting.  In some States, sports betting is simply illegal, while in other States, it is allowed but comprehensively regulated.  Nonetheless, Kalshi says that state gambling laws do not matter to its activities.  That is so, Kalshi argues, because of financial legislation Congress enacted fifteen years ago.  Back

1

then, sports betting was illegal in all but a few States. But, according to Kalshi, Congress subtly preempted the States from regulating sports betting when it responded to the 2008 financial crisis—apparently without anyone noticing for years.

If that sounds farfetched, that is because it is. Indeed, Kalshi's position violates two clear-statement rules that inform how courts interpret federal law. *First*, under the federalism canon, courts expect Congress to speak clearly when it intends to shift this country's traditional balance of power. It follows that Congress could not have removed the States' traditional authority over sports betting without even mentioning the subject. *Second*, under the major-questions doctrine, courts expect Congress to speak clearly if it intends to give a federal agency unprecedented authority over significant topics. That doctrine also matters here, as Kalshi's position would delegate to a federal commission the authority to set nationwide sports-gambling policy. If Congress really wanted to delegate that much power, it would not have kept the matter a secret.

In short, the unlikelihood of Kalshi's position signals its downfall. The *amici* States thus submit this brief in support of Maryland.

2

## BACKGROUND

Kalshi's preemption argument rests on an unrealistic premise. The company submits that, when responding to the 2008 financial crisis, Congress quietly chose to make sweeping changes to this country's gambling laws. To understand why that is so unlikely, it helps to review this country's regulatory history—both as to gambling and derivatives markets.

## I. The States traditionally have regulated gambling, including sports betting.

**A.** The regulation of gambling is "concededly within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Indeed, the States have a lengthy history of regulation.

Gambling regulation traces back to before the Founding. On their way to the Americas, sailors on Columbus's ships played games of chance to pass the time. *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65, 66 (1996). But, in the seventeenth century, settling communities began to outlaw such behavior. In 1638, the Puritans of Massachusetts enacted idleness laws that barred people from possessing cards, dice, or other gambling devices. *Id.* About fifty years later, the Quakers of Pennsylvania enacted a similar prohibition. *Id.* During the next century, colonies like New Hampshire

3

and New Jersey took comparable steps. *Id.* Authorities in the Northwest Territories did, too. *Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*, 70 Ohio St. 2d 95, 99 (1982).

After the Founding, opposition to gambling continued to build. For instance, shortly after Ohio entered the Union, its legislature made various forms of gambling illegal. *Id.* And the Ohio Constitution of 1851 expressly added prohibitions on lotteries. *Id.* Even in Nevada, perhaps the most gambling-friendly State in the Union, games of chance were prohibited by the territorial and early state legislatures. *See History of Gaming in Nevada*, Nevada Resort Association, perma.cc/M3FE-BUW2. With these and other developments, "gambling was largely banned throughout the country" by the late 1800s. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018).

But in the twentieth century, many States loosened gambling prohibitions. *Id.* at 458–59. Nevada, for instance, first decriminalized certain forms of gambling in 1869. *History of Gaming in Nevada*, Nevada Resort Association, perma.cc/M3FE-BUW2. After a brief ban on gambling during the Progressive Movement, Nevada eventually legalized "wide-open" gambling in 1931, a move that soon gave rise to Nevada's booming casino

4

industry. *Id.*; Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, UNLV: The Center for Gaming Research Occasional Paper Series, at 1 (2011), http://digitalscholarship.unlv.edu/occ_papers/11.

Although Nevada was on the forefront, other States have also softened on gambling over time. Ohio, as one example, legalized bingo and state-conducted lotteries in the 1970s. *Mills-Jennings of Ohio*, 70 Ohio St. 2d at 101. And, about fifteen years ago, a slim majority of Ohio voters approved a constitutional amendment allowing for casino gaming. *See* Ohio Const. art. XV, §6(C).

**B.** Recently, the country's attention has turned to sports betting. *See Murphy*, 584 U.S. at 460–61. Like other forms of gambling, sports betting was illegal throughout the States for much of this country's history. *See id.* at 458. That began to change in the mid-twentieth century. Nevada set the pace in this area, too: the Silver State began permitting some sports betting with the passage of the Gaming Control Act of 1949. *See* Jennifer Carleton et al., The Gambling Law Review 147 (Carl Rohsler ed. 2016), perma.cc/3BSY-UYMZ. Over the next few decades, Montana,

5

Delaware, and Oregon also legalized certain forms of sports betting. *Murphy*, 584 U.S. at 462.

In the early 1990s, Congress tried to halt sports betting's continued growth. Through the Professional and Amateur Sports Protection Act, Congress purported to bar States from authorizing any additional sports betting. *Id.* at 461. In *Murphy*, however, the Supreme Court held that this barrier was unlawful. *Id.* at 458, 480. Thus, just seven years ago, the Supreme Court left the States "free to act" as they wished on the "controversial subject" of "sports gambling." *Id.* at 486.

The States have made different choices after *Murphy*. Eleven States—Alabama, Alaska, California, Georgia, Hawaii, Idaho, Minnesota, Oklahoma, South Carolina, Texas, and Utah—have kept sports betting illegal. *See* Am. Gaming Ass'n, *State of the States 2025*, at 12-13 (May 13, 2025), perma.cc/J27S-WLSB. But most States have chosen legalization. Today, thirty-nine States, along with the District of Columbia, permit some form of sports betting. *Id.*

**C.** The increased legalization of gambling has not left gambling unregulated. Instead, the States' "authorization of legalized gambling" over the years "has almost always been accompanied by the establishment of

a corresponding regulatory regime and structure." Nat'l Gambling Impact Study Comm'n, *Final Report*, 3-1 (1999), perma.cc/UF4R-2UXH. For example, Ohio has comprehensive statutory schemes regulating the gambling it authorizes. *See, e.g.*, Ohio Rev. Code chs. 3769 (horse racing), 3770 (lotteries), 3772 (casino gaming), 3774 (fantasy contests), 3775 (sports gaming). As does Nevada. *See, e.g.*, Nev. Rev. Stat. chs. 462 (lotteries and games), 463 (licensing and control of gaming), 463B (supervision of certain gaming establishments), 464 (pari-mutuel wagering), 465 (crimes and liabilities concerning gaming), 466 (horse racing).

## II.    In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis.

**A.** The States' regulation of gambling has long co-existed with federal regulation of derivatives markets. Before unpacking those federal regulations, it helps to review some financial terms. A "derivative" is a financial contract whose value depends on, and usually derives from, another, more basic asset such as the value of a stock or the price of hogs. John C. Hull, *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013). A "futures contract" is one type of derivative in which "an agreement between two parties to buy or sell an asset at a certain time in the future for a certain price."

7

Hull, *Options, Futures, and Other Derivatives*, 7.  Parties come together to trade such contracts in standardized form on "exchanges."  *Id.*

Swaps are another type of derivative in which two parties agree to exchange cash flows in the future.  *Id.* at 148; *see also Inv. Co. Inst.*, 720 F.3d at 373*;* Norman Menachem Feder, *Deconstructing Over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. 677, 701–13 (2002) (discussing different types of swaps).  The "most common" swap is an interest-rate swap in which "a company agrees to pay cash flows equal to interest at a pre-determined" rate over a number of years and, in return, receives interest at a floating rate over the same period of time.  Hull, *Options, Futures, and Other Derivatives*, 148.  As another example, a "credit-default swap" mitigates the creditors' risk of a debtor defaulting.  To illustrate, "a company that supplies auto parts to General Motors and depends on payments from GM might purchase a credit default swap on a GM bond to hedge against the risk of a GM default."  Rena S. Miller, *Derivatives Regulation and Legislation Through the 111th Congress*, Congressional Research Services, at 2 (Jan. 30, 2012).

**B.**  With those terms established, move to the regulatory history. From as early as 1921, Congress authorized legislation regulating trades

8

of certain derivatives in commodities markets. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360 (1982). In 1936, Congress enacted the Commodity Exchange Act to expand federal oversight to different commodities and to increase regulation over futures contracts. *Id.* at 362. Among other things, the Act authorized federal officials "to fix limits on the amount of permissible speculative trading in a futures contract." *Id.* at 362–63.

A few decades later, Congress created the Commodity Futures Trading Commission ("CFTC"). *Id.* at 365–66. It gave the CFTC "exclusive jurisdiction over commodity futures trading." *Id.* at 386. But lawmakers worried that some might overread the CFTC's jurisdiction. *Id.* at 386. Thus, the statute detailing the CFTC's exclusive jurisdiction contains two saving clauses, which protect the States' "regulatory authorities" and "the jurisdiction" of state courts. 7 U.S.C. §2(a)(1)(A).

**C.** Until 2010, the CFTC lacked authority to regulate swaps. *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025). That is likely because for many years, swaps were perceived as a narrow category of derivatives with little potential for mischief. In 1989, for instance, the CFTC issued guidance distinguishing unregulated "swap transactions"

9

from regulated "futures contracts." *See* 54 Fed. Reg. 30694, 30694 (July 21, 1989). The commission stressed that swaps were "predominantly" confined to "commercial and institutional participants." *Id.* at 30695. A swap, moreover, typically involved parties acting "in conjunction with" their "line of business." *Id.* at 30697. The CFTC further emphasized that unregulated swaps were not "marketed to the public." *Id.*

Without regulation, however, "[t]rading in swaps exploded in the early 2000s." *Phillips*, 155 F.4th at 113. And many blamed swaps for the 2008 financial crisis. *Id.* In particular, a congressionally authorized investigation found that credit-default swaps helped "fuel the housing bubble." Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* at xxiv (2011), perma.cc/C54L-RZVE.

In response, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. 111-203, 124 Stat. 1376 (2010). The Act extended the CFTC's jurisdiction to include "swaps." *See* 7 U.S.C. §2(a)(1)(A). The Act defined a "swap" to include "any agreement, contract, or transaction … that provides for any purchase, sale, payment,

10

or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."   7 U.S.C. §1a(47)(A).  The Act further made it generally "unlawful for any person ... to enter into a swap unless the swap is entered into on" a CFTC-regulated contract market.  7 U.S.C. §2(e); *see also* 7 U.S.C. §1a(18).  Thus, an ordinary consumer who wishes to trade in a "swap" must do so on a designated contract market.

## III.  Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide.

This brings us to the dispute between Kalshi and the States.  Kalshi is a designated contract market that offers online "events contracts" to users.  Contracts traded on Kalshi identify a future circumstance and allow users to bet on whether the circumstance will happen.  If users bet correctly, they are paid out.  By this format, Kalshi boasts that users may "[t]rade on anything" regardless of state law.   X Post, @Kalshi, perma.cc/X9YC-EHE7 (last accessed November 24, 2025).

Many of the "contracts" Kalshi lists are indistinguishable from sports betting.  *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025) perma.cc/CWK2-TZCV.  Kalshi has

said so. Take, for instance, this ad from the last March Madness tourna-ment:



*Id.*

It takes only a quick trip to Kalshi's website to solidify the point. The website has an entire category dedicated to "sports" where people can bet on "events" like whether the Baltimore Ravens will win ten or more games this season. Kalshi Website, Sports: Pro Football; Exact wins, https://kalshi.com/sports/football (last accessed December 15, 2025). Kalshi also recently began offering parlays, which combine two or more wagers into a single bet. *See* Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R.

12

To support its claim of nationwide sports betting, Kalshi relies on a novel theory. It argues that events contracts about sports are "swaps" within the CFTC's exclusive jurisdiction. Kalshi Br.25–26. Kalshi is now litigating this theory across the country. In addition to Maryland, lawsuits are ongoing in Connecticut, Nevada, New Jersey, New York, Massachusetts, and Ohio. Illinois and Montana have also sent Kalshi cease-and-desist letters.

While preliminary results have been mixed, multiple district courts have already found Kalshi's theory unlikely. Below, the district court laid out many different reasons why statutory text does not signal the necessary preemptive intent. Memo. Op. 13–20, R.70. More recently, a Nevada district court rejected the premise that sports wagers qualify as swaps under federal law. *Kalshiex, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282, at *3 (D. Nev. Nov. 24, 2025). That court emphasized that "Kalshi's proposed reading" would upend the "the traditional balance between state and federal regulation of gaming" without an "expressed congressional intent to do so"; all while leaving "no federal gaming regulator to replace the states' regulatory infrastructures." *Id.* at *8.

13

## SUMMARY OF ARGUMENT

The *amici* States agree with Maryland that federal law does not preempt States from regulating sports betting via events contracts. Through both legal and practical considerations, this brief highlights the implausible nature of Kalshi's theory.

**I.** When Congress intends major changes to federal law, it does not obscure that intent. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Kalshi's position violates this well-settled notion in two ways.

*First*, Kalshi's position violates the federalism canon. Under the canon, courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond v. United States*, 572 U.S. 844, 857–59 (2014). This canon applies here. The regulation of gambling falls within the States' traditional powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). For centuries, therefore, the States have regulated gambling, including sports betting. This Court should not upset this traditional balance absent a clear congressional directive. And Kalshi identifies none.

*Second*, Kalshi's position violates the major-questions doctrine. The doctrine requires broad claims of federal-agency authority to flow from

14

"clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted).  This doctrine also applies here.  With millions of people involved and billions of dollars at stake, sports betting is a matter of great political and economic significance.  Kalshi's theory gives the CFTC broad power to make nationwide decisions about sports betting.  If Congress intended to give the CFTC so much power, it would have spoken far more clearly.

**II.**  The negative ramifications of Kalshi's position are another sure sign that the company is wrong.  The States have considerable experience in regulating gambling, including sports betting.  The CFTC, by contrast, "has no expertise in crafting" policies to address sports betting.  *See King v. Burwell*, 576 U.S. 473, 486 (2015).  That makes it "especially unlikely that Congress would have delegated" this power in such an opaque manner.  *See id.*

## ARGUMENT

Under the Supremacy Clause, federal law is "the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  So, when Congress acts within its enumerated powers, it may preempt state law through federal statutes.  Such preemption can take different forms: federal statutes sometimes

15

preempt state law expressly; other times they preempt by implication. *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). But preemption always turns on the text of federal law. *Id.* at 202. And to give statutory text a "fair reading," courts must remain aware that "Congress legislates against the backdrop" of certain presumptions. *Bond v. United States*, 572 U.S. 844, 857 (2014) (quotation omitted).

In this case, two backdrop presumptions—the federalism canon and major-questions doctrine—render Kalshi's position untenable. And practical considerations only reinforce the point.

## I.    When Congress makes major changes to the existing state of law, it does so clearly, not obscurely.

Congress, the Supreme Court has said, does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). So when Congress seeks to change the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.* Textual arguments that suggest otherwise "ultimately founder." *See id.*

This no-elephants-in-mouseholes principle has several context-specific applications. For example, if Congress wishes to abrogate a government body's sovereign immunity, it "must use unmistakable language." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo*

16

*Investigativo, Inc.*, 598 U.S. 339, 342 (2023).  And "absent a clear statement from Congress," courts presume that federal statutes are inapplicable outside the United States.  *Bond*, 572 U.S. at 857.  These and other "clear-statement rules help courts act as faithful agents of the Constitution."  *West Virginia v. EPA*, 597 U.S. 697, 736 (2022) (Gorsuch, J., concurring) (quotation omitted).

Two clear-statement rules prove critical here.  Specifically, the federalism canon and major-questions doctrine both demonstrate why Kalshi's counterintuitive preemption theory should fail.

## A.  Kalshi's position violates the federalism canon.

Begin with the federalism canon, which stems from "basic principles of federalism."  *Bond*, 572 U.S. at 859.  As every schoolchild learns, the Constitution gives the federal government "only limited powers; the States and the people retain the remainder."  *Id.* at 854; *see* U.S. Const. amend. X.  That setup leaves the States with considerable police powers that they exercise for the public good.  *Bond*, 572 U.S. at 854.  Congress, moreover, legislates against this default ordering of sovereign authority.  *Id.* at 857–58. Against that "backdrop," any statute that displaces or limits a significant amount of state power constitutes a major change.  *See*

17

*id.* at 857 (quotation omitted). And one expects Congress to speak clearly when effecting a major change. Thus, absent a "clear statement," courts should not assume that Congress intends "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *Id.* at 858–59 (quotation omitted). That ensures that Congress "has in fact faced, and intended to bring into issue, the critical matters involved." *Id.* at 858 (quotation omitted).

This federalism canon applies with particular force to preemption. Preemption necessarily triggers the "sensitive relation between federal and state" authority. *Id.* (quotation omitted). Courts thus need "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 858 (quotation omitted). Courts should thus be especially "reluctant to find" preemption in an area "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

The federalism canon applies with full force here. Given the many dangers of gambling (*below* 27–30), the regulation of gambling fits neatly "within the police powers of a State." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Or, to borrow this Court's words, "because the regulation

18

of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens the regulation of gambling lies at the heart of the state's police power." *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) (quotation omitted). It should therefore come as no surprise that the States have a lengthy history of gambling regulation, including the regulation of sports betting. *Above* 3–7. And federal law historically has "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

Applying the federalism canon, Kalshi's theory should fail unless Congress made a "clear statement" signaling that it intended "a significant change in the sensitive relation between" the federal and state governments as to gambling. *See Bond*, 572 U.S. at 858–59 (quotation omitted); *accord Ah Sin*, 198 U.S. at 505–06. Kalshi identifies no clear statement within federal law. Kalshi instead offers a roundabout preemption theory under which Congress—fifteen years ago, when sports betting was mostly illegal—supposedly made a subtle-but-drastic change to gambling laws by inserting the word "swap" into a pre-existing regulatory scheme aimed at financial regulation. *See* Kalshi Br.25–26; *above* 8–11.

19

Tellingly, Kalshi's position is much like proposed readings that have failed in past clear-statement cases. For instance, in 2000, the Supreme Court stopped a dramatic expansion of federal regulatory authority by refusing to read the word "drug"—in the context of the Food, Drug, and Cosmetic Act—to include tobacco. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). And in *Bond*, the Supreme Court refused to read the term "chemical weapon" in an "improbably broad" and "boundless" way that would have reached "purely local crimes" and "intrude[d] on the police power of the States." *Bond*, 572 U.S. at 860. This Court should likewise refuse to read the term "swaps"—a term of art describing particular financial instruments used to hedge against economic risk—in an improbably broad and boundless way that usurps the States' police power over sports betting.

If the text clearly signals anything here, it is the *lack* of any intent to preempt sports-betting regulations. The exclusive-jurisdiction provision on which Kalshi so heavily relies includes not just one, but two saving clauses, both of which signal preservation of state authority. 7 U.S.C. §2(a)(1)(A). The statutory scheme also includes two express preemption clauses. 7 U.S.C. §16(e)(2), (h). One of those clauses preempts state laws

20

about select forms of "gaming." §16(e)(2). But that clause does not cover sports betting. Thus, Congress's inclusion of a specific preemption provision tailored to other forms of gaming indicates a lack of preemptive intent as to sports betting. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

In sum, Kalshi invites the Court to read an express-preemption clause into federal law where none exists. Because this is an area of traditional state authority, the Court should squarely reject that invitation.

**B.    Kalshi's position violates the major-questions doctrine.**

Turn next to another clear-statement rule: the major-questions doctrine. The doctrine teaches that courts—when reading statutes empowering federal agencies—should employ "common sense as to the manner in which Congress would have been likely to delegate" power. *West Virginia*, 597 U.S. at 722–23 (alteration accepted, quotation omitted). "Extraordinary grants of regulatory authority," the Supreme Court has explained, "are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* at 723 (alteration accepted, quotation omitted).

The major-questions doctrine thus requires a clear statement whenever a federal agency claims broad and novel authority over matters of

21

great economic and political significance. *See id.* at 721, 724. In these situations, a "colorable textual basis" is not enough to support a major grant of federal-agency authority. *Id.* at 722. Rather, an assertion of broad authority must arise from a "clear congressional authorization." *Id.* at 724 (quotation omitted).

This case implicates the major-questions doctrine. Sports betting is an issue of political and economic significance—and one on which "Americans have never been of one mind." *Murphy*, 584 U.S. at 458. Like other major questions, sports betting involves "billions of dollars" and affects "millions of people." *King v. Burwell*, 576 U.S. 473, 485 (2015). Over the last year, over one-in-five adults in this country bet money on sports. John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT. And Americans wagered almost $150 billion on sports in 2024. Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp. Indeed, Kalshi alone now reports wagering volumes of over $1 billion a month, 90% of which comes from sports betting. Lev Akabas, *Kalshi's*

22

*Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM.

Beyond those staggering figures, the regulation of sports betting is politically and historically significant. As detailed above (at 5–6), sports betting has been illegal under state law for much of this country's history. It remains illegal in eleven States. And the States that do allow sports betting have made different decisions about what to allow.

Against this backdrop, Kalshi's position would grant the CFTC an incredible and unexpected amount of power. Once again, Kalshi argues that sports bets packaged as events contracts qualify as "swaps" for purposes of CFTC's exclusive jurisdiction. *See* Kalshi Br.25–26; 7 U.S.C. §2(a)(1)(A).

An important textual consequence flows from Kalshi's position. If sports bets qualify as swaps within the CFTC's exclusive jurisdiction, then sports bets cannot be treated in any other fashion. Under the federal definition of swap, a swap is any type of "agreement, contract, or transaction" that satisfies certain conditions. 7 U.S.C. §1a(47)(A). If an agreement satisfies those conditions, the federal scheme makes it "*unlawful* for any person" to enter into such an agreement except via a

23

CFTC-regulated contract market. 7 U.S.C. §2(e) (emphasis added). Thus, Kalshi is not simply arguing that sports betting *may* occur on designated contract markets. Kalshi's real argument is that sports betting *must* occur on those markets, subject to the sole regulation of the CFTC. It would follow that States which authorize sports betting via state-regulated processes—again, about forty States at present, *see above* 6—are all facilitating illegal activity under federal law.

In effect, Kalshi's position would make the CFTC this country's arbiter of sports betting. If Congress truly meant to give the commission that much discretion, it would have spoken clearly. Kalshi, again, points to no such clear statement. *Above* 19–20. Instead, its attenuated theory of preemption relies on a contextless brand of textualism that is "colorable" at best. *See West Virginia*, 597 U.S. at 724 (quotation omitted). And a merely colorable textual theory is not enough for such a change. *Id.*

To hammer the point home, revisit the history. As Kalshi would have it, Congress preempted state gambling laws as part of its response to the 2008 financial crisis. *Above* 9–13. But that makes no historical sense. Nobody thought that "sports gambling gone wrong" caused the financial crisis. Sports betting was, after all, mostly illegal at that time. *See*

24

*Murphy*, 584 U.S. at 458. Congress was instead responding to a much different problem involving derivatives like credit default swaps. *Above* 10. Thus, employing even an ounce of "common sense as to the manner in which Congress would have been likely to delegate" power, *see West Virginia*, 597 U.S. at 722–23 (quotation omitted), Kalshi's argument crumbles. Congress did not sneak sports-gambling preemption into the Dodd-Frank Act, and this Court should confirm as much.

## II. Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens.

Practical concerns make Kalshi's position even less likely. As a corollary to the major-questions doctrine, Congress is "especially unlikely" to delegate broad power to an agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. This Court should thus be "especially" reluctant to transfer authority over sports betting from experienced state regulators to an inexperienced federal commission.

### A. States are experienced in regulating sports betting and its many potential harms.

**1.** States that allow sports betting comprehensively regulate that activity. For example, given the importance of gambling to Nevada's overall economy, the State strictly regulates all gambling activities to ensure the public's continued "confidence and trust." Nev. Rev. Stat.

25

§463.0129(1) (outlining Nevada's public policy on gambling).  A central part of Nevada's mission is ensuring that gaming proprietors are "controlled and assisted" so as to "protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." *Id.*

Consistent with that goal, Nevada's regulatory scheme offers gamblers many levels of protection.  As a general matter, Nevada employs a rigorous licensing process that ensures any gambling entity undergoes an in-depth investigation before receiving a license.  *See* Nev. Rev. Stat. §§463.170, 463.530, 463.5735; *see also below* 32–33.  This process ensures that gambling is free from organized crime and other criminal elements.

Nevada's regulatory scheme also offers a variety of more specific protections.  For instance, Nevada requires those that conduct gaming operations to conspicuously post information about resources for problem gamblers.  Nev. Gaming Comm'n Reg. 5.170.  Nevada law also includes various safeguards to protect against improper betting practices, including improper wagers on sports.  *See, e.g.*, Nev. Rev. Stat. §§465.092–.094; Nev. Gaming Comm'n Regs. 22.010(14), 22.060–.063, 22.080(1); *cf. also* Nev. Rev. Stat. §§463.362–.3668 (detailing Nevada's dispute resolution process).  Of particular note, Nevada prohibits sports wagers by game

26

officials, owners, coaches, players, or other team staff. *See* Nev. Gaming Comm'n Reg. 22.1205. Further, Nevada requires that those facilitating sports betting report suspicious activity. Nev. Gaming Comm'n Reg. 22.121.

Consider also Ohio's recently adopted approach to sports gambling. Similar to Nevada, Ohio prohibits companies from offering sports betting without a license. Ohio Rev. Code §3775.03(A). That requires a company to establish that it can responsibly facilitate such gambling. *See* Ohio Rev. Code §3775.09(A)–(B). Along related lines, Ohio facilitates an exclusion program whereby people worried about their sports gambling habits may place themselves on a voluntary exclusion list. *See* Ohio Rev. Code §3775.02(B)(11). To enforce that list, sports gaming proprietors are required to "employ commercially reasonable methods to prevent any person who is participating in the sports gaming voluntary exclusion program from engaging in sports gaming." Ohio Rev. Code §3775.13(C)(1).

**2.** These and other regulations protect the States' citizens and mitigate the risks of gambling. While gambling is entertaining for many, it is dangerous for some. Millions of Americans qualify as problematic or pathological gamblers. Nat'l Gambling Impact Study Comm'n, Final

27

Report, 4-1; Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024), perma.cc/BQY6-YBC3. And research has linked gambling to many other problems—substance abuse and psychological distress, to name a few. *See* Randi Richardson, *Online gambling has fueled an industry boom*, NBC News (Oct. 24, 2024), perma.cc/XL7W-QS2L.

Some gamble to the point of financial ruin. *See* Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024), perma.cc/JG9G-P7QT. Others place gambling over the health of loved ones. *See* Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024), perma.cc/E4ZU-U3MN. Still others gamble to the point of suicide. *See* Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025), perma.cc/76KG-5ZGS.

With the growing ease of gambling, these problems are on the rise. *See id.* A 2022 survey performed by the Ohio Casino Control Commission signaled that the prevalence of at risk/problem gamblers in the Buckeye State had nearly doubled in five years. *See Ohio Gambling Survey 2022*,

28

Ohio Casino Control Commission, perma.cc/4GG3-SGQE (slide five of PowerPoint). As another datapoint, calls to Ohio's gambling hotline were up 55% in 2023. Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024), https://tinyurl.com/mtjnna33.

Minors are particularly vulnerable, as online sports betting attracts a younger crowd. A recent New Jersey-based survey reflected that nearly one in every five people surveyed between the ages of 18 and 24 was at high risk of a gambling problem. *See* Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies, at 33 (2023), perma.cc/V3KH-BPHC. And research reflects that those who start gambling at a young age run a higher risk of problematic gambling. *See* Nat'l Gambling Impact Study Comm'n, Final Report, 4-12.

But Kalshi's position, if accepted, would effectively lower the gambling age in many States. According to Kalshi's membership agreement, the company's services are open to anyone of the age of majority in their State. Kalshi Member Agreement (November 4, 2025), https://perma.cc/ZH3B-2G9P. In many if not most States, the age of

29

majority is eighteen. *See, e.g.*, Nev. Rev. Stat. §129.010; Ohio Rev. Code §3109.01. But many States have decided to limit gambling (or at least certain types of gambling) to those twenty-one or older. *See, e.g.*, Nev. Rev. Stat. §463.350; Ohio Rev. Code §3775.99(A). That discrepancy is no small matter. As just mentioned, those who begin gambling at a young age face a higher risk of long-term problems. That might be good for Kalshi's bottom line, but it is bad for the States' citizens.

One final problem deserves emphasis. As several recent events illustrate, sports betting also risks the integrity of sporting events. Just weeks ago, the federal government indicted dozens of people—including current and former NBA players—alleging unlawful betting on professional basketball games. *U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025), https://tinyurl.com/yux8k2nk. Earlier this year, it took only a few pitches during baseball games to spark controversy over prop bets in Ohio. *See* Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025), perma.cc/CA26-SA28. And last year, gamblers even threatened a coach of the Cleveland Cavaliers. Tom Withers, *Cavs coach Bickerstaff says he*

*received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024), perma.cc/4KR5-3F56.

> ### B.   Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.

Contrary to Kalshi's suggestions, federal regulation of the derivatives marketplace is not a cure-all when it comes to nationwide sports betting. Kalshi hints that federal law's "detailed system" for regulating designated contract markets should alleviate any concerns. *See* Kalshi Br.15–17. But the CFTC's present regulatory requirements provide cold comfort for sports betting. Those requirements—often called the "core principles"—are outlined within the federal code. *See* 17 C.F.R. §§38.100–.1200. They cover topics like dispute resolution, 17 C.F.R. §38.750, conflicts of interest, 17 C.F.R. §38.850, and disciplinary procedures, 17 C.F.R. §38.700.

Although Kalshi is regulated in this sense, these regulations are geared toward participants in the financial markets. They do not replace the States' regulatory schemes, which are specifically designed to combat problems associated with gambling. Moreover, relying on federal regulation alone forces a one-size-fits-all regime, eliminating the States' ability to experiment with other approaches.

Take Nevada again. The State, after all, has nearly one hundred years' experience in regulating legalized gambling to respond to challenges unique to both the gambling industry and local Nevadan concern.

With that experience in mind, consider a gap that would result from a federal-only regime. Nevada has developed robust procedures for determining the suitability of any person involved in the gaming industry in Nevada. This suitability determination is a front-loaded process in which the person seeking a gaming approval bears the burden of showing the person is qualified to hold a license. Nev. Rev. Stat. §463.170(1). This burden entails satisfying the Nevada Gaming Commission that the person is a "person of good character, honesty and integrity"; that the person's "prior activities, criminal record ..., reputation, habits and associations do not pose a threat to the public interest of [Nevada] or to the effective regulation and control of gaming"; and that the person is "[i]n all other respects qualified to be licensed or found suitable consistently with the declared policy of [Nevada]." Nev. Rev. Stat. §463.170(2). This burden extends to the person showing "adequate business probity, competence and experience, in gaming" and that the financing for the operation is both adequate and from a suitable source. Nev. Rev. Stat. §463.170(3).

32

In this way, Nevada takes care to screen out potentially predatory, bad actors from its system of legalized gambling.

The Commodity Exchange Act offers no comparator to Nevada's suitability procedures. Worse still, designated contract markets like Kalshi may list new types of events contracts on their exchange without pre-approval, simply by self-certifying to the CFTC that the new contract complies with federal law. *See* 7 U.S.C. §7a-2(c)(1). Such loose processes will allow individuals who would be unable to clear state-law hurdles to run de facto sports books, immune from the States' regulation.

The takeaway is simple. Under Kalshi's theory, the various state-law safeguards discussed above would disappear. That, in turn, would create a sizeable hole in the States' ability to protect their citizens from predatory practices and other problematic behavior.

*

One critical benefit of our constitutional structure is that the States act "as laboratories" of democracy, "devising solutions" to new and difficult problems. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quotation omitted). That flexibility is a particularly good thing here since "Americans have never been of one mind

33

about gambling." *Murphy*, 584 U.S. at 458.  States are in the best position to implement innovative regulatory schemes responsive to particularized concerns that arise within their borders, thereby protecting the public and promoting confidence in the gaming industry.  Nothing in federal law suggests, much less clearly states, that Congress has stripped the States of their traditional power over sports betting.  This Court, it follows, should not do so.

## CONCLUSION

The Court should affirm.

| | |
|---|---|
| AARON D. FORD<br>Nevada Attorney General | DAVE YOST<br>Ohio Attorney General |
| HEIDI PARRY STERN<br>Nevada Solicitor General<br>JESSICA E. WHELAN<br>Chief Deputy Solicitor General<br>Office of the Nevada<br>Attorney General<br>1 State of Nevada Way, Suite 100<br>Las Vegas, NV 89119<br>702.486.3420<br>jwhelan@ag.nv.gov | */s/ Mathura J. Sridharan*<br>MATHURA J. SRIDHARAN*<br>Ohio Solicitor General<br> *Counsel of Record*<br>ZACHERY P. KELLER<br>Deputy Solicitor General<br>30 East Broad Street, 17th Floor<br>Columbus, Ohio 43215<br>614.466.8980<br>Mathura.Sridharan@OhioAGO.gov |
| *Counsel for Amicus Curiae*<br>  *State of Nevada* | *Counsel for Amicus Curiae*<br>  *State of Ohio* |

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

STEPHEN J. COX
Alaska Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia
Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

MATTHEW J. PLATKIN
New Jersey Attorney General

RAÚL TORREZ
New Mexico Attorney General

36

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

DAN RAYFIELD
Oregon Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

PETER F. NERONHA
Rhode Island Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

DEREK E. BROWN
Utah Attorney General

CHARITY R. CLARK
Vermont Attorney General

NICHOLAS W. BROWN
Washington Attorney General

JOSH KAUL
Wisconsin Attorney General

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume for an *amicus* brief supporting an appellant and contains 6,394 words. *See* Fed. R. App. P. 32(a)(7)(B)(i), 29(a)(5).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/  Mathura J. Sridharan*
MATHURA J. SRIDHARAN
Ohio Solicitor General

38

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN
Ohio Solicitor General

# Exhibit G

No. 25-7516

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KALSHIEX LLC,
*Plaintiff-Appellant,*

v.

KIRK D. HENDRICK, ET AL.,
*Defendants-Appellees.*

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the Judgment of the United States
District Court for the District of Nevada
(Dist. Ct. No. 2:25-cv-00575-APG-BNW)

### BRIEF OF *AMICI CURIAE* OF NEW JERSEY, OHIO, 37 OTHER STATES, AND THE DISTRICT OF COLUMBIA SUPPORTING APPELLEES

JENNIFER DAVENPORT
New Jersey Attorney General

JEREMY M. FEIGENBAUM
New Jersey Solicitor General
STEPHEN EHRLICH
Deputy Solicitor General
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
Stephen.Ehrlich@njoag.gov

*Counsel for Amicus Curiae
  State of New Jersey*

DAVE YOST
Ohio Attorney General

MATHURA J. SRIDHARAN*
Ohio Solicitor General
  *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae
  State of Ohio*

*Additional counsel listed after signature block*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................ii

STATEMENT OF AMICI INTEREST ......................................................1

INTRODUCTION................................................................................1

BACKGROUND .................................................................................3

   I.    The States traditionally have regulated gambling, including sports betting. .................................................................3

   II.   In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis. .........................7

   III.  Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide. ..............10

SUMMARY OF ARGUMENT ...............................................................13

ARGUMENT ...................................................................................15

   I.    When Congress makes major changes to the existing state of law, it does so clearly, not obscurely. ........................16

     A.    Kalshi's position violates the federalism canon. ..................17

     B.    Kalshi's position violates the major-questions doctrine.......21

   II.   Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens. .........................25

     A.    States are experienced in regulating sports betting and its many potential harms.........................................25

     B.    Existing federal regulation is an insufficient substitute for the States' robust gaming regulations................................31

CONCLUSION .................................................................................35

ADDITIONAL COUNSEL ...................................................................36

CERTIFICATE OF COMPLIANCE FOR BRIEFS .............................38

CERTIFICATE OF SERVICE.............................................................40

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Ah Sin v. Wittman,*
198 U.S. 500 (1905) ........................................................... 3, 14, 18, 19

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ..................................................................... 34

*Artichoke Joe's Cal. Grand Casino v. Norton,*
353 F.3d 712 (9th Cir. 2003) ......................................................... 18

*Bond v. United States,*
572 U.S. 844 (2014) ............................................................... *passim*

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) ....................................................................... 21

*CSX Transp., Inc. v. Easterwood,*
507 U.S. 658 (1993) ....................................................................... 18

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ....................................................................... 19

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de
Periodismo Investigativo, Inc.,*
598 U.S. 339 (2023) ....................................................................... 16

*Greater New Orleans Broadcasting Ass'n, Inc. v. United
States,*
527 U.S. 173 (1999) ....................................................................... 19

*Inv. Co. Inst. v. CFTC,*
720 F.3d 370 (D.C. Cir. 2013) ......................................................... 7

*KalshiEX LLC v. Martin,*
793 F. Supp. 3d 667 (D. Md. 2025) ................................................. 13

*Kalshiex, LLC v. Hendrick,*
No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24,
2025) ........................................................................................... 13

*Kansas v. Garcia,*
  589 U.S. 191 (2020) ................................................................... 15

*King v. Burwell,*
  576 U.S. 473 (2015) ..................................................... 15, 22, 25

*Massachusetts v. KalshiEX, LLC,*
  No. 2584CV02525, 2026 Mass. Super. LEXIS 2 (Mass.
  Sup. Ct. Jan. 20, 2026) ............................................................. 13

*Merrill Lynch, Pierce, Fenner & Smith v. Curran,*
  456 U.S. 353 (1982) ...................................................................8

*Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control,*
  70 Ohio St. 2d 95 (1982) ...........................................................4

*Murphy v. NCAA,*
  584 U.S. 453 (2018) ......................................................... *passim*

*United States v. Phillips,*
  155 F.4th 102 (2d Cir. 2025) ....................................................9

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ........................................................ *passim*

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ....................................................... 1, 14, 16

**Statutes, Regulations, and Constitutional Provisions**

U.S. Const. amend. X ....................................................................17

U.S. Const. art. VI ........................................................................15

N.J. Const. art. IV, §7 ....................................................................4

Ohio Const. art. XV, §6 ..................................................................5

17 C.F.R. §§38.100–.1200 ..............................................................31

17 C.F.R. §38.700 ..........................................................................31

17 C.F.R. §38.750 ..........................................................................31

17 C.F.R. §38.850 ...................................................................... 31

54 Fed. Reg. 30694 (July 21, 1989) ............................................ 9

89 Fed. Reg. 48968 (June 10, 2024) ........................................ 33

7 U.S.C. §1a ..................................................................... 10, 23

7 U.S.C. §2 ............................................................... *passim*

7 U.S.C. §7a-2 ......................................................................... 33

7 U.S.C. §16 ................................................................... 20, 21

N.J. Admin. Code §§13:69N-1.6 to -1.12 ............................... 26

N.J. Admin. Code §13:69N-1.8 ............................................... 26

N.J. Admin. Code §13:69O-1.2 ............................................... 26

N.J. Stat. Ann. §§5:5-22 to -206 .............................................. 6

N.J. Stat. Ann. §§5:8-1 to -131 ................................................ 6

N.J. Stat. Ann. §§5:9-1 to -25 .................................................. 7

N.J. Stat. Ann. §§5:12-1 ................................................... 25, 26

N.J. Stat. Ann. §§5:12-1 to -233 ......................................... 4, 7

N.J. Stat. Ann. §5:12-84 ......................................................... 32

N.J. Stat. Ann. §5:12-104 ....................................................... 33

N.J. Stat. Ann. §§5:12A-10 to -11 .......................................... 26

N.J. Stat. Ann. §§5:12A-10 to -19 ............................................ 7

N.J. Stat. Ann. §5:12A-11 .......................... 27, 30, 32, 33

N.J. Stat. Ann. §5:12A-13 ....................................................... 26

N.J. Stat. Ann. §9:17B-3 ........................................................ 30

iv

Ohio Rev. Code 3769.01-.28 ...................................................................6

Ohio Rev. Code 3770.01-.99 ...................................................................6

Ohio Rev. Code 3772.01-.99 ...................................................................6

Ohio Rev. Code 3774.01-.09 ...................................................................6

Ohio Rev. Code 3775.01-.99 ...................................................................6

Ohio Rev. Code §3109.01.......................................................................30

Ohio Rev. Code §3775.02.......................................................................27

Ohio Rev. Code §3775.03.......................................................................27

Ohio Rev. Code §3775.09.......................................................................27

Ohio Rev. Code §3775.13.......................................................................27

Ohio Rev. Code §3775.99.......................................................................30

Pub. L. 111-203, 124 Stat. 1376 (2010)................................................10

**Other Authorities**

Am. Gaming Ass'n, *State of the States 2025: The AGA
    Analysis of the Commercial Casino Industry* (May 13,
    2025)........................................................................................... 5, 6

Brandon Gustafson, *2024: A year of growth for sports betting
    revenue*, CBS Sports (Mar. 28, 2025)..............................................22

Charita M. Goshay, *Ohio offers Voluntary Exclusion List for
    problem gamblers as calls to helpline rise*, Canton
    Repository (Sept. 2, 2024)................................................................27

Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For
    Monday Night Football Games*, Event Horizon (Sept. 30,
    2025).................................................................................................12

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On
    Things*, Event Horizon (April 3, 2025)..............................................11

Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024) ................................................................ 28

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011) ......................................................................... 9

George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65 (1996) ........................... 3, 4

Jennifer Carleton et al., *Chapter 14: Nevada*, in The Gambling Law Review (Carl Rohsler ed. 2016) ................................. 5

John C. Hull, *Options, Futures, and Other Derivatives* (8th ed. 2012) ............................................................................ 7, 8, 9

John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025) .......................................................... 22

Kalshi Member Agreement (November 4, 2025) ................................... 29

Kalshi Website, Sports ................................................................................ 12

Kalshi Website, Sports: Football; Events ............................................... 12

Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024) ......................................... 29

Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024) .................................... 28

Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025) ...................................... 23

Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies (2023) ...............................................................29

Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025) ...............................................................28

Nat'l Gambling Impact Study Comm'n, Final Report (1999) ....... 6, 27, 29

*Ohio Gambling Survey 2022*, Ohio Casino Control Commission ...............................................................28

Randi Richardson, *Online gambling has fueled an industry boom*, NBC News (Oct. 24, 2024) ...............................................28

Rena S. Miller, *Derivatives Regulation and Legislation Through the 111th Congress*, Congressional Research Services (Jan. 30, 2012) ...............................................................8

Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025) ...............................................................30

Tom Withers, *Cavs coach Bickerstaff says he received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024) ...............................................................30

*U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025) ...............................................30

X Post, @Kalshi ...............................................................11

## STATEMENT OF AMICI INTEREST

*Amici* consist of New Jersey, Ohio, 37 other States, and the District of Columbia ("the *amici* States"). They are interested in this case because Kalshi's aggressive theory of preemption threatens the States' longstanding ability to protect their citizens. The *amici* States submit this brief under Federal Rule of Appellate Procedure 29(a)(2).

## INTRODUCTION

As the saying goes, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Courts do not expect Congress to make dramatic changes through obscure language. They instead expect Congress to speak clearly if it intends a sea change.

This basic point dooms Kalshi's case. By way of background, in January 2025, Kalshi began offering online sports betting on its platform. This activity caught the States' attention. The States have long regulated gambling, including sports betting. In some States, sports betting is simply illegal, while in other States, it is allowed but comprehensively regulated. Nonetheless, Kalshi says that state gambling laws do not matter to its activities. That is so, the argument goes, because of financial legislation Congress enacted fifteen years ago. Back then, sports betting

1

was illegal in all but a few States. But, according to Kalshi, Congress subtly preempted the States from regulating sports betting when it responded to the 2008 financial crisis—apparently without anyone noticing for years.

If that sounds farfetched, that is because it is. Indeed, Kalshi's position violates two clear-statement rules that inform how courts interpret federal law. *First*, under the federalism canon, courts expect Congress to speak clearly when it intends to shift this country's traditional balance of power. It follows that Congress could not have removed the States' traditional authority over sports betting without even mentioning the subject. *Second*, under the major-questions doctrine, courts expect Congress to speak clearly if it intends to give a federal agency unprecedented authority over significant topics. That doctrine also matters here, as Kalshi's position would delegate to a federal commission the authority to set nationwide sports-gambling policy. If Congress really wanted to delegate that much power, it would not have kept the matter a secret.

In short, the unlikelihood of Kalshi's position signals its downfall. The *amici* States thus submit this brief in support of Nevada.

## BACKGROUND

Kalshi's preemption argument rests on an unrealistic premise. The company submits that, when responding to the 2008 financial crisis, Congress quietly chose to make sweeping changes to this country's gambling laws. To understand why that is so unlikely, it helps to review this country's regulatory history—both as to gambling and derivatives markets.

## I.  The States traditionally have regulated gambling, including sports betting.

**A.** The regulation of gambling is "concededly within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Indeed, the States have a lengthy history of regulation.

Gambling regulation traces back to before the Founding. On their way to the Americas, sailors on Columbus's ships played games of chance to pass the time. *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65, 66 (1996). But settling communities eventually outlawed such behavior. In 1638, the Puritans of Massachusetts enacted idleness laws that barred people from possessing cards, dice, or other gambling devices. *Id.* About fifty years later, the Quakers of Pennsylvania enacted a similar prohibition. *Id.* During the next century, colonies like New Hampshire and New Jersey took

3

comparable steps. *Id.* Authorities in the Northwest Territories did, too. *Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*, 70 Ohio St. 2d 95, 99 (1982).

After the Founding, opposition to gambling continued to build. For instance, shortly after Ohio entered the Union, its legislature made various forms of gambling illegal. *Id.* And the Ohio Constitution of 1851 expressly added prohibitions on lotteries. *Id.* New Jersey, as another illustration, banned all gambling by constitutional amendment in 1897. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). With these and other developments, "gambling was largely banned throughout the country" by the late 1800s. *Id.*

But in the twentieth century, many States loosened gambling prohibitions. *Id.* at 458–59. In 1976, for example, New Jersey residents voted to amend the New Jersey Constitution and allow gambling within Atlantic City. *Id.* at 459; N.J. Const. art. IV, §7, ¶2(D). The following year, the New Jersey Legislature implemented that constitutional amendment by enacting the Casino Control Act, N.J. Stat. Ann. §§5:12-1 to -233, which regulates casinos within Atlantic City. Ohio, for its part, legalized bingo and state-conducted lotteries in the 1970s. *Mills-Jennings of Ohio*, 70

4

Ohio St. 2d at 101. And, about fifteen years ago, a slim majority of Ohio voters approved a constitutional amendment allowing for casino gaming. *See* Ohio Const. art. XV, §6(C). Today, forty-eight States permit some form of gambling. *See* Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, at 12–13 (May 13, 2025), perma.cc/J27S-WLSB.

**B.** Recently, the country's attention has turned to sports betting. *See Murphy*, 584 U.S. at 460–61. Like other forms of gambling, sports betting was illegal throughout the States for much of this country's history. *See id.* at 458. That began to change in the mid-twentieth century. Nevada began permitting some sports betting with the passage of the Gaming Control Act of 1949. *See* Jennifer Carleton et al., *Chapter 14: Nevada*, in The Gambling Law Review 147 (Carl Rohsler ed. 2016), perma.cc/3BSY-UYMZ. Over the next few decades, Montana, Delaware, and Oregon also legalized certain forms of sports betting. *Murphy*, 584 U.S. at 462.

In the early 1990s, Congress tried to halt sports betting's continued growth. Through the Professional and Amateur Sports Protection Act, Congress purported to bar States from authorizing any additional sports betting. *Id.* at 461. In *Murphy*, however, the Supreme Court held that

this barrier was unlawful. *Id.* at 458, 480. Thus, just seven years ago, the Supreme Court left the States "free to act" as they wished on the "controversial subject" of "sports gambling." *Id.* at 486.

The States have made different choices after *Murphy*. Eleven States—Alabama, Alaska, California, Georgia, Hawaii, Idaho, Minnesota, Oklahoma, South Carolina, Texas, and Utah—have kept sports betting illegal. *See* Am. Gaming Ass'n, *State of the States 2025*, at 12–13. But most States have chosen legalization. Today, thirty-nine States, along with the District of Columbia, permit some form of sports betting. *Id.*

**C.** The increased legalization of gambling has not left gambling unregulated. Instead, the States' "authorization of legalized gambling" over the years "has almost always been accompanied by the establishment of a corresponding regulatory regime and structure." The Nat'l Gambling Impact Study Comm'n, Final Report, 3-1 (1999), perma.cc/UF4R-2UXH. For example, Ohio has comprehensive statutory schemes regulating the gambling it authorizes. *See, e.g.*, Ohio Rev. Code §§3769.01–.28 (horse racing), 3770.01–.99 (lotteries), 3772.01–.99 (casino gaming), 3774.01–.09 (fantasy contests), 3775.01–.99 (sports gaming). As does New Jersey. N.J. Stat. Ann. §§5:5-22 to -206 (horse racing); 5:8-1 to -131 (games of

6

chance); 5:9-1 to -25 (lotteries); 5:12-1 to -233 (casino gaming); 5:12A-10 to -19 (sports gaming).

## II. In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis.

**A.** The States' regulation of gambling has long co-existed with federal regulation of derivatives markets. Before unpacking those federal regulations, it helps to review some financial terms. A "derivative" is a financial contract whose value depends on, and usually derives from, another, more basic asset such as the value of a stock or the price of hogs. John C. Hull, *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012). A "futures contract" is one type of derivative in which "an agreement between two parties to buy or sell an asset at a certain time in the future for a certain price." *Id.* at 7. Parties come together to trade such contracts in standardized form on "exchanges." *Id.*

Swaps are another type of derivative in which two parties agree to exchange cash flows in the future. *Id.* at 148; *see Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013). The "most common" swap is an interest-rate swap in which "a company agrees to pay cash flows equal to interest at a predetermined" rate over a number of years and, in return, receives interest at a floating rate over the same period of time. Hull,

*Options, Futures, and Other Derivatives*, 148. As another example, a "credit-default swap" mitigates the creditors' risk of a debtor defaulting. To illustrate, "a company that supplies auto parts to General Motors and depends on payments from GM might purchase a credit default swap on a GM bond to hedge against the risk of a GM default." Rena S. Miller, *Derivatives Regulation and Legislation Through the 111th Congress*, Congressional Research Services, at 2 (Jan. 30, 2012).

**B.** With those terms in mind, move to the regulatory history. From as early as 1921, Congress authorized legislation regulating trades of certain derivatives in commodities markets. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360 (1982). In 1936, Congress enacted the Commodity Exchange Act to expand federal oversight to different commodities and to increase regulation over futures contracts. *Id.* at 362. Among other things, the Act authorized federal officials "to fix limits on the amount of permissible speculative trading in a futures contract." *Id.* at 362–63.

A few decades later, Congress created the Commodity Futures Trading Commission ("CFTC"). *Id.* at 365–66. It gave the CFTC "exclusive jurisdiction over commodity futures trading." *Id.* at 386. But lawmakers

8

worried that some might overread the CFTC's jurisdiction. *Id.* Thus, the statute detailing the CFTC's exclusive jurisdiction contains two saving clauses, which protect the States' "regulatory authorities" and "the jurisdiction" of state courts. 7 U.S.C. §2(a)(1)(A).

**C.** Until 2010, the CFTC lacked authority to regulate swaps. *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025). That is likely because for many years, swaps were perceived as a narrow category of derivatives with little potential for mischief. In 1989, for instance, the CFTC issued guidance distinguishing unregulated "swap transactions" from regulated "futures contracts." *See* 54 Fed. Reg. 30694, 30694 (July 21, 1989). The commission stressed that swaps were "predominantly" confined to "commercial and institutional participants." *Id.* at 30695. A swap, moreover, typically involved parties acting "in conjunction with" their "line of business." *Id.* at 30697. The CFTC further emphasized that unregulated swaps were not "marketed to the public." *Id.*

Without regulation, "[t]rading in swaps exploded in the early 2000s." *Phillips*, 155 F.4th at 113. And many blamed swaps for the 2008 financial crisis. *Id.* In particular, a congressionally authorized investigation found that credit-default swaps helped "fuel the housing bubble." Fin.

9

Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* at xxiv (2011), perma.cc/C54L-RZVE.

In response, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act.  Pub. L. 111-203, 124 Stat. 1376 (2010). The Act extended the CFTC's jurisdiction to "swaps."  *See* 7 U.S.C. §2(a)(1)(A).  The Act defined a "swap" to include "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. §1a(47)(A).  And the Act made it generally "unlawful for any person ... to enter into a swap unless the swap is entered into on" a CFTC-regulated contract market.  7 U.S.C. §2(e); *see also* 7 U.S.C. §1a(18).  Thus, an ordinary consumer who wishes to trade in a "swap" must do so on a designated contract market.

## III. Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide.

This brings us to the dispute between Kalshi and the States.  Kalshi is a designated contract market that offers online "events contracts" to

10

users.  Contracts traded on Kalshi identify a future circumstance and allow users to bet on whether the circumstance will happen.  If users bet correctly, they are paid out.  By this format, Kalshi boasts that users may "[t]rade on anything" regardless of state law.  X Post, @Kalshi, https://x.com/Kalshi (last accessed January 21, 2026).

Many of the "contracts" Kalshi lists are indistinguishable from sports betting.  *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025) perma.cc/CWK2-TZCV.  Kalshi has said so.  Consider, for instance, this ad from the last March Madness tournament:



*Id.*

It takes only a quick trip to Kalshi's website to solidify the point. The website has an entire category dedicated to "sports" where users can

make a variety of bets—ranging from who will win a game, to whether a team will cover a point spread, to how individual athletes will perform. *See generally* Kalshi Website, Sports, https://kalshi.com/sports/all-sports (last accessed January 21, 2025).  Users can even bet on whether particular players—say, Aaron Rodgers or Travis Kelce—will retire before the next season.  Kalshi Website, Sports: Football; Events, https://kalshi.com/sports/football/all/events (last accessed January 21, 2026).  Kalshi also recently began offering parlays, which combine two or more wagers into a single bet.  *See* Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R.

To support its claim of nationwide sports betting, Kalshi relies on a novel theory.  It argues that events contracts about sports are "swaps" within the CFTC's exclusive jurisdiction.  Kalshi Br.45–46.  Kalshi is presently litigating this theory across the country.  In addition to Nevada, lawsuits are ongoing in Connecticut, Maryland, New Jersey, New York, Massachusetts, Ohio, and Tennessee.

Several courts have found Kalshi's theory unlikely.  Below, the district court rejected the premise that sports wagers qualify as swaps under

12

federal law. *Kalshiex, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282, at \*3 (D. Nev. Nov. 24, 2025). That court emphasized that "Kalshi's proposed reading" would upend the "the traditional balance between state and federal regulation of gaming" without an "expressed congressional intent to do so"; all while leaving "no federal gaming regulator to replace the states' regulatory infrastructures." *Id.* at \*8. A few months earlier, a Maryland district court laid out many different reasons why statutory text does not signal the necessary preemptive intent. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 675–86 (D. Md. 2025). And a few weeks ago, a Massachusetts state court also rejected Kalshi's theory of preemption. *Massachusetts v. KalshiEX, LLC*, No. 2584CV02525, 2026 Mass. Super. LEXIS 2, at \*10–\*20 (Mass. Sup. Ct. Jan. 20, 2026).

## SUMMARY OF ARGUMENT

The *amici* States agree with Nevada that federal law does not preempt States from regulating sports betting via events contracts. Through both legal and practical considerations, this brief highlights the implausible nature of Kalshi's theory.

13

**I.** When Congress intends major changes to federal law, it does not obscure that intent. *Whitman*, 531 U.S. at 468. Kalshi's position violates this well-settled notion in two ways.

*First*, Kalshi's position violates the federalism canon. Under the canon, courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond v. United States*, 572 U.S. 844, 857–59 (2014). This canon applies here. The regulation of gambling falls within the States' traditional powers. *Ah Sin*, 198 U.S. at 505–06. The States have therefore long regulated gambling, including sports betting. This Court should not upset this traditional balance absent a clear congressional directive. And Kalshi identifies none.

*Second*, Kalshi's position violates the major-questions doctrine. The doctrine requires broad and novel claims of federal-agency authority over significant topics to flow from "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted). This doctrine also applies here. With millions of people involved and billions of dollars at stake, sports betting is a matter of great political and economic significance. Kalshi's theory gives the CFTC broad power to make

14

nationwide decisions about sports betting. If Congress intended to give the CFTC so much power, it would have spoken far more clearly.

**II.** The negative ramifications of Kalshi's position are another sure sign that the company is wrong. The States have considerable experience in regulating gambling, including sports betting. The CFTC, by contrast, "has no expertise in crafting" policies to address sports betting. *See King v. Burwell*, 576 U.S. 473, 486 (2015). That makes it "especially unlikely that Congress would have delegated" this power in such an opaque manner. *See id.*

## ARGUMENT

Under the Supremacy Clause, federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. So, when Congress acts within its enumerated powers, it may preempt state law through federal statutes. Such preemption can take different forms: federal statutes sometimes preempt state law expressly; other times they preempt by implication. *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). But preemption always turns on the text of federal law. *Id.* at 202. And to give statutory text a "fair reading," courts must remain aware that "Congress legislates

15

against the backdrop" of certain presumptions. *Bond v. United States*, 572 U.S. 844, 857 (2014) (quotation omitted).

In this case, two backdrop presumptions—the federalism canon and major-questions doctrine—render Kalshi's position untenable. And practical considerations only reinforce the point.

## I. When Congress makes major changes to the existing state of law, it does so clearly, not obscurely.

Congress, the Supreme Court has said, does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468. So when Congress seeks to change the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.* Textual arguments that suggest otherwise "ultimately founder." *See id.*

This no-elephants-in-mouseholes principle has several context-specific applications. For example, if Congress wishes to abrogate a government body's sovereign immunity, it "must use unmistakable language." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 342 (2023). And "absent a clear statement from Congress," courts presume that federal statutes are inapplicable outside the United States. *Bond*, 572 U.S. at 857. These and other "clear-

16

statement rules help courts act as faithful agents of the Constitution."
*West Virginia*, 597 U.S. at 736 (Gorsuch, J., concurring) (quotation omitted).

Two clear-statement rules prove critical here. Specifically, the federalism canon and major-questions doctrine both demonstrate why Kalshi's counterintuitive preemption theory should fail.

## A.  Kalshi's position violates the federalism canon.

Begin with the federalism canon, which stems from "basic principles of federalism." *Bond*, 572 U.S. at 859. As every schoolchild learns, the Constitution gives the federal government "only limited powers; the States and the people retain the remainder." *Id.* at 854; *see* U.S. Const. amend. X. That setup leaves the States with considerable police powers, which they exercise for the public good. *Bond*, 572 U.S. at 854. Congress, moreover, legislates against this default ordering of sovereign authority. *Id.* at 857–58. Against that "backdrop," any statute that displaces or limits a significant amount of state power constitutes a major change. *See id.* at 857 (quotation omitted). And one expects Congress to speak clearly when effecting a major change. Thus, absent a "clear statement," courts should not assume that Congress intends "a significant change in the

17

sensitive relation between" the federal and state governments in an area of "traditional state authority." *Id.* at 858–59 (quotation omitted). That ensures that Congress "has in fact faced, and intended to bring into issue, the critical matters involved." *Id.* at 858 (quotation omitted).

This federalism canon applies with particular force to preemption. Preemption necessarily triggers the "sensitive relation between federal and state" authority. *Id.* at 858–59 (quotation omitted). Courts thus need "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 858 (quotation omitted). Courts should thus be especially "reluctant to find" preemption in an area "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

The federalism canon applies with full force here. Given the many dangers of gambling (*below* 27–31), the regulation of gambling fits neatly "within the police powers of a State." *Ah Sin*, 198 U.S. at 505–06. Or, in this Court's words, "the regulation of gambling lies at the heart of the state's police power." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (quotation omitted). It should therefore come as no surprise that the States have a lengthy history of gambling

18

regulation, including the regulation of sports betting. *Above* 3–7. And federal law historically has "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

Applying the federalism canon, Kalshi's theory should fail unless Congress made a "clear statement" signaling that it intended "a significant change in the sensitive relation between" the federal and state governments as to gambling. *See Bond*, 572 U.S. at 858–59 (quotation omitted); *accord Ah Sin*, 198 U.S. at 505–06. Kalshi identifies no clear statement within federal law. Kalshi instead offers a roundabout preemption theory under which Congress—fifteen years ago, when sports betting was mostly illegal—supposedly made a subtle-but-drastic change to gambling laws by inserting the word "swap" into a pre-existing regulatory scheme aimed at financial regulation. *See* Kalshi Br.45–46; *above* 8–12.

Tellingly, Kalshi's position is much like proposed readings that have failed in past clear-statement cases. For instance, in 2000, the Supreme Court stopped a dramatic expansion of federal regulatory authority by refusing to read the word "drug"—in the context of the Food, Drug, and Cosmetic Act—to include tobacco. *FDA v. Brown & Williamson Tobacco*

19

*Corp.*, 529 U.S. 120, 125 (2000). And in *Bond*, the Supreme Court refused to read the term "chemical weapon" in an "improbably broad" and "boundless" way that would have reached "purely local crimes" and "intrude[d] on the police power of the States." *Bond*, 572 U.S. at 860. This Court should likewise refuse to read the term "swaps"—a term of art describing particular financial instruments used to hedge against economic risk— in an improbably broad and boundless way that usurps the States' police power over sports betting. The Supreme Court certainly has not done so: just a few years after Dodd-Frank, the Court concluded that States are "free to act" as they wish on the "controversial subject" of "sports gambling." *Murphy*, 584 U.S. at 486. That would make little sense if, as Kalshi posits, the CFTC controls all sports gambling so long as it is cleverly structured as an "events contract."

If the text clearly signals anything here, it is the *lack* of any intent to preempt sports-betting regulations. The exclusive-jurisdiction provision on which Kalshi so heavily relies includes not just one, but two saving clauses, both of which signal preservation of state authority. 7 U.S.C. §2(a)(1)(A). The statutory scheme also includes two express preemption clauses. 7 U.S.C. §16(e)(2), (h). One of those clauses preempts state laws

20

about select forms of "gaming." §16(e)(2). But the "gaming" the clause covers does not extend to "sports-betting laws." *See Martin*, 793 F. Supp. 3d at 680–81. Thus, Congress's inclusion of a specific preemption provision tailored to *other* forms of gaming indicates a lack of preemptive intent as to sports betting. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

In sum, Kalshi invites the Court to read an express-preemption clause into federal law where none exists. Because this is an area of traditional state authority, the Court should squarely reject that invitation.

## B. Kalshi's position violates the major-questions doctrine.

Turn next to another clear-statement rule: the major-questions doctrine. The doctrine teaches that courts—when reading statutes empowering federal agencies—should employ "common sense as to the manner in which Congress would have been likely to delegate" power. *West Virginia*, 597 U.S. at 722–23 (alteration accepted, quotation omitted). "Extraordinary grants of regulatory authority," the Supreme Court has explained, "are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* at 723 (alteration accepted, quotation omitted).

21

The major-questions doctrine thus requires a clear statement when-ever a federal agency claims broad and novel authority over matters of great economic and political significance. *See id.* at 721, 724. In these situations, a "colorable textual basis" is not enough to support a major grant of federal-agency authority. *Id.* at 722. Rather, an assertion of broad authority must arise from "clear congressional authorization." *Id.* at 724 (quotation omitted).

This case implicates the major-questions doctrine. Sports betting is an issue of political and economic significance—and one on which "Amer-icans have never been of one mind." *Murphy*, 584 U.S. at 458. Like other major questions, sports betting involves "billions of dollars" and affects "millions of people." *King*, 576 U.S. at 485. Recent figures reinforce this bit of commonsense. Over the last year, over one-in-five adults in this country bet money on sports. John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT. And Americans wagered almost $150 billion on sports in 2024. Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp. Indeed, Kalshi alone now reports wagering

22

volumes of over $1 billion a month, 90% of which comes from sports bet-ting. Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM.

Beyond those staggering figures, the regulation of sports betting is po-litically and historically significant. As detailed above (at 5–6), sports betting has been illegal under state law for much of this country's history. It remains illegal in eleven States. And the States that do allow sports betting have made different decisions about what to allow.

Against this backdrop, Kalshi's position would grant the CFTC an in-credible and unexpected amount of power. Once again, Kalshi argues that sports bets packaged as events contracts qualify as "swaps" for pur-poses of CFTC's exclusive jurisdiction. *See* Kalshi Br.45–46; 7 U.S.C. §2(a)(1)(A).

An important textual consequence flows from Kalshi's position. If sports bets qualify as swaps within the CFTC's exclusive jurisdiction, then sports bets cannot be treated in any other fashion. Under the fed-eral definition of swap, a swap is any type of "agreement, contract, or transaction" that satisfies certain conditions. 7 U.S.C. §1a(47)(A). If an agreement satisfies those conditions, the federal scheme makes it

23

"*unlawful* for any person" to enter into such an agreement except via a CFTC-regulated contract market. 7 U.S.C. §2(e) (emphasis added). Thus, Kalshi is not simply arguing that sports betting *may* occur on designated contract markets. Kalshi's real argument is that sports betting *must* occur on those markets. It would follow that States which authorize sports betting via state-regulated processes—again, about forty States at present, *see above* 6—are all facilitating illegal activity under federal law.

If Congress truly meant to give the CFTC so much authority, it would have spoken clearly. Kalshi, again, points to no such clear statement. *Above* 19. Instead, its attenuated theory of preemption relies on a contextless brand of textualism that is "colorable" at best. *See West Virginia*, 597 U.S. at 724 (quotation omitted). And a merely colorable textual theory is not enough for such a change. *Id.*

To hammer the point home, revisit the history. As Kalshi would have it, Congress preempted state gambling laws as part of its response to the 2008 financial crisis. *Above* 8–12. But that makes no historical sense. Nobody thought that "sports gambling gone wrong" caused the financial crisis. Sports betting was, after all, mostly illegal at that time. *See Murphy*, 584 U.S. at 458. Congress was instead responding to a much

24

different problem involving derivatives like credit default swaps. *Above* 9–10. Thus, employing even an ounce of "common sense as to the manner in which Congress would have been likely to delegate" power, *see West Virginia*, 597 U.S. at 722–23 (quotation omitted), Kalshi's argument crumbles. Congress did not sneak sports-gambling preemption into the Dodd-Frank Act, and this Court should confirm as much.

## II. Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens.

Practical concerns make Kalshi's position even less likely. As a corollary to the major-questions doctrine, Congress is "especially unlikely" to delegate broad power to an agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. This Court should thus be "especially" reluctant to transfer authority over sports betting from experienced state regulators to an inexperienced federal commission.

### A. States are experienced in regulating sports betting and its many potential harms.

**1.** States that allow sports betting comprehensively regulate that activity. For example, given the importance of gambling to New Jersey's overall economy, the State strictly regulates all gambling activities to ensure the public's continued "confidence and trust." N.J. Stat. Ann. §5:12-1(b)(6) (outlining New Jersey's public policy on gambling). A central part

25

of New Jersey's mission is ensuring that gaming proprietors are "controlled and fostered" so as to "provid[e] a substantial contribution to the general welfare, health and prosperity of the State and its inhabitants." *Id.*

Consistent with that goal, New Jersey's regulatory scheme offers gamblers many levels of protection. As a general matter, New Jersey employs a rigorous licensing process that ensures any gambling entity undergoes an in-depth investigation before receiving a license. *See* N.J. Stat. Ann. §§5:12A-10 to -11, -13(a); *see also below* 32–33. This process ensures that gambling is free from organized crime and other criminal elements.

New Jersey's regulatory scheme also offers a variety of more specific protections. For instance, New Jersey requires those that conduct gaming operations to conspicuously post information about resources for problem gamblers. N.J. Stat. Ann. §5:12A-13(a)(11); N.J. Admin. Code §§13:69N-1.8(g), 13:69O-1.2(b). New Jersey law also includes various safeguards to protect against improper betting practices, including improper wagers on sports. *See, e.g.*, N.J. Stat. Ann. §§5:12A-10 to -11; N.J. Admin. Code §§13:69N-1.6 to -1.12. Of particular note, New Jersey prohibits sports wagers by referees, owners, coaches, players, or other team

26

staff.  *See* N.J. Stat. Ann. §5:12A-11(f).  Further, New Jersey requires that those facilitating sports betting report suspicious activity.  N.J. Stat. Ann. §5:12A-11(i).

Consider also Ohio's recently adopted approach to sports gambling. Similar to New Jersey, Ohio prohibits companies from offering sports betting without a license.  Ohio Rev. Code §3775.03(A).  That requires a company to establish that it can responsibly facilitate such gambling.  *See* Ohio Rev. Code §3775.09(A)–(B).  Along related lines, Ohio facilitates an exclusion program whereby people worried about their sports gambling habits may place themselves on a voluntary exclusion list.  *See* Ohio Rev. Code §3775.02(B)(11).  To enforce that list, sports gaming proprietors are required to "employ commercially reasonable methods to prevent any person who is participating in the sports gaming voluntary exclusion program from engaging in sports gaming."  Ohio Rev. Code §3775.13(C)(1).

**2.**  These and other regulations protect the States' citizens and mitigate the risks of gambling.  While gambling is entertaining for many, it is dangerous for some.  Millions of Americans qualify as problematic or pathological gamblers.  Nat'l Gambling Impact Study Comm'n, Final Report, 4-1; Charita M. Goshay, *Ohio offers Voluntary Exclusion List for*

27

*problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024), perma.cc/BQY6-YBC3.  And research has linked gambling to many other problems—substance abuse and psychological distress, to name a few.  *See* Randi Richardson, *Online gambling has fueled an industry boom that threatens public health, commission finds*, NBC News (Oct. 24, 2024), perma.cc/XL7W-QS2L.

Some gamble to the point of financial ruin.  *See* Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024), perma.cc/JG9G-P7QT.  Others place gambling over the health of loved ones.  *See* Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024), perma.cc/E4ZU-U3MN.  Still others gamble to the point of suicide.  *See* Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025), perma.cc/76KG-5ZGS.

With the growing ease of gambling, these problems are on the rise.  *See id.*  A 2022 survey performed by the Ohio Casino Control Commission signaled that the prevalence of at risk/problem gamblers in the Buckeye State had nearly doubled in five years.  *See Ohio Gambling Survey 2022*,

28

Ohio Casino Control Commission, perma.cc/4GG3-SGQE (slide five of PowerPoint). As another datapoint, calls to Ohio's gambling hotline were up 55% in 2023. Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024), https://tinyurl.com/mtjnna33.

Minors are particularly vulnerable, as online sports betting attracts a younger crowd. A recent New Jersey-based survey reflected that nearly one in every five people surveyed between the ages of 18 and 24 was at high risk of a gambling problem. *See* Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies, at 33 (2023), perma.cc/V3KH-BPHC. And research reflects that those who start gambling at a young age run a higher risk of problematic gambling. *See* Nat'l Gambling Impact Study Comm'n, Final Report, 4-12.

But Kalshi's position, if accepted, would effectively lower the gambling age in many States. According to Kalshi's membership agreement, the company's services are open to anyone of the age of majority in their State. Kalshi Member Agreement (November 4, 2025), https://perma.cc/ZH3B-2G9P. In many if not most States, the age of

29

majority is eighteen. *See, e.g.*, N.J. Stat. Ann. §9:17B-3; Ohio Rev. Code §3109.01. But many States have decided to limit gambling (or at least certain types of gambling) to those twenty-one or older. *See, e.g.*, N.J. Stat. Ann. §5:12A-11(e); Ohio Rev. Code §3775.99(A). That discrepancy is no small matter. As just mentioned, those who begin gambling at a young age face a higher risk of long-term problems. That might be good for Kalshi's bottom line, but it is bad for the States' citizens.

One final problem deserves emphasis. Unregulated sports betting also risks the integrity of sporting events. Just months ago, the federal government indicted dozens of people—including current and former NBA players—alleging unlawful betting on professional basketball games. Santul Nerkar, et al., *U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025), https://tinyurl.com/yux8k2nk. And last year, it took only a few pitches during baseball games to spark controversy over prop bets in Ohio. *See* Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025), perma.cc/CA26-SA28. Before that, gamblers even threatened a coach of the Cleveland Cavaliers. Tom Withers, *Cavs coach Bickerstaff says he*

30

*received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024), perma.cc/4KR5-3F56.  Such risks provide all the more reason for robust state involvement.

### B.  Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.

Contrary to Kalshi's suggestions, federal regulation of the derivatives marketplace is not a cure-all when it comes to nationwide sports betting. Kalshi hints that federal law's "detailed system" for regulating designated contract markets should alleviate any concerns.  *See* Kalshi Br.15–17.  But the CFTC's present regulatory requirements provide cold comfort for sports betting.  Those requirements—often called the "core principles"—are outlined within the federal code.  *See* 17 C.F.R. §§38.100–.1200.  They cover topics like dispute resolution, 17 C.F.R. §38.750, conflicts of interest, 17 C.F.R. §38.850, and disciplinary procedures, 17 C.F.R. §38.700.

Although Kalshi is regulated in this sense, these regulations are geared toward participants in the financial markets.  They do not replace the States' regulatory schemes, which are specifically designed to combat problems associated with gambling.  Moreover, relying on federal

31

regulation alone forces a one-size-fits-all regime, eliminating the States'
ability to experiment with other approaches.

Take New Jersey again. The State, after all, has over a century's ex-
perience in regulating gambling to respond to challenges unique to both
the gambling industry and local New Jersey concerns.

With that experience in mind, consider a gap that would result from a
federal-only regime. New Jersey has developed robust procedures for de-
termining the suitability of any person involved in the gaming industry
in New Jersey. This suitability determination is a front-loaded process
in which the person seeking a gaming approval bears the burden of show-
ing the person is qualified to hold a license. N.J. Stat. Ann. §§5:12-84
(casino license); 5:12A-11 (sports wagering license). As it relates to sports
wagering, only casinos and racetracks may obtain licenses to "operate a
sports pool" in accordance with state law and regulations. N.J. Stat. Ann.
§5:12A-11(a). In addition to having already satisfied the requirements
for casinos or racetracks, the sports-wagering-license applicant must sat-
isfy the Division of Gaming Enforcement that the applicant is of "good
character, honesty and integrity" and has "financial stability, integrity
and responsibility." N.J. Stat. Ann. §5:12A-11(a). The holder of a sports

wagering license may then "authorize an internet sports pool operator" to "operate an online sports pool on its behalf provided the terms of the agreement are approved by the [D]ivision [of Gaming Enforcement]." N.J. Stat. Ann. §5:12A-11(a); *see id.* §5:12-104(a)(12), (13).  In this way, New Jersey takes care to screen out potentially predatory, bad actors from its system of legalized gambling.

The Commodity Exchange Act offers no comparator to New Jersey's suitability procedures.  In the CFTC's own words: the Commodity Exchange Act and "Commission regulations are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling."  89 Fed. Reg. 48968, 48982 (June 10, 2024).  Worse still, designated contract markets like Kalshi may list new types of events contracts on their exchange without pre-approval, simply by self-certifying to the CFTC that the new contract complies with federal law.  *See* 7 U.S.C. §7a-2(c)(1).  Such loose processes will allow individuals who would be unable to clear state-law hurdles to run de facto sports books, immune from the States' regulation.

The takeaway is simple.  Under Kalshi's theory, the various state-law safeguards discussed above would disappear.  That would create a sizeable hole in the States' ability to protect their citizens from predatory practices and other problematic behavior.

\*

One critical benefit of our constitutional structure is that the States act "as laboratories" of democracy, "devising solutions" to new and difficult problems.  *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quotation omitted).  That flexibility is a particularly good thing here since "Americans have never been of one mind about gambling."  *Murphy*, 584 U.S. at 458.  States are in the best position to implement innovative regulatory schemes responsive to particularized concerns that arise within their borders, thereby protecting the public and promoting confidence in the gaming industry.  Nothing in federal law suggests, much less clearly states, that Congress has stripped the States of their traditional power over sports betting.  This Court, it follows, should not do so.

34

## CONCLUSION

The Court should affirm.

JENNIFER DAVENPORT
New Jersey Attorney General

JEREMY M. FEIGENBAUM
New Jersey Solicitor General
STEPHEN EHRLICH
Deputy Solicitor General
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
Stephen.Ehrlich@njoag.gov

*Counsel for Amicus Curiae*
  *State of New Jersey*

DAVE YOST
Ohio Attorney General

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
  *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae*
  *State of Ohio*

35

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

STEPHEN J. COX
Alaska Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia
Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANTHONY G. BROWN
Maryland Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

RAÚL TORREZ
New Mexico Attorney General

36

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

DAN RAYFIELD
Oregon Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

PETER F. NERONHA
Rhode Island Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

DEREK E. BROWN
Utah Attorney General

CHARITY R. CLARK
Vermont Attorney General

JAY JONES
Virginia Attorney General

NICHOLAS W. BROWN
Washington Attorney General

JOSH KAUL
Wisconsin Attorney General

37

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** <u>25-7516</u>

I am the attorney or self-represented party.

**This brief contains  6,497         words,** excluding the items ex-

empted by Fed. R. App. P. 32(f). The brief's type size and typeface comply

with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

38

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** /s/ Mathura J. Sridharan      **Date** January 30, 2026

39

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2026, the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/  Mathura J. Sridharan*

Mathura J. Sridharan
Ohio Solicitor General

40

# Exhibit H

Nos. 25-7187, 25-7516, 25-7831

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NORTH AMERICAN DERIVATIVES EXCHANGE, INC.
D/B/A CRYPTO.COM | DERIVATIVES NORTH AMERICA,
*Plaintiff-Appellant,*

v.

THE STATE OF NEVADA, ET AL.,
*Defendants-Appellees,*

NEVADA RESORT ASSOCIATION,
*Intervenor-Defendant-Appellee.*

On Appeal from the Judgment of the United States
District Court for the District of Nevada
(Dist. Ct. No. 2:25-cv-00978-APG-BNW)

BRIEF OF *AMICI CURIAE* OF OHIO, NEW JERSEY, 37 OTHER STATES, AND
THE DISTRICT OF COLUMBIA SUPPORTING APPELLEES

JENNIFER DAVENPORT
New Jersey Attorney General

JEREMY M. FEIGENBAUM
New Jersey Solicitor General
STEPHEN EHRLICH
Deputy Solicitor General
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
Stephen.Ehrlich@njoag.gov

*Counsel for Amicus Curiae*
  *State of New Jersey*

DAVE YOST
Ohio Attorney General

MATHURA J. SRIDHARAN*
Ohio Solicitor General
  *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae*
  *State of Ohio*

*Additional counsel listed after signature block*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................ii

STATEMENT OF AMICI INTEREST ....................................................... 1

INTRODUCTION.................................................................................... 1

BACKGROUND ..................................................................................... 4

SUMMARY OF ARGUMENT ................................................................ 10

ARGUMENT ........................................................................................ 13

    I.    The CFTC's reading of federal statutes deserves no special weight.................................................................................... 15

    II.    Under the major-questions doctrine, the Court should reject "the CFTC's new claim of expansive authority......................... 19

    III.    The federalism canon forecloses the expansive authority the CFTC now asserts.............................................................. 25

    IV.    The CFTC lacks the States' experience in regulating gambling. ........................................................................... 28

CONCLUSION ..................................................................................... 32

ADDITIONAL COUNSEL ..................................................................... 33

CERTIFICATE OF COMPLIANCE FOR BRIEFS ............................... 35

CERTIFICATE OF SERVICE............................................................... 37

i

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Ah Sin v. Wittman,*
    198 U.S. 500 (1905)............................................................ 12, 26

*Alaska v. Fed. Subsistence Bd.,*
    544 F.3d 1089 (9th Cir. 2008)...............................................17

*Altria Grp., Inc. v. Good,*
    555 U.S. 70 (2008)................................................................17

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015)..............................................................30

*Artichoke Joe's Cal. Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003)................................................25

*Bond v. United States,*
    572 U.S. 844 (2014)........................................... 2, 12, 25, 26

*Cantor v. Detroit Edison Co.,*
    428 U.S. 579 (1976)..............................................................31

*Chamber of Commerce v. Whiting,*
    563 U.S. 582 (2011)..............................................................15

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993)....................................................... 17, 25

*Davidson v. Sprout Foods, Inc.,*
    106 F.4th 842 (9th Cir. 2024) ..............................................31

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)..............................................................26

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
    527 U.S. 173 (1999)..............................................................25

*Green v. Fund Asset Mgt., L.P.,*
    245 F.3d 214 (3d Cir. 2001) .................................................31

*Kansas v. Garcia*,
  589 U.S. 191 (2020)...................................................................... 10, 15

*King v. Burwell*,
  576 U.S. 473 (2015)................................................................. 13, 21, 28

*Learning Res., Inc. v. Trump*,
  607 U.S. —, 2026 WL 477534 (2026)......................................... *passim*

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................... *passim*

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982)................................................................................5

*Murphy v. NCAA*,
  584 U.S. 453 (2018)..................................................................... *passim*

*NFIB v. OSHA*,
  595 U.S. 109 (2022)......................................................................... 4, 20

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)...............................................................................17

*Spectrum Ne., LLC v. Frey*,
  22 F.4th 287 (1st Cir. 2022)................................................................31

*Util. Air Regulatory Group v. EPA*,
  573 U.S. 302 (2014)...............................................................................20

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)............................................................... 10, 15, 16

*West Virginia v. EPA*,
  597 U.S. 697 (2022).................................................................... *passim*

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)...............................................................................14

*Wyeth v. Levine*,
  555 U.S. 555 (2009).................................................................... *passim*

## Statutes, Regulations, and Constitutional Provisions

U.S. Const. art. VI, cl. 2 ................................................................. 15

17 C.F.R. §40.11 ............................................................... 6, 7, 29

76 Fed. Reg. 44776 (July 27, 2011) ................................................ 7

77 Fed. Reg. 48208 (Aug. 13, 2012)......................................... 7, 19

89 Fed. Reg. 48968 (June 10, 2024) .............................................. *passim*

7 U.S.C §1a ....................................................................... 6, 14, 22

7 U.S.C. §2 ............................................................................. *passim*

7 U.S.C. §7a-2 ................................................................... 6, 29

## Other Authorities

156 Cong. Rec. S5902 (daily ed. July 15, 2010) ........................................ 6

Am. Gaming Ass'n, *State of the States 2025: The AGA
    Analysis of the Commercial Casino Industry* (May 13,
    2025).......................................................................................... 5

CFTC Letter No. 25-36, Advisories (Sept. 20, 2025) .............................. 9

Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For
    Monday Night Football Games*, Event Horizon (Sept. 30,
    2025)........................................................................................ 8

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On
    Things*, Event Horizon (April 3, 2025) ........................................... 8, 30

Kalshi Website, Sports......................................................................... 8

Laya Neelaatkandan, *Kalshi says Super Bowl trading
    volume surpassed $1 billion*, CNBC (Feb. 10, 2026)........................ 21

Lev Akabas, *Kalshi's Volume Has Been 90% Sports During
    Football Season*, Sportico (Oct. 3, 2025)................................. 8

iv

Michael S. Selig, *States Encroach on Prediction Markets*,
   Wall Street Journal (Feb 16, 2026) ................................................. 9, 19

Pub. L. 93-463, §201(b), 88 Stat. 1389 (1974) .......................................... 5

State-Amicus Br., *KalshiEX LLC v. Assad, et al.*, No. 25-
   7516 (9th Cir.) ........................................................................... *passim*

v

## STATEMENT OF AMICI INTEREST

*Amici* consist of New Jersey, Ohio, 37 other States, and the District of Columbia ("the *amici* States"). They are interested in this case because it concerns an overbroad preemption theory that threatens the States' longstanding ability to protect their citizens. The *amici* States also respond to a recent brief from the Commodity Futures Trading Commission ("CFTC"). In that brief, the CFTC wrongly argues that federal law displaces the States' ability to regulate sports betting. The *amici* States submit this brief under Federal Rule of Appellate Procedure 29(a)(2).

## INTRODUCTION

This brief is best read as a sequel. The original was filed in a related case, involving Nevada's dispute with Kalshi. *See* State-Amicus Br., *KalshiEX LLC v. Assad, et al.*, No. 25-7516 (9th Cir.), DktEntry 48.1 ("State-Amicus Br."). There, thirty-nine States—along with the District of Columbia—explained why they may regulate online sports betting, regardless of whether prediction markets package such betting as so-called "events contracts." The States relatedly explained why preemption theories to the contrary are far-fetched.

In a nutshell, here is the States' position. Prediction-market litigants in this case and others argue that somewhere buried within subsections

1

of subsections of complex derivatives-related statutes, Congress snuck in its intent to drastically reshape this country's gambling laws. But when Congress makes major changes to this nation's power structure, it speaks clearly. *Bond v. United States*, 572 U.S. 844, 857–59 (2014); *see also Learning Res., Inc. v. Trump*, 607 U.S. —, 2026 WL 477534, at \*7–\*9 (2026) (Roberts, C.J., op.). Thus, if Congress truly meant to preempt the States' traditional authority over sports betting, it would not be a secret. That matters here because nothing in the text of the relevant statutes displaces (much less clearly displaces) the States' traditional authority over sports betting. In fact, even with all those statutes in place, the Supreme Court recently declared that States are "free to act" as they wish on the "controversial subject" of "sports gambling." *Murphy v. NCAA*, 584 U.S. 453, 486 (2018).

The *amici* States, however, do not offer this brief to repeat themselves. They instead address a new development: the CFTC's recent decision to pick a side. That decision was a sharp pivot. Prediction markets began offering online sports betting in January 2025. For roughly a year thereafter, the CFTC was careful not to endorse this behavior. Indeed, just a few months ago, the CFTC warned prediction markets that they should

2

prepare for the prospect that state law bars such conduct.  Yet in recent weeks, under new leadership, the CFTC now suggests that things have been "plain" all along.  *See* CFTC Br.15.   It argues that federal law displaces the States' power over sports betting.  *See* CFTC Br.15, 22–24.

The CFTC's preemption theory misreads federal statutes.  The theory stems from a 2010 amendment to the Commodity Exchange Act that Congress made in response to the 2008 financial crisis.  Congress gave the CFTC jurisdiction over "swaps," a derivative sometimes associated with the financial crisis.  *See* 7 U.S.C. §2(a)(1)(A).  But Congress made no mention of sports betting (at the time, such betting was still illegal in most of the country).   The CFTC nonetheless argues, echoing litigants like Crypto and Kalshi, that sports bets qualify as "swaps" within its exclusive authority.  CFTC Br.14–20.  That endorsement does not make the argument any more likely.  The argument still rests on a dubious foundation: that Congress, in response to the financial crisis, quietly removed the States' traditional power over sports gambling without anyone noticing for years—including the Supreme Court in *Murphy*.  *See* State-Amicus Br.1–2.

3

The CFTC's implausible theory—which trumpets the CFTC's *own* authority—warrants skepticism rather than deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). After all, courts are wary of federal agencies using established statutory law to claim new and exceptional authority over significant topics. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022); *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (*per curiam*). The CFTC's new claim of authority is exactly that: in effect, the Commission asks to be declared this country's sole regulator of sports betting. *See* CFTC Br.4, 13, 23. In our system of divided sovereignty, that type of power grab requires "clear congressional authorization." *West Virginia*, 597 U.S. at 723 (quotation omitted). None exists here.

## BACKGROUND

**I.** Our country's division of power has long distinguished between gambling and financial derivatives. Through their police powers, the States have traditionally regulated gambling, including gambling on sports. *See* State-Amicus Br.3–7 (discussing that tradition, including the experiences of Ohio and New Jersey). For much of this country's history, the States simply outlawed sports betting. *See Murphy*, 584 U.S. at 458–62. But in *Murphy*, the Supreme Court made clear that the States are

4

"free to act" as they choose on the subject. *Id.* at 486. Since then, the States have made different choices. Today, some States continue to bar sports betting, while other States allow sports betting but heavily regulate the activity. *See* Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, at 12–13 (May 13, 2025), perma.cc/J27S-WLSB.

For about a century, the States' regulation of gambling has co-existed with federal regulation of derivatives markets. The federal government began regulating futures markets in 1921. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360 (1982). Then, in 1936, Congress expanded federal regulation through the Commodity Exchange Act. *Id.* at 362. And, in 1974, Congress created the CFTC and gave it "exclusive jurisdiction" over certain enumerated derivatives. Pub. L. 93-463, §201(b), 88 Stat. 1389 (1974) (amending 7 U.S.C. §2(a)).

In response to the 2008 financial crisis, Congress increased federal oversight of derivatives markets. Specifically, in 2010, Congress expanded the CFTC's "exclusive jurisdiction" to cover "swaps"—a form of derivative that contributed to the crisis. *See* 7 U.S.C. §2(a)(1)(A); State-Amicus Br.9–10. As part of this financial reform, Congress offered a

5

complex, six-part definition outlining which agreements, contracts, or transactions qualify as "swap[s]." *See* 7 U.S.C §1a(47)(A). And, in a corresponding move, Congress made it generally "unlawful" for people to enter into swaps outside of a CFTC-regulated contract market. 7 U.S.C. §2(e); *see also* CFTC Br.4.

At the same time, Congress added statutory language empowering the CFTC to prohibit certain contracts if they "involve," among other topics, "gaming." 7 U.S.C. §7a-2(c)(5)(C)(i). In discussing this change, lawmakers noted their desire to prevent "gambling through *supposed* 'event contracts,'" including "gaming contract[s]," which are "used predominantly by speculators or participants not having a commercial or hedging interest." *See* 156 Cong. Rec. S5902, S5906–07 (daily ed. July 15, 2010) (emphasis added) (statements of Sen. Blanche Lincoln and Sen. Dianne Feinstein).

**II.** Since receiving authority over swaps in 2010, the CFTC has taken a constrained view of what fits within that category. For example, shortly after its jurisdiction increased, the CFTC promulgated a rule prohibiting designated contract markets from listing any contract "that involves, relates to, or references … gaming." 17 C.F.R. §40.11(a). This prohibition,

6

the CFTC explained, matched "Congress's intent to prevent gambling through the futures markets."  76 Fed. Reg. 44776, 44786 (July 27, 2011).  The prohibition remains on the books today.  *See* 17 C.F.R. §40.11(a).

The CFTC exercised similar caution in later rulemakings.  In 2012, as part of a rule jointly promulgated with the SEC, the CFTC refused to read the term "swaps" in a way that would disrupt "customary business arrangements" that "historically have not been considered to involve swaps."  77 Fed. Reg. 48208, 48247 (Aug. 13, 2012).  Swaps, the CFTC explained, "involve risk-shifting arrangements with financial entities."  *Id.* at 48248.  As a result, the CFTC did not read the term "swaps" to capture transactions or arrangements involving "personal or family activities" that ordinary "consumers" regularly engage in.  *Id.* at 48247.

Just two years ago, the CFTC issued a proposed rule that directly confronted the relationship between state-gambling regulation and federal-derivatives regulation.  The CFTC acknowledged that "gambling is overseen by state regulators with particular expertise" and that federal-derivatives law is "not aimed at protecting against gambling-specific risks and concerns."  89 Fed. Reg. 48968, 48982–83 (June 10, 2024).  The CFTC further disclaimed having the "statutory mandate" or "specialized

7

experience" necessary to exercise jurisdiction over the "rapidly evolving field" of gambling. *Id.* at 48983.

**III.** The dispute here concerns sports betting on designated contract markets. (For ease of reading, this brief calls the relevant platforms "prediction markets.") These markets began offering sports-related events contracts at the beginning of last year. And they actively advertised such contracts as sports betting. Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025), perma.cc/CWK2-TZCV. This form of sports betting has quickly taken hold with the public. *See, e.g.*, Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM. Prediction markets, in turn, have quickly expanded the types of sports bets they offer. Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R. Today, people can make all types of sports bets on these platforms—ranging from who will win a game, to whether a team will cover a point spread, to more obscure wagers about how a given athlete will perform. *See, e.g.*, Kalshi Website, Sports, https://kalshi.com/sports/all-sports (last accessed March 2, 2026).

Until recent weeks, the CFTC was careful not to endorse this activity. Most notably, in September, the CFTC issued a staff advisory directed at platforms offering sports-related events contracts. CFTC Letter No. 25-36, Advisories (Sept. 20, 2025), https://www.cftc.gov/PressRoom/PressReleases/9137-25. The advisory warned that the CFTC had never "taken any official action to approve" the listing of such contracts. *Id.* at 2 n.4. The advisory further explained that the CFTC "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under" the Commodity Exchange Act. *Id.* Those offering sports-related events contracts, the advisory thus cautioned, must be prepared for the possibility that state law will "result in the termination" of such contracts. *Id.* at 2.

The CFTC has since changed its tune. At the end of last year, the Commission swore in a new Chairman. Fresh on the job, and without public input or comment, the Chairman soon broadcast his view that all events contracts—including those about sports—are "swaps" within the CFTC's exclusive power. *See, e.g.*, Michael S. Selig, *States Encroach on Prediction Markets*, Wall Street Journal (Feb 16, 2026),

9

https://web.archive.org/web/20260218182304/https://www.cftc.gov/Press Room/SpeechesTestimony/seligstatement021726.

A few days later, the CFTC filed an amicus brief here embracing this new position. The CFTC now argues that its exclusive jurisdiction over swaps is broad enough to cover contracts involving any uncertain outcome that can be loosely tied to potential economic consequences. CFTC Br.15, 19. Taking that "broad" reading, the argument goes, bets on the "final score" of games (or other comparable wagers) qualify as swaps. CFTC Br.15. In the CFTC's view, moreover, the States have no "concurrent jurisdiction" over this activity. *See* CFTC Br.13.

## SUMMARY OF ARGUMENT

The *amici* States offer four points in response to the CFTC.

**I.** The CFTC's preemption theory deserves no special weight. Preemption analysis generally turns on statutory interpretation. *See Kansas v. Garcia*, 589 U.S. 191, 208 (2020); *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (Gorsuch, J., op.). This case is no exception. Here, preemption depends on whether federal statutes about derivatives contain a clear statement removing the States' traditional authority over sports betting. The CFTC has "no special competence" to answer that

10

question about "the scope of" its own jurisdiction. *See Loper Bright*, 603 U.S. at 400–01. Rather, because the CFTC's fresh reading of federal statutes exalts its own authority, this case presents a scenario where "abdication in favor of the agency is *least* appropriate." *See id.* at 401.

Accounting for the surrounding circumstances, the CFTC's new position also does not carry any "particular power to persuade." *See id.* at 402 (quotation omitted). The position was prepared for purposes of litigation, without input from the public or the States. The position is inconsistent with the CFTC's past guidance, including guidance offered much closer in time to the enactment of the relevant statutory text. And the position does not arise from any special expertise in the area of sports betting. Considering these features, the CFTC's position is "inherently suspect." *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009).

**II.** The CFTC's new claim of expansive power also confirms that this case implicates the major-questions doctrine. Under the doctrine, broad and novel claims of federal-agency authority over significant topics must flow from "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. at 723 (quotation omitted). The doctrine thus captures scenarios where an agency "claim[s] to discover in a long-extant statute an

11

unheralded power representing a transformative expansion in its regulatory authority." *Id.* at 724 (alterations accepted, quotation omitted).

This case fits that description. The CFTC claims to have discovered within statutory provisions about financial derivatives—all of which have been in place for fifteen years or longer—"an unheralded power" to regulate sports betting for the entire country. *See id.* (quotation omitted). Such an assertion of federal power requires "clear congressional authorization." *See id.* (quotation omitted). And the CFTC identifies none.

**III.** The CFTC's sudden claim of exclusive authority over sports betting also contravenes the federalism canon. As that canon teaches, courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond*, 572 U.S. at 857–59. And the regulation of gambling falls within the States' traditional police powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). The States have therefore long regulated gambling, including sports betting. The Court should not upset this traditional balance absent a clear congressional directive. The CFTC's position, however, would do just that.

**IV.** The CFTC's lack of expertise as to sports betting makes preemption even more implausible. Congress is "especially unlikely," the

12

Supreme Court has said, to delegate broad power to a federal agency that "has no expertise" crafting "policy" on a given topic. *King v. Burwell*, 576 U.S. 473, 486 (2015). Here, the CFTC has no expertise in regulating sports betting. The States, on the other hand, have considerable expertise on the subject. Given that discrepancy, the CFTC's reading of statutory text is "especially unlikely." *See id.*

## ARGUMENT

The CFTC repeats the tale that prediction markets like Crypto and Kalshi have been telling over the last year. The Commission argues that its exclusive jurisdiction over "swaps" is so broad as to preempt the States' traditional authority over sports betting. *See* CFTC Br.22–24. By that account, Congress quietly removed the States' traditional authority fifteen years ago—when it responded to the 2008 financial crisis—by adding the word "swaps" to a pre-existing statutory scheme aimed at financial instruments and markets. That makes no sense. Fifteen years ago, sports betting was mostly illegal. *See Murphy*, 584 U.S. at 458. Congress had tried to keep it that way. *Id.* at 461. And nobody thought that sports betting caused the mortgage crisis. Thus, applying even an ounce of common sense, the preemption tale is fanciful.

13

Legally speaking, the CFTC's interpretation of federal statutes fares no better. When Congress intends major changes to the existing state of the law, it speaks clearly, not obscurely. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That matters here because the CFTC's expansive preemption theory would be a seismic change to this country's gambling laws. Consequently, the CFTC's position does not work unless Congress made a clear statement of such broad preemptive intent.

No such statement exists. As Nevada aptly explains, the text of the Commodity Exchange Act does not signal an intent to displace the States' traditional authority over sports betting. And it certainly does not do so clearly. Among other things, betting on the score of a game, or the performance of an athlete, does not fit within the statutory definition of "swaps." *See* 7 U.S.C. §§1a(47)(A), 2(a)(1)(A); Nevada Br.20–32. That financial-instrument descriptor simply "cannot bear" the weight that prediction markets place on it. *See Learning Res., Inc.*, 2026 WL 477534, at *6 (majority op.). In arguing otherwise, the CFTC resorts to a stilted, contextless reading of the statutory text.

To add to the discussion, the *amici* States emphasize four points. *First*, the CFTC's interpretation of federal statutes should receive no

14

deference or special weight. *Second*, the CFTC's new claim of expansive federal power solidifies that the major-questions doctrine applies to this case. *Third*, the CFTC's reading of statutory law violates the federalism canon, under which courts expect Congress to speak clearly when it intends to significantly shift this country's traditional balance of power. *Fourth*, considering practical expertise, it is especially unlikely that Congress would have replaced the States (which have considerable experience regulating gambling) with the CFTC (which has no experience).

## I. The CFTC's reading of federal statutes deserves no special weight.

**A.** Under the Supremacy Clause, Congress may preempt state law when it acts within the boundaries of its enumerated powers. *See* U.S. Const. art. VI, cl. 2. But preemption is not a "freewheeling judicial inquiry" by which courts guess at unstated "federal objectives." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (quotations omitted). Instead, "all preemption arguments," no matter the form they take, "must be grounded" in the text of federal law—usually the text of a "statute." *Kansas*, 589 U.S. at 208 (quotation omitted). As a result, preemption analysis almost always turns on statutory interpretation. *Va. Uranium, Inc.*, 587 U.S. at 767 (Gorsuch, J., op.). And courts apply standard

15

rules of statutory interpretation when deciding federal law's "preemptive effect." *Id.*

The Supreme Court recently clarified one relevant rule of statutory interpretation. Specifically, in *Loper Bright*, the Court overruled the doctrine of *Chevron* deference, under which the judiciary sometimes deferred to federal agencies' interpretation of federal statutes. 603 U.S. at 377–80, 412–13. It is the role of judges, *Loper Bright* explained, "to determine the best reading of" federal statutes. *Id.* at 400. This remains true in cases presenting "technical statutory questions." *Id.* at 402. Federal agencies, the decision went on, have "no special competence" when it comes to interpreting "the scope of" their "own power." *Id.* at 400–01. If anything, "abdication in favor of [an] agency is *least* appropriate" in such scenarios. *Id.* at 401. The Supreme Court thus held that judges "must exercise their independent judgment in deciding whether" a matter fits within an agency's "statutory authority." *Id.* at 412.

For preemption purposes, *Loper Bright* built on top of an existing foundation. Even during the *Chevron* era, the Supreme Court stressed that "agencies have no special authority to pronounce on pre-emption absent delegation by Congress." *Wyeth*, 555 U.S. at 577. Courts, therefore, were

16

not permitted to "defer[] to an agency's *conclusion* that state law is pre-empted." *Id.* at 576. Separate caselaw also taught that Courts should be "reluctant to find" preemption in areas "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *accord Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).

Of course, even after *Loper Bright*, there may be times when an agency's opinion about statutory meaning carries "particular 'power to persuade.'" 603 U.S. at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). But such power depends on the circumstances. The persuasiveness of an agency's opinion involves various factors including "the thoroughness evident in its consideration, the validity of its reason-ing, [and] its consistency with earlier and later pronouncements." *Id.* at 388 (quotation omitted). Agency interpretations "issued contemporane-ously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.* at 394. By contrast, agency positions "developed during the course" of litigation are naturally more questionable. *See Alaska v. Fed. Subsist-ence Bd.*, 544 F.3d 1089, 1095 (9th Cir. 2008). Along similar lines, when an agency opines on preemption "without offering States or other

17

interested parties notice or opportunity for comment," the agency's opin-ion is "inherently suspect." *Wyeth*, 555 U.S. at 577.

**B.** Applying this framework, the CFTC's new position deserves no special weight. The preemption analysis in this case turns on interpret-ing federal statutes, including the statutory provision giving the CFTC "exclusive jurisdiction" over certain listed derivatives. *See* 7 U.S.C. §2(a)(1)(A). The CFTC has "no special competence" to perform this stat-utory analysis about the "scope of" its "own power." *See Loper Bright*, 603 U.S. at 400–01. Rather, because the CFTC reads federal statutes in a manner that aggrandizes its own power, this is an "occasion on which abdication in favor of the agency is *least* appropriate." *See id.* at 401.

Delving further, the CFTC's opinion bears many features that cut against its power to persuade. For one, the CFTC's thoughts on preemp-tion were formed "without offering States or other interested parties no-tice or opportunity for comment." *Wyeth*, 555 U.S. at 577. For another, the CFTC's present view of "swaps" is *inconsistent* with the CFTC's ear-lier views, which the Commission offered much closer in time to the rel-evant statutory amendments. *See above* 6–8. Indeed, just two years after gaining jurisdiction over "swaps," the CFTC refused to read the term so

18

broadly as to capture ordinary consumer transactions—concerning "personal" activities—that did not "involve risk-shifting arrangements" and "historically have not been considered to involve swaps." 77 Fed. Reg. at 48247–48. The CFTC also formed its present position for the purposes of litigation. *See* Selig, *States Encroach on Prediction Markets*, Wall Street Journal (indicating that the CFTC's brief responds to "legal attacks on the CFTC's authority"). Finally, as discussed more below (at 28–29), the CFTC has no special expertise as to sports betting.

Combining all this, the conclusion is easy. The CFTC's opinion on preemption is "inherently suspect" and should be treated with the same caution as any argument from a self-interested party. *See Wyeth*, 555 U.S. at 577. Perhaps recognizing as much, the CFTC does not even try to argue that its position deserves special respect.

## II. Under the major-questions doctrine, the Court should reject the CFTC's new claim of expansive authority.

**A.** Even setting aside power-to-persuade considerations, the CFTC's position violates the major-questions doctrine. The doctrine teaches that courts—when reading statutes empowering federal agencies—should employ "common sense as to the manner in which Congress would have been likely to delegate" power. *West Virginia,* 597 U.S. at 722–23

19

(alteration accepted, quotation omitted); *see also Learning Res., Inc.*, 2026 WL 477534, at *7 (Roberts, C.J., op.) (discussing the need for context, common sense, and skepticism when the federal government claims "broad, expansive power on an uncertain statutory basis"). "Extraordinary grants of regulatory authority," the Supreme Court has said, "are rarely accomplished through modest words, vague terms, or subtle devices." *West Virginia*, 597 U.S. at 723 (alteration accepted, quotation omitted).

The major-questions doctrine thus requires a clear statement whenever a federal agency claims broad and novel authority over matters of great economic and political significance. *See id.* at 721, 724. Courts should therefore tread cautiously when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in its regulatory authority.'" *Id.* at 724 (alterations accepted, quoting *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). Said differently, a "lack of historical precedent," "coupled with" a broad claim of federal authority, makes for "a telling indication" of federal overreach. *Learning Res., Inc.*, 2026 WL 477534, at *9 (Roberts, C.J., op.) (quoting *NFIB v. OSHA*, 595 U.S. at 119).

20

As the States' earlier briefing explained, this case implicates the major-questions doctrine. State-Amicus Br.21–25. Sports betting is a politically and historically significant topic. The practice has been illegal for much of this country's history, and it remains illegal in many States. Am. Gaming Ass'n, *State of the States 2025*, at 12–13. Sports betting is also economically significant. The pastime has rapidly ballooned into a multi-billion-dollar industry, involving millions of Americans. State-Amicus Br.22–23; *see also King*, 576 U.S. at 486. As just one illustration of this, Kalshi recently reported over a billion dollars in trading on Super Bowl Sunday alone. Laya Neelaatkandan, *Kalshi says Super Bowl trading volume surpassed $1 billion*, CNBC (Feb. 10, 2026), https://perma.cc/PS9A-2K76. Sports gambling is thus clearly a matter of "economic and political significance." *See Learning Res., Inc.*, 2026 WL 477534, at *9 (Roberts, C.J., op.) (quoting *West Virginia*, 597 U.S., at 721).

The CFTC's new position further cements the major-questions doctrine's application. The CFTC has had jurisdiction over swaps for more than fifteen years. And it has had jurisdiction over other derivatives for half a century. But before the last few weeks, the CFTC had never

21

claimed that its jurisdiction was broad enough to override the States' authority over sports betting. In fact, just two years ago, the CFTC recognized that "gambling is overseen by state regulators" and that there is no "statutory mandate" to the contrary. 89 Fed. Reg. at 48982–83. Departing from its past restraint, the Commission now claims to have discovered, within fifteen-year-old statutory text, "an unheralded power" that would drastically expand its authority. *See West Virginia*, 597 U.S. at 724 (quotation omitted). That claim warrants skepticism.

In practical effect, the breadth of the CFTC's position is immense. If Crypto's and Kalshi's sports bets qualify as swaps within the CFTC's exclusive jurisdiction, then traditional sports bets cannot be treated in any other fashion. Under the federal definition, a swap is any type of "agreement, contract, or transaction" that satisfies certain conditions. 7 U.S.C. §1a(47)(A). If an agreement satisfies those conditions, the federal scheme makes it generally "*unlawful* for any person" to enter into such an agreement except via a CFTC-regulated contract market. 7 U.S.C. §2(e) (emphasis added). Thus, when unpacked, the CFTC's real argument is that all sports betting *must* occur on CFTC-regulated markets. The CFTC seems to realize these implications. *See* CFTC Br.4, 13, 23. Its brief

22

declares that "Congress did not carve out a role for" the States in this area. *Id.* at 13. Thus, in the CFTC's view, the States possess no "concurrent jurisdiction." *Id.* These words leave no mystery: the CFTC seeks to be crowned this country's "sole lawful regulator" of sports betting. *See* CFTC Br.23 n.14 (quotation omitted). Candidly, "Congress would not have delegated" such "'highly consequential power' through ambiguous language." *See Learning Res., Inc.*, 2026 WL 477534, at *7 (Roberts, C.J., op.) (quoting *West Virginia*, 597 U.S. at 723–24).

Because this case implicates the major-questions doctrine, the CFTC's position works *only if* federal statutes contain a clear statement bestowing such grand authority. *See West Virginia*, 597 U.S. at 724. The CFTC identifies no such clear statement. Instead, like the litigants it supports, the CFTC relies upon a roundabout preemption theory under which Congress—fifteen years ago, when sports betting was mostly illegal—supposedly made a subtle-but-drastic change to gambling laws by inserting the word "swaps" into a pre-existing regulatory scheme aimed at financial regulation. If that sounds wrong, it is because it is.

**B.** The CFTC's contrary arguments fall flat. The CFTC no doubt appreciates that sports betting is a politically and economically significant

23

topic. *See* CFTC Br.28–29. Even so, the CFTC suggests that any backdrop "presumption" against its position fades away because the federal provision giving it exclusive jurisdiction signals some preemptive intent. *See id.* at 27 (citing 7 U.S.C. §2(a)(1)(A)). That argument dodges the key question. The key question here is not whether federal statutes about derivatives *sometimes* have preemptive effect in *some* situations. The key question is instead whether those statutes clearly displace the States' traditional authority over sports betting. And the answer to *that* question is a resounding "no."

To sharpen the point, return to the major-questions doctrine. The doctrine, by its very nature, involves scenarios where Congress has chosen to give an agency *some* power. The doctrine, therefore, does not focus on the mere existence of agency power. The doctrine instead focuses, more specifically, on whether Congress has clearly authorized the *breadth* of power an agency is claiming. It follows here that the CFTC cannot simply rely on the fact that its exclusive jurisdiction results in some preemption. The CFTC must instead identify a clear statement supporting the broad "power *it claims*." *See West Virginia*, 597 U.S. at 723 (emphasis added). On that front, the CFTC has nothing persuasive to offer.

24

## III.  The federalism canon forecloses the expansive authority the CFTC now asserts.

**A.**  The CFTC's position also runs afoul of the federalism canon.  As the States' earlier briefing explained, State-Amicus Br.17–21, the canon requires courts "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers."  *Bond*, 572 U.S. at 858 (quotation omitted).  Courts should thus be especially "reluctant to find" preemption in an area "traditionally governed by state law."  *CSX Transp., Inc.*, 507 U.S. at 664.

Gambling is exactly such a field.  The States have long exercised their police powers to regulate gambling.  Or, in this Court's words, "the regulation of gambling lies at the heart of the state's police power."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (quotation omitted).  Federal law has thus historically "defer[red] to, and even promote[d], differing gambling policies in different States."  *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).  The States may, as a result, act to promote the "welfare, safety, and morals" of their citizens in this field.  *Artichoke Joe's*, 353 F.3d at 737 (quotation omitted).

25

Applying the federalism canon, the CFTC's position should fail unless Congress made a "clear statement" signaling that it intended "a significant change in the sensitive relation between" the federal and state governments as to gambling. *See Bond*, 572 U.S. at 858–59 (quotation omitted); *accord Ah Sin*, 198 U.S. at 505–06. As explained above (at 14, 23), the CFTC identifies no clear statement—it offers only an attenuated theory, under which Congress hid broad preemptive intent in obscure subsections of complex statutory text.

Tellingly, the CFTC's position looks much like proposed readings that have failed in the past. For instance, in 2000, the Supreme Court rejected the FDA's attempt to claim authority over tobacco based on the word "drug" within the Food, Drug, and Cosmetic Act. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). This Court should similarly reject the CFTC's invitation to read the word "swaps" in an improbably broad way that would usurp the States' traditional authority.

The CFTC's position becomes even more improbable given the Supreme Court's decision in *Murphy*. The Supreme Court decided *Murphy* years after the CFTC had already received jurisdiction over swaps. And the Court proclaimed in *Murphy* that the States are "free to act" as they

26

wish on the "controversial subject" of "sports gambling." 584 U.S. at 486. That would make no sense if, as the CFTC posits, sports bets have really been swaps under its exclusive authority all along.

**B.** The CFTC cannot dodge the federalism canon by staying at a high level of abstraction. It says that its position works (and no presumption against preemption applies) because Congress gave it exclusive jurisdiction provision "to provide national uniformity for derivatives trading" on "derivatives markets." CFTC Br.27. This argument "misunderstands" the specific focus of the federalism canon. *See Wyeth*, 555 U.S. at 565 n.3. Because courts do not expect Congress to "cavalierly" remove traditional state authority, the canon focuses on "the historic presence of state law," not "the absence of federal regulation." *See id.* (quotation omitted). That Congress granted the CFTC exclusive jurisdiction over *derivatives markets* is nowhere close to the "clear and manifest" statement required to supersede "the historic police powers of the States" to regulate *gambling*, including sports gambling. *See id.* at 565. The Court should thus reject the CFTC's new claim of unbridled authority.

27

## IV. The CFTC lacks the States' experience in regulating gambling.

**A.** As a corollary to the above clear-statement rules, Congress is "especially unlikely" to delegate broad power to a federal agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. That makes preemption especially unlikely here, given the stark difference in experience between the States and the CFTC.

Begin with the States. As the CFTC itself has previously conceded, the States have "particular expertise" addressing the "risks and concerns associated with gambling," including sports betting. 89 Fed. Reg. at 48982–83. The States confront these risks in many ways. To name a few, they (1) impose front-end screening to ensure that those facilitating gambling are suitable for the task, (2) set age limits to protect those most vulnerable to gambling addiction, (3) limit who may place bets to protect the integrity of sporting events, and (4) facilitate voluntary exclusion lists to assist problem gamblers. *See* State-Amicus Br.25–27, 32–33 (discussing the approaches of New Jersey and Ohio).

The CFTC has no history of offering similar protections. By its own admission, the CFTC lacks "specialized experience appropriate to oversee" gambling. 89 Fed. Reg. at 48983. Its regulations "are focused on

28

regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling." *Id.* Consistent with the CFTC's inexperience as to gambling, Congress allowed the CFTC to prohibit contracts involving "gaming" from being listed on CFTC-regulated markets. 7 U.S.C. §7a-2(c)(5)(C). To that end, the CFTC promulgated a regulation making clear "[a] registered entity shall not list for trading" a "swap based upon an excluded commodity" that "involves, relates to, or references," among other things, "gaming." 17 C.F.R. §40.11(a)(1). Both the statutory provision and corresponding regulation are curiously absent from the CFTC's brief.

Another feature of the federal scheme exacerbates the problem. Federal law allows prediction markets to self-certify the contracts they list, with no pre-approval from the CFTC. *See* 7 U.S.C. §7a-2(c)(1). That hands-off approach, combined with an inexperienced regulator, is a sure formula for irresponsible sports betting. It is improbable, to say the least, that Congress would have left such a gap.

**B.** The CFTC does not seriously engage with the topic of regulatory experience. Nor does it discuss, in any real detail, what it is doing (or

29

plans to do) to confront gambling problems stemming from sports betting on prediction markets. Rather than confronting these issues, the CFTC hides behind the notion that this is all some brand new "financial innovation." *See* CFTC Br.17. That asks the Court to ignore reality. Risking money on the "final score of a sporting event," CFTC Br.15, is sports betting, no matter how it is dressed up. *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon. The States have experience regulating such activity; the CFTC has none.

One final argument warrants a response. The CFTC's briefing promises a parade of horribles if the States retain their traditional power. *See* CFTC Br.28–29. But the CFTC's vague consequentialism shows surprisingly little regard for this country's first principles. The CFTC decries the fact that prediction markets offering sports betting are being subject to "a patchwork of state laws and regulations." CFTC Br.7. That is a strange complaint since, in our federalist system, the possibility that States will make different choices is a feature, not a bug.

Under this country's constitutional structure, the States are *supposed* to act "as laboratories" of democracy, "devising solutions" to new and difficult problems. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,

30

576 U.S. 787, 817 (2015) (quotation omitted). And companies must commonly account for both state and federal law, including in scenarios involving antitrust laws, securities laws, drug-labeling laws, and consumer-protection laws. *See, e.g.*, *Wyeth*, 555 U.S. at 581 (drug labeling); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596 (1976) (antitrust); *Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir. 2024) (food labeling); *Green v. Fund Asset Mgt., L.P.*, 245 F.3d 214, 227 (3d Cir. 2001) (securities); *Spectrum Ne., LLC v. Frey*, 22 F.4th 287, 301 (1st Cir. 2022) (consumer protection). A key takeaway of the federalism canon—especially coupled with the major-questions doctrine—is that *the States* are expected to be the primary regulators of health and safety. So the constitutional default is that companies like Crypto and Kalshi will have to navigate both state and federal law.

Allowing the States freedom to make their own choices is a particularly good thing here since "Americans have never been of one mind about gambling." *Murphy*, 584 U.S. at 458. The States are therefore "free to act" in this area until Congress clearly removes their historic authority. *Id.* at 486. Congress has not done so, and the CFTC has no special license to declare otherwise.

31

## CONCLUSION

The Court should affirm.

JENNIFER DAVENPORT
New Jersey Attorney General

JEREMY M. FEIGENBAUM
New Jersey Solicitor General
STEPHEN EHRLICH
Deputy Solicitor General
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0112
Stephen.Ehrlich@njoag.gov

*Counsel for Amicus Curiae
  State of New Jersey*

DAVE YOST
Ohio Attorney General

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
  *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae
  State of Ohio*

32

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

STEPHEN J. COX
Alaska Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia
Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANTHONY G. BROWN
Maryland Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

RAÚL TORREZ
New Mexico Attorney General

33

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

DAN RAYFIELD
Oregon Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

PETER F. NERONHA
Rhode Island Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

DEREK E. BROWN
Utah Attorney General

JAY JONES
Virginia Attorney General

NICHOLAS W. BROWN
Washington Attorney General

JOSH KAUL
Wisconsin Attorney General

KEITH G. KAUTZ
Wyoming Attorney General

34

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** <u>25-7187</u>

I am the attorney or self-represented party.

**This brief contains  <u>6,140</u>   words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** /s/ Mathura J. Sridharan_____ **Date** March 10, 2026

36

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2026, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mathura J. Sridharan*

Mathura J. Sridharan
Ohio Solicitor General

37